**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

PATTI H. MENDERS, et al.,                )
                                          )
        Plaintiffs,                       )
                                          )
v.                                        )        Case No. 1:21-cv-669-AJT-TCB
                                          )
LOUDOUN COUNTY SCHOOL BOARD,              )
                                          )
        Defendant.                        )

**DEFENDANT'S MEMORANDUM IN OPPOSITION**
**TO THE MOTION OF PLAINTIFFS FOR PRELIMINARY INJUNCTION**

Defendant Loudoun County School Board ("School Board"), by counsel and pursuant to

Local Rule 7, submits this Memorandum in Opposition to the Motion of Plaintiffs for

Preliminary Injunction ("Motion for Preliminary Injunction").  Dkt. 9.

**INTRODUCTION**

In their three-count Complaint, Plaintiffs Menders, Mineo, and Jane Does #1, #2, #3

("Adult Plaintiffs") assert on their own behalf and on behalf of their minor children, R.M., A.M.,

Jane Does #4 and #5 and John Does #1 and #2 ("Minor Plaintiffs) a Fourteenth Amendment

equal protection claim (Count I); First Amendment viewpoint discrimination claim (Count II);

and a First Amendment overbreadth claim (Count III).  Counts I and II challenge the School

Board's Student Equity Ambassador ("SEA") program and Count III challenges the School

Board's use of a bias incident reporting form, which is used as part of the SEA program.

In their Motion of Plaintiffs for a Preliminary Injunction ("Motion for Preliminary

Injunction"), Plaintiffs asks this Court to preliminarily enjoin the SEA program and the use of

the bias incident reporting form before the start of the upcoming school year.  Dkt. 9.  See also

1

Brief of Plaintiffs in Support of Their Motion for a Preliminary Injunction ("Brief") Dkt. 9-1.[1] Plaintiffs' request for preliminary injunction should be denied three reasons.  First, the Adult Plaintiffs all lack standing and, therefore, are not entitled to any relief, injunctive or otherwise. Second, the Plaintiffs are not likely to succeed on the merits of any of their claims and, in any event, both the SEA program and the bias reporting are fully consistent with the First and Fourteenth Amendments.  Third, even if Plaintiffs could clear the first two hurdles, which they cannot do, the Plaintiffs have not demonstrated that they will suffer irreparable harm nor can they show that the balance of equities and public interest weigh in their favor.  Indeed, these factors weigh heavily in the School Board's favor.

For these reasons, Plaintiffs' Motion for Preliminary Injunction should be denied.

## FACTUAL BACKGROUND

In an effort to identify and address deep-seated racial inequities based in part on its past practices, including being one of the last school divisions in the nation to desegregate its schools, the School Board commissioned a Systemic Equity Assessment for the school division in 2019. Appendix Supporting Plaintiffs' Motions for Preliminary Injunction and to Proceed

---

[1] Plaintiffs have also filed their Motion of Plaintiffs for the Court to Judicially Notice Certain Facts in Support of Their Motion for a Preliminary Injunction in which they ask the Court to take judicial notice of a video posted to the Virginia Department of Education's ("VDOE") website. Dkt. 10.  The School Board does not oppose the request that the Court take judicial notice of this VDOE video.  However, in their Brief Plaintiffs cite additional sources, including the website of Parents Against Critical Race Theory (P.A.C.T.), a group apparently run by Plaintiff Mineo, Dkt. 9-1 at 6, 7, 24, an article from DHE Press, the Dominion High School student newspaper, Dkt. 9-1 at 8, 14, an article from The Daily Wire, Dkt. 9-1 at 9, and a page from the website of the Association of Wisconsin School Administrators, Dkt. 9-1 at 17.  The Court should not consider any of these sources because Plaintiffs did not request that the Court take judicial notice of them. See Dkt. 10 (seeking judicial notice only as to the VDOE video).  And even if the Plaintiffs had included these sources in their Motion, the Court should not take judicial notice of these sources for the same reasons stated in the Defendant's Memorandum in Opposition to Corrected Motion of Plaintiffs for Court to Judicially Notice Certain Facts in Support of Their Motion to Proceed Anonymously, Dkt. 16, filed simultaneously herewith and incorporated by reference herein.

Anonymously ("App.") Dkt. 9-2 at 23, 72.  The purposes of the assessment included identifying

areas for improvement regarding equitable practices in the school division related to diversity,

equity, inclusion, and race.  App. at 72.  Guided by the recommendations from the Systemic

Equity Assessment, the School Board developed "Action Plans to Combat Systemic Racism"

beginning around June 2020.  Declaration of Lottie Spurlock ("Spurlock"), attached as Exhibit

A, at ¶ 3.  The Action Plans included sixteen action items, only one of which is at issue in this

case.  See App. at 4–25.  The fifteenth action item provides that "LCPS will collect qualitative

data regarding racial incidents to amplify student voices."  App. at 21.  The SEA program and

the bias reporting forms were developed to implement this action item.  Id.; Spurlock at ¶ 4.

*Student Equity Ambassadors*

SEAs are selected to amplify the voices of students of color throughout the school

division through participating in "Share, Speak Up, and Speak Out" meetings, which take place

four to five times per school year.  Spurlock at ¶ 5 and Exhibit 1.  SEA positions are open to all

middle and high school students in the school division, regardless of their race.  Spurlock at ¶ 5.

Potential SEAs are nominated by school staff, administrators, fellow students, or themselves,

and, from the pool of nominated students, each middle and high school principal selects two or

three students to serve as SEAs.  Spurlock at ¶ 6 and Exhibit 1.  Students serve as SEAs for the

duration of the school year, and new ones are selected each year.  Spurlock at ¶ 6.

If more than two or three students at one school show interest, the selection process is

competitive to fill the limited number of spots.  Spurlock at ¶ 6.  The selection criteria

implemented for the SEA program includes several attributes that suggest which students will

best serve their peers as SEAs.  Spurlock at Exhibit 1.  The selection criteria implemented for the

program does not consider the race of the students, and the program does not have any sort of

racial quotas regarding the makeup of the SEAs.  Spurlock at ¶ 7.  One of the attributes listed is

that students have "a passion for social justice and are willing to serve."  Spurlock at Exhibit 1.

This attribute is intended to identify students who will take the program seriously and work to

make it successful and is not intended to limit the SEA position to students of a particular race or

ideology.  Spurlock at ¶ 8.

On October 23, 2020, early unapproved draft criteria and FAQs regarding the SEA

program and selection criteria were prematurely posted to Board Docs[2] before they had received

the appropriate approvals.  Spurlock at ¶ 10.  A copy of this unapproved draft is attached to the

Declaration of Scott Mineo at App. 125–28.  This draft was not intended to be the version put

forward to the School Board for approval and contained language that that SEA program was

intended for students of color.  Spurlock at ¶ 10.  The approved draft was uploaded to Board

Docs four days later to replace the initial draft.  Spurlock at ¶ 11.  A copy of the final approved

criteria are attached as Exhibit 1 to the Declaration of Lottie Spurlock.  The replacement of the

early unapproved draft with the updated requirements was not prompted by any public

comments.  Spurlock at ¶ 11.  Upon learning that inaccurate information had been given to

principals regarding who was allowed to participate in the SEA program, the Director of Equity,

Lottie Spurlock, contacted the principals and informed them that they should not move forward

with selecting any SEAs until the issue was clarified through the final approved criteria.

Spurlock at ¶ 12.

---

[2] Board Docs is a web-based application utilized by the school division to post draft materials for review prior to School Board consideration.

*Bias Reporting Form*

The bias reporting form at issue in this case is an online electronic form developed to allow students to anonymously share their experiences regarding issues of racism, injustice, and inequity.  Spurlock at ¶ 13.  The aim of the forms is to "amplify" the voices of minority students, who have, as the school division learned through the Systemic Equity Assessment, experienced racial insults and slurs or racially motivated violent behavior.  App. at 21; Spurlock at ¶ 4.  Once the forms are completed and submitted, the responses go directly to the Equity Office and are not generally shared with other departments within the school division.  Spurlock at ¶ 13.  The ultimate purpose of the information collected from the forms is to identify issues and generate discussion points for the "Share, Speak Up, Speak Out" meetings held with the SEAs.  Spurlock at ¶ 14.  The agendas for the meetings are predetermined by the Equity Office, which leads and moderates student discussion on issues related to increasing equity in the school division.  Spurlock at ¶ 14. These discussions allow school division staff to better understand the student experience and develop appropriate plans to ensure the safety and wellbeing of all students.  Spurlock at ¶ 14.

The Equity Office has no authority to investigate any matters reported through the bias reporting forms or to issue any discipline as a result of the submission of a bias form.  Spurlock at ¶ 14.  Any information included in the bias reporting form is only sent to school administrators if the student expressly requests and provides her or his name.  Spurlock at ¶ 15.  No disciplinary action is taken as a result of anything provided in the bias reporting form; a student's completing the form is not considered filing a formal complaint with school administration; and the forms do not otherwise replace or supersede any established incident reporting policies.  Spurlock at ¶ 16.

For the reasons demonstrated below, the SEA program and the bias reporting form do not violate any Constitutional principles and the Court should deny Plaintiffs Motion for Preliminary Injunction.

## ARGUMENT

A preliminary injunction is an "extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008); see also Pashby v. Delia, 709 F.3d 307, 319 (4th Cir. 2013) ("preliminary injunctions are "extraordinary remed[ies] involving the exercise of very far-reaching power") (internal citations omitted).  "A preliminary injunction . . . may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" Dewhurst v. Century Aluminum Co., 649 F.3d 287, 290 (4th Cir. 2011) (quoting Winter, 555 U.S. at 22 (2008)).

To obtain a preliminary injunction, Plaintiffs must demonstrate as a threshold matter that they have standing to assert their claims, which requires a showing the Plaintiffs have suffered an injury-in-fact.  See Cooksey v. Futrell, 721 F.3d 226, 234–35 (4th Cir. 2013).  In addition, they must satisfy each of the following four elements: "(1) they are likely to succeed on the merits of their claim, (2) they are likely to suffer irreparable harm without an injunction, (3) the balance of equities tilts in their favor, and (4) issuing an injunction is in the public interest."[3]  N. Carolina State Conf. of the NAACP v. Raymond, 981 F.3d 295, 303 (4th Cir. 2020).

"[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion[.]" Leary v. Daeschner, 228 F.3d 729, 739 (6th Cir. 2000); accord Direx Israel, Ltd. v. Breakthrough Med. Corp., 952

---

[3] As Plaintiffs acknowledge, the third and fourth elements merge with the government is a party to the claim.  Brief at 10.

F.2d 802, 819 (4th Cir. 1991) ("[m]ore than a summary judgment review [i]s required" for a preliminary injunction). For that reason, a court considering whether to grant such an "extraordinary remedy," Winter, 555 U.S. at 22, is "required to weigh evidence and articulate its findings of fact." Diamonds Direct USA, Inc. v. BFJ Holdings, Inc., 895 F. Supp. 2d 752, 755 n.2 (E.D. Va. 2012). "[F]ailure to show any one of the relevant factors mandates denial of the preliminary injunction." Parson v. Alcorn, 157 F. Supp. 3d 479, 491 (E.D. Va. 2016).

Plaintiffs' Motion for Preliminary Injunction fails for three sets of reasons.  First, the Adult Plaintiffs have not demonstrated that they have standing, and so this Court lacks jurisdiction to hear their claims.  Second, Plaintiffs have failed to demonstrate that they are likely to succeed on the merits of their claims.  And third, Plaintiffs have failed to satisfy any of the other elements necessary to merit issuance of a preliminary injunction.

## I.    The Adult Plaintiffs lack standing to bring their claims.

The Adult Plaintiffs are asserting claims on behalf of their minor children but are also asserting claims on their own behalf.  A plaintiff demonstrates injury-in-fact by showing "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical."  Cooksey, 721 F.3d at at 235 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).  As explained above, the SEA program is limited to students attending middle and high school in the school division; parents of students, regardless of their viewpoints, are not eligible to participate.  In addition, the bias reporting system is limited to use by students, and there are no disciplinary or investigative consequences stemming from the bias reporting system itself for students, let alone their parents.  Accordingly, the Adult Plaintiffs cannot assert any abridgment of any of their legally protected interests,

concrete or otherwise.  They therefore lack standing in this matter, and their claims must be

dismissed.[4]  See Lujan, 504 U.S. at 563.

## II.     Plaintiffs are not likely to succeed on the merits of their claims.

### A.     Plaintiffs' cannot show an equal protection violation by the SEA program (Count I).

In the absence of an explicit racial classification,[5] Plaintiffs must demonstrate that the

selection criteria for the SEA program were both (1) established with discriminatory intent and

(2) have an actual discriminatory impact.  See Raymond, 981 F.3d at 302; Monroe v. City of

Charlottesville, 579 F.3d 380, 388 (4th Cir. 2009).  As Plaintiffs cannot make either of these

showings, let alone both, they cannot demonstrate that they are likely to succeed on the merits of

their equal protection claim.  Moreover, even if the Court were to determine that the SEA

selection criteria were adopted in part due to racially discriminatory intent, Plaintiffs still cannot

demonstrate a likelihood of success because the School Board can demonstrate it would have

adopted the same selection criteria even without the racial consideration.

#### 1.     Plaintiffs have not shown that the SEA selection criteria were established with discriminatory intent and that they have a discriminatory impact.

Plaintiffs have failed to demonstrate that the SEA selection criteria were established with

any discriminatory intent.  To make such a showing, Plaintiffs must show that racial

discrimination was a "substantial or motivating factor" by considering factors the Supreme Court

---

[4] As explained in its Memorandum in Opposition to Plaintiffs' Motion to Proceed Anonymously (Dkt. 15), the School Board is unable to evaluate the standing of the minor Plaintiffs because it cannot determine the veracity of their allegations related to standing.  Indeed, the Complaint alleges that Jane Doe #4 and John Does #1 and #2 will attend a LCPS middle school but does not even indicate whether they are currently enrolled.  Complaint, ¶ 6.
[5] Plaintiffs appear to concede, as they must, that the criteria for the SEA program do not explicitly classify students based on race.  Brief at 11.

identified in Vill. of Arlington Heights v. Metro. Hous. Dev. Corp, 429 U.S. 252 (1977).  See Raymond, 981 F.3d at 303.  These factors include the "historical background" and "specific sequence of events" leading to the establishment of the criteria, as well as any applicable legislative history and "whether the law bears more heavily on one race than another."  Id.  The Court must also afford the School Board the presumption of good faith in evaluating whether the Arlington Heights factors show that the SEA selection criteria were motivated by racial discrimination in this case.  Id.

Plaintiffs rely on the draft criteria and FAQs that were prematurely posted to Board Docs as the basis for their claim that the criteria are a racial classification.  In so doing, Plaintiffs ask the Court to disregard the presumption of good faith and find that the actual SEA selection criteria are tainted with discriminatory intent simply because an early unapproved draft contained a racial classification.  The Supreme Court and Fourth Circuit have explicitly rejected this method of proof as "fundamentally flawed" because it flips the evidentiary burden on its head and forces the government to show a lack of discriminatory animus, rather than require the plaintiff to demonstrate the presence of such animus.  See Abbott v. Perez, -- U.S. --, 138 S. Ct. 2305, 2325–27 (2018); Raymond, 981 F.3d at 304–05.[6]  Accordingly, the School Board does not have the obligation to demonstrate that it somehow "purged the taint" of any previously unlawful plan[7] or had "a true change of heart" on the issue under the Arlington Heights analysis. Raymond, 981 F.3d at 304.  Plaintiffs' contention otherwise is in error.

---

[6] Indeed, Plaintiffs mischaracterize the Supreme Court's precedent on the matter, pointing only to dicta in Justice Sotomayor's concurrence in Ramos v. Louisiana, -- U.S. --, 140 S. Ct. 1390, 1410 (2020)—which is not an Equal Protection Case—in support of their argument regarding the School Board's burden to demonstrate that the revised selection criteria are no longer tainted. Brief at 15.

[7] To be sure, the School Board does not admit that the unapproved draft criteria for the SEAs were unlawful, and the legality of the unapproved draft criteria are not at issue in this case.

On the contrary, the historical background of and the specific sequence of events leading to the establishment the SEA selection criteria, as explained above, demonstrate that they were not established with discriminatory intent.  The establishment of the SEA program itself is just one of multiple action items identified by the School Board as part of their broader efforts to decrease racial discrimination and rectify historic inequity in the school division—a far cry from the invidious racial discrimination that is typically the concern when evaluating the original motivation for the government's action.  The version of the criteria and FAQs that contained explicit racial classifications was never intended to be the final version submitted to the School Board for approval.  The change was not the result of any public outcry—there was none, contrary to Plaintiffs' claims, see Spurlock at ¶ 11—and there were significant efforts made by the Diversity Office to clarify that the SEA program was open to all students, regardless of color, and that the principals should make their selections accordingly.

Plaintiffs have also failed to demonstrate any actual discriminatory impact resulting from the SEA criteria.  Indeed, Plaintiffs admit that they are not in possession of any facts to support their claim that "the racial backgrounds of student participants [are] substantially disproportionate."  Brief at 12, n.12.  Plaintiffs' claim of discriminatory impact is therefore wholly speculative and cannot support a finding that Plaintiffs are likely to succeed on the merits of their Equal Protection Claim.[8]  See Raymond, 981 F.3d at 302 (noting that plaintiffs "had to prove that the [challenged law] . . . has an actual discriminatory impact).

_____

[8] Moreover Plaintiffs' bald assertions that principals are well aware that they should not select white students for the SEA program or that those who are selected are not full participants are erroneous.  See Brief at 14.  For the 2020-2021 school year, 31 individuals who identified as white or who list two or more races, one of which is white, participated as SEAs.  As the school division's Director of Equity notes, "white students freely participate in the meetings and share their views at a rate equal to the non-white students, and their opinions are valued and respected."  Spurlock at ¶¶ 9, 15.

Because Plaintiffs have not demonstrated that the School Board acted with discriminatory intent or that there is any actual discriminatory impact, the SEA selection criteria are not a racial classification subject to strict scrutiny, and Plaintiffs have failed to show they are likely to succeed on the merits of their claim.  See Monroe, 579 F.3d at 388–389.

        **2.**      **The SEA selection criteria would have been adopted even if race were not considered.**

Even if the Court concludes that the SEA selection criteria were motivated in part by racial discrimination, Plaintiffs still do not prevail because the School Board can demonstrate that it would have adopted the same SEA selection criteria even without the alleged discriminatory motivation.[9]  See Raymond, 981 F.3d at 303 ("[I]f the Challengers meet their burden to show discriminatory intent . . . 'the burden shifts to the law's defenders to demonstrate that the law would have been enacted without' racial discrimination." (quoting Hunter v. Underwood, 471 U.S. 222, 228 (1985))).  Because the "attributes to consider" did not change between the early unapproved draft and the final approved criteria, it cannot be said that the "passion for social justice" criterion is intended only to discriminate on the basis of race or ensure successful candidates were only students of color—the early unapproved draft had that requirement explicitly but still suggested considering students with a passion for social justice. This shows that the recommended attribute of a passion for social justice is to help to identify students with the motivation, work ethic, and attitude conducive to success in the program and was not tied up in any racially discriminatory motive.

---

[9] The School Board denies that its original intent was to have all SEAs be students of color but hypothetically addresses the possibly here to complete its analysis of Plaintiffs claim and show why the request for a preliminary injunction should be denied in any case.

Because the School Board can show that it would have adopted the same SEA selection criteria without relying on any racially discriminatory motive, Plaintiffs therefore have not demonstrated a likelihood of success on the merits of Count I.

**B.     The SEA selection criteria do not discriminate unlawfully on the basis of viewpoint (Count II).**

Plaintiffs' Complaint and Brief are ambiguous whether they are challenging the selection criteria for the SEA program, perceived limitations on permissible speech at the "Share, Speak Up, Speak Out" meetings, or both.  Although this distinction is important because these claims are properly analyzed under different constitutional provisions, Plaintiffs have not demonstrated a claim for viewpoint discrimination for either aspect of the SEA program.  Plaintiffs have not demonstrated any viewpoint discrimination actually occurs under either aspect of the SEA program, and even if they could, it is permissible for school personnel to make viewpoint-based distinctions when responding to or regulating student speech under these circumstances.

*SEA Selection Criteria*

Plaintiffs' complaints regarding the SEA selection criteria do not constitute viewpoint discrimination.  No particular viewpoint is required for the program.  Rather, the point of the SEA program is to perform a certain action, i.e., "amplifying the voice of Students of Color," which makes student participation in the program about how the student spends her time and her willingness to help other students in a particular way.  Nothing in the selection criteria says that students with particular views are excluded from participation, or indeed that any particular viewpoint is required for the program.  The selection criteria merely invite a recommender to consider attributes the student possesses that would make her successful in the program when recommending her.  These include having "a passion for social justice," but also include, for example, being honest, sympathetic, sensitive, and having the respect of their peers.  Spurlock at

Exhibit 1.  In other words, Plaintiffs take issue with a direction that essentially says, "consider recommending a student who has a passion for social justice to be an SEA."  Plaintiffs' argument that mentioning "a passion for social justice" as an attribute to consider precludes individuals with particular viewpoints is therefore no different than saying that the selection criteria discriminate against those who do not believe in being honest, sympathetic, or sensitive.  There is simply no viewpoint discrimination implicated in the SEA selection criteria.

Even if the reference to "a passion for social justice" in the selection criteria did implicate particular viewpoints, which it does not, Plaintiffs still have not demonstrated any cognizable claim for viewpoint discrimination based on the selection criteria.  The selection criteria for the SEA program are a function of the limited number of spots available to students at each school and are part of the competitive process through which these limited number of spots are allocated among interested students.  The Fourth Circuit has held that the Free Speech Clause does not apply here, where a school is providing a public benefit that is allocated to a limited number of persons through a competitive process.  Buxton v. Kurtinitis, 862 F.3d 423, 429–30 (4th Cir. 2017).  In such circumstances, the government may, as it did here, take viewpoints expressed into consideration, and make determinations based on those viewpoints, when deciding who is awarded a spot.  Id. at 430.  Plaintiffs' qualms with the requirements of a competitive selection process are properly addressed, if valid, through an Equal Protection claim, which Plaintiffs have asserted in Count I, rather than through the Free Speech Clause.  See Id. at 431.

*Speech at the "Share, Speak Up, Speak Out" Meetings*

To the extent that Count II is based on speech during the "Share, Speak Up, Speak Out" meetings, Plaintiffs likewise fail to demonstrate that there is any viewpoint discrimination taking place during the meetings.  SEAs are free to express their views on the subjects being discussed,

and Plaintiffs point to no evidence to the contrary.  See Spurlock at ¶ 15.  But even if the SEA

selection criteria itself could be construed as limiting speech during the meetings, Plaintiffs still

cannot show any actionable viewpoint discrimination.

Plaintiffs agree that speech in connection with the SEA program is school-sponsored

student speech subject to the Supreme Court's decision in Hazelwood Sch. Dist. v. Kuhlmeier.

See Brief at 17.  Hazelwood provides that school personnel may regulate school-sponsored

student speech when the regulations are "reasonably related to legitimate pedagogical concerns."

Hazelwood, 484 U.S. 260, 273 (1988).  Plaintiffs argue that Hazelwood nevertheless does not

permit schools to engage in viewpoint discrimination.  Brief at 17–18.  However, Plaintiffs

acknowledge no binding precedent supports their position.  Rather, Plaintiffs incorrectly assert

that a majority of circuits have adopted their position, even though they have identified only

three (Second, Ninth, and Eleventh).  Brief at 18.

How Plaintiffs can contend they are likely to prevail on the merits of their viewpoint

discrimination claim when they cannot definitively identify the applicable law is unclear.

Indeed, at least equally compelling as the decisions on which Plaintiffs rely are the decisions of

the First and Tenth Circuits, specifically holding that Hazelwood does not require viewpoint

neutral regulation.  See Fleming v. Jefferson Cty. Sch. Dist., 298 F.3d 918 (10th Cir. 2002);

Ward v. Hickey, 996 F.2d 448 (1st Cir. 1993).  As the Tenth Circuit acknowledged in Fleming,

the Hazelwood Court based its permissive approach to speech regulation on the idea that schools

are responsible for "'awakening the child to cultural values' and promoting conduct consistent

with 'the shared values of a civilized social order." See Fleming, 298 F.3d at 928–29 (quoting

Hazelwood, 484 U.S. at 272).  The SEA program is part of the School Board's efforts to meet

14

these responsibilities.  Indeed, limiting speech that is "biased or prejudiced" is related to legitimate pedagogical concerns.  See Hazelwood at 271.

Because Plaintiffs cannot demonstrate that a likelihood of success on the merits of their viewpoint discrimination claim, their request for a preliminary injunction should be denied.

### C.   Plaintiffs fail to establish a First Amendment overbreadth claim based on the bias reporting forms (Count III).

The gravamen of Plaintiffs' complaint pertaining to the bias reporting forms is that the Minor Plaintiffs allegedly wish to speak out on controversial political issues but are afraid they will be subject to investigation, discipline, and/or shaming if such comments are submitted through a bias reporting form.  Plaintiffs frame this concern as a "First Amendment overbreadth claim."  Brief at 22.  Plaintiffs' claims under Count III fail because Plaintiffs have not demonstrated standing to bring the claims and have not demonstrated that the bias reporting forms are unconstitutionally overbroad.

### 1.   Plaintiffs lack standing to bring an overbreadth claim based on the bias reporting forms.

Plaintiffs must first demonstrate they have standing to make a First Amendment overbreadth claim.  See Abbott v. Pastides, 900 F.3d 160, 176 (4th Cir. 2018).  They must do so by showing either (1) "that they intend to engage in conduct at least arguably protected by the First Amendment but also proscribed by the policy they wish to challenge, and that there is a credible threat that the policy will be enforced against them when they do so," or (2) "they may refrain from exposing themselves to sanctions under the policy, instead making a sufficient showing of self-censorship—establishing, that is, a chilling effect on their free expression that is objectively reasonable."  Id. (internal quotation marks omitted).  "Either way, a credible threat of

enforcement is critical."  Id.  Because Plaintiffs cannot demonstrate any threat of enforcement, let alone a credible one, they lack standing to bring this claim.[10]  Id.

As explained above, the Equity Office has no authority to investigate any matters reported through the bias reporting form or to issue any discipline as a result of the submission of a bias reporting form.  No disciplinary action is taken as a result of anything provided in the bias reporting form.  During the 2020-2021 school year, there were a total of 10 bias reporting forms submitted on which the student selected the option to have the school administrator notified of the report, and none of those reports resulted in any formal investigation or disciplinary action.  Spurlock at ¶ 16.  There is simply no credible threat of enforcement for any incidents described in a bias response form.  Moreover, the SEAs do not receive copies of the forms submitted by students and are only informed generally about the contents of the issues raised in the forms.  Spurlock at ¶ 17.  The SEAs have no authority whatsoever to initiate any investigations or issue any discipline.  Id.  The SEAs do not learn the identity of any individual associated with the submitted forms, whether the submitter or an individual is identified in the report.  Id.  Accordingly, Plaintiffs' alleged fears of repercussions from the SEAs based on anything said in the bias response forms is likewise unreasonable.

For these reasons, the cases on which Plaintiffs rely to demonstrate that their concerns are actionable do not support their claims.  Plaintiffs point to decisions from the Fifth Circuit, Speech First, Inc. v. Fenves, 979 F.3d 319 (5th Cir. 2020), and the Sixth Circuit, Speech First, Inc. v. Schlissel, 939 F.3d 756 (6th Cir. 2019), that concluded university bias reporting systems

---

[10] In addition, Plaintiffs have not demonstrated that they intend to engage in any conduct arguably protected by the First Amendment as they have only vaguely noted that they "wish to speak out on . . . other controversial political issues" and not identified any particular conduct they plan to engage in.  See Brief at 22.  A particularized showing of an intended activity in the face of a credible threat of enforcement is required.  See Abbott, 900 F.3d at 171.

chilled student speech such that an organization representing the students had standing to bring First Amendment claims.  Brief at 24–27.  The courts in <u>Fenves</u> and <u>Schlissel</u> based their findings of an objective chill on the clear "plethora of potential sanctions" associated with the bias response systems, including actual and threatened disciplinary actions and referrals.  <u>See</u> <u>Fenves</u>, 979 F.3d at 337–38; <u>Schlissel</u>, 939 F.3d at 765.  In contrast, the issue here of the bias response forms and how they are handled raises no similar concerns.  No disciplinary action is taken or threatened as a result of the bias response forms, and neither the Equity Office or the SEAs have any disciplinary authority; nothing is passed along to administration without the express request of the reporting student, who can then no longer proceed anonymously—and there is no record of any formal investigations or disciplinary action having been taken following a student making such a request; and the stated purpose of the forms is nothing more than to provide discussion points for the SEAs at the "Share, Stand Up, Speak Out" meetings.[11]

Accordingly, Plaintiffs lack standing to assert Count III.

### 2. Plaintiffs have not shown that the bias reporting forms are unconstitutionally overbroad.

Not only do Plaintiffs' lack standing with respect to Count III, Plaintiffs also cannot demonstrate they are likely to succeed on the merits of that claim.  To succeed on a First Amendment overbreadth claim, Plaintiffs must show that "a law punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep.'"  <u>See</u> <u>Virginia v. Hicks</u>, 539 U.S. 113, 118–19 (2003) (quoting <u>Broadrick v. Oklahoma</u>, 413 U.S. 601, 615 (1973)).

---

[11] In this way, the case here is more similar to the bias response system at issue in <u>Speech First, Inc. v. Killeen</u>, 968 F.3d 628, 639–642 (7th Cir. 2020), where the court found that there was not a credible threat of enforcement such that the alleged chill was objectively reasonable.  Plaintiffs ignore the holding of this opinion and cite only to Judge Brennan's dissent.  Brief at 26.

Plaintiffs have not shown that use of the bias response forms punishes a "substantial" amount of protected speech.  Implicit in Plaintiffs' arguments is the assumption that their speech and views regarding "controversial political issues" are somehow outside the appropriate definition of a "bias incident."  Yet they provide no reason or justification for this position or explain how their views are protected speech but the sort of speech they believe appropriately included in the definition of a "bias incident" is not.  At bottom, therefore, Plaintiffs want the Court to enjoin the use of the bias reporting forms because they perceive their opinions are unpopular, not because they are outside the "plainly legitimate sweep" of the bias response forms.  This is not the basis for a constitutional claim.  Rather than address this issue, Plaintiffs' arguments continue to focus on the "chill" they claim to experience, which is unreasonable in the absence of a credible threat of enforcement and, in any case, is part of the standing analysis for this claim, not the merits.  As Plaintiffs have not demonstrated a likelihood of success on the merits of their claim, their request for a preliminary injunction regarding the bias response forms must be denied.

**III.   Plaintiffs cannot demonstrate they satisfy any of the other factors necessary to award an injunction.**

      **A.   Plaintiffs have not shown they will suffer irreparable harm.**

Although Plaintiffs tout the principle that a deprivation of constitutional rights for even a brief time is an irreparable injury, they nevertheless fail to demonstrate that they will suffer any such deprivation.

As an initial matter, Plaintiffs[12] do not identify any harm connected with their Equal

Protection claim in Count I or their viewpoint discrimination claim in Count II, instead pointing

only to a hypothetical dilemma related to their Free Speech claim in Count III in connection with

the bias reporting system.  Brief at 29.  Accordingly, Plaintiffs' request for an injunction as to the

SEA program must be denied on these grounds alone.

Moreover, the Fourth Circuit has noted that, in the First Amendment context, "a

plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the

merits of plaintiff's First Amendment claim."  WV Ass'n of Club Owners & Fraternal Servs.,

Inc. v. Musgrave, 553 F.3d 292, 298 (4th Cir. 2009).  Accordingly, a party fails to show that it

will suffer irreparable harm absent the issuance of a preliminary injunction when it cannot show

they are likely to succeed on the merits of their claims.  See Vollette v. Watson, No. 2:12CV231,

2012 WL 3026360, at *20 (E.D. Va. July 24, 2012).  Because Plaintiffs here cannot show they

are likely to succeed on the merits of their claims, as explained in § II above, Plaintiffs have not

shown they will suffer irreparable harm.  Their request for a preliminary injunction must

therefore be denied.

### B.     Plaintiffs have not shown that the balance of equities or the public interest weigh in their favor.

In support of their argument that the balance of equities and the public interest weigh in

their favor, Plaintiffs merely assert that the School Board suffers no harm from an injunction

covering programs "likely to be found unconstitutional" and point to the truism that "upholding

constitutional rights serves the public interest."  Brief at 29.  Plaintiffs identify no other equities

---

[12] Tellingly, Plaintiffs only reference "the parents' children" and the hypothetical harm they may face; there is no discussion of any irreparable harm any of the Adult Plaintiffs would face.  Brief at 29.

that weigh in their favor.  Yet, as explained above, Plaintiffs cannot rely on these propositions because they have not demonstrated that the SEA criteria or the bias reporting forms are likely to be found unconstitutional.

In addition, Plaintiffs do not consider any of the equities that weigh in favor of the School Board, which include redressing the effects of systemic racism present in the school division and ensuring that all students are treated equitably; providing an avenue for students to express concerns regarding sensitive issues anonymously in order to foster student engagement and dialog on solving those issues; and in being able to run its competitive program with the criteria it sees fit in order to ensure the program's success to the benefit of all students.  Each of these factors weigh in favor of the public interest as well, because "the Government's interest is the public interest."  See Toure v. Hott, 458 F. Supp. 3d 387, 408 (E.D. Va. 2020).  In sum, the balance of equities and the public interest weigh in favor of the School Board, and so Plaintiffs' request for preliminary injunction should be denied.

## CONCLUSION

For the reasons stated above, Plaintiffs have failed to demonstrate they have standing and/or are entitled to a preliminary injunction on any of their claims.  The School Board accordingly requests that the Court dismiss the Adult Plaintiffs from this case, deny Plaintiffs' request for preliminary injunction as to Counts I and II, dismiss Count III from this case (or in the alternative deny Plaintiffs' request for a preliminary injunction as to Count III), and award the School Board such further relief as the Court deems appropriate.

Respectfully submitted,

LOUDOUN COUNTY SCHOOL BOARD

By Counsel

/s/ Stacy L. Haney
Stacy L. Haney, Esq. (VSB 71054)
Andrew P. Selman, Esq. (VSB 91060)
HANEY PHINYOWATTANACHIP PLLC
11 S. 12th Street, Suite 300C
Richmond, VA 23219
Tel:     (804) 500-0301
Fax:     (804) 500-0309
shaney@haneyphinyo.com
aselman@haneyphinyo.com

Counsel for Loudoun County School Board

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of July, 2021, I have electronically filed the

foregoing using the CM/ECF system, which will automatically send email notification of such

filing to counsel of record as follows:

> Jeffrey D. Jennings
> Daniel R. Suhr
> Reilly Stephens
> Liberty Justice Center
> 208 South LaSalle Street, Suite 1690
> Chicago, IL 60603
> Tel: (312) 263-7668
> Fax: (312) 263-7702
> jjennings@libertyjusticecenter.org
> dsuhr@libertyjusticecenter.org
> rstephens@libertyjusticecenter.org

> /s/ Stacy L. Haney
> Stacy L. Haney, Esq. (VSB 71054)
> Andrew P. Selman, Esq. (VSB 91060)
> HANEY PHINYOWATTANACHIP PLLC
> 11 S. 12th Street, Suite 300C
> Richmond, VA 23219
> Tel:   (804) 500-0301
> Fax:   (804) 500-0309
> shaney@haneyphinyo.com
> aselman@haneyphinyo.com
>
> Counsel for Loudoun County School Board

22