IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

PATTI H. MENDERS, *et al.*,       )
                           )
            Plaintiffs,     )
                           )
        v.               )     Civil Action No. 1:21-cv-669 (AJT/TCB)
                           )
LOUDOUN COUNTY SCHOOL BOARD, )
                           )
         Defendant.    )
                           )

## <u>ORDER</u>

Plaintiffs Patti Hidalgo Menders, Scott Mineo, and Jane Does #1, #2, and #3, on behalf of themselves and their minor children R.M., A.M., Jane Does #4, #5, and #6, and John Does #1 and #2 (together, "Plaintiffs") have sued to enjoin the Loudoun County School Board ("Defendant" or "LCSB") from enforcing the Student Equity Ambassadors Program ("SEA Program") and the Bias Incident Reporting System ("the Reporting System"). In short summary, Plaintiffs contend that the SEA Program (a) discriminates on the basis of race against white students in violation of the Equal Protection Clause of the Fourteenth Amendment (Count I) and (b) discriminates on the basis of viewpoint in violation of the First and Fourteenth Amendments (Count II). They also contend that the Reporting System chills protected speech in violation of the First and Fourteenth Amendments (Count III). Before the Court is a Motion of Plaintiffs for a Preliminary Injunction [Doc. No. 9] (the "Motion" or "Motion for Preliminary Injunction"), in which Plaintiffs seek to preliminarily enjoin, pending final adjudication, the use of the SEA

Program and the Reporting System.  A hearing was held on the Motion on July 30, 2021, following which the Court took the Motions under advisement.[1]

At its core, this action involves determining where the broad discretion afforded local school officials to establish educational policy and programs ends and constitutional guardrails are breached.  For the reasons stated below, based on the current record, Plaintiffs have not established, as required, a likelihood of success on the merits of their claims, as well as the other requirements for the extraordinary relief requested.  The Motion for Preliminary Injunction is therefore DENIED.

## I.    BACKGROUND

The following facts are taken from the Complaint [Doc. No. 1] ("Compl.") and the materials submitted in connection with the Motion and appear undisputed unless otherwise noted.

In 2019, the Loudoun County Public Schools ("LCPS") commissioned the Systemic Equity Assessment to address inequities that remain in the school division.  Declaration of Lottie Spurlock, attached as Ex. A to Def.'s Opp. [Doc. No. 17-1] (hereinafter "Spurlock Decl.") ¶ 1. It recommended, *inter alia*, that LCPS "[e]stablish student affinity groups at all levels to support the social and cultural identities of students of color . . . that serves as a network of care for marginalized student populations and establishes a safe place for students to unpack feelings and emotions in times of social or cultural conflict."  Appendix Supporting Plaintiffs' Motions for Preliminary Injunction and to Proceed Anonymously (hereinafter "App.") at 101.

---

[1] Plaintiffs have also filed a Motion of Plaintiffs for the Court to Judicially Notice Certain Facts in Support of Their Motion for a Preliminary Injunction [Doc. No. 10] (the "Motion for Judicial Notice"), which the Court grants. The Court has considered those judicially noticed facts to the extent and for the purposes authorized under the Federal Rules of Evidence.

On June 23, 2020, LCPS published its "Action Plan to Combat Systemic Racism" ("the Action Plan"). The Action Plan consists of sixteen "action items," the fifteenth of which, the only one at issue in this case, is that "LCPS will collect qualitative data regarding racial incidents to amplify student voices." App. at 4–25. Towards that end, the "LCPS administration will support the concept of LCPS staff amplifying student voices regarding racial incidents they have experienced in school" and "create an electronic form for LCPS students to anonymously share their stories regarding issues of racism, injustice and inequity." App. at 2. In addition, "Student Equity Ambassadors" ("SEAs") will be selected and "[s]tories and experiences will be reviewed and shared by the Supervisor of Equity and the Student Equity Ambassadors during regularly occurring student Share, Speak-up Speak-out meetings." Spurlock Decl. ¶ 7, Ex. 1 at 2. As explained by the LCSB at the hearing, these Share, Speak-up, Speak-out meetings are intended to occur multiple times during the year and are open only to students who are SEAs.

SEAs are selected based on nominations by school staff, administrators, fellow students, or themselves and, from the pool of nominated students, each middle and high school principal selects two or three students to serve as a SEA for one school year term, with new ones selected each year. Spurlock Decl. ¶ 6. If more than three students show interest from any particular school, the selection process becomes a competitive one, without regard to race, based on "student attributes" that identify students who are (a) honest and able to speak the truth while listening; (b) have "a passion for social justice" and are willing to serve; (c) are sympathetic and sensitive; (d) have the respect and credibility of their peers; and (e) will be empowered by this opportunity and have the potential for leadership. Spurlock Decl. ¶ 7, Ex. 1. Selected students will be expected to "be responsible for amplifying the voice of Students of Color by engaging in

3

discussions about student stories/experiences regarding issues of racism, injustice and inequity" and "serve as equity ambassadors for their school."  *Id*., Ex. 1 at 2.

The online electronic form used to report bias incidents is titled the Bias Reporting Form. Spurlock Decl. ¶ 13, Ex. 3.  The Form states that "[s]tories of bias shared through this platform will be used in an anonymous manner for the Share, Speak Up, Speak Out sessions with Student Equity Ambassadors."  Spurlock Decl., Ex. 3.  A "bias incident," as stated in the Form, is "an act of discrimination, harassment, and intimidation directed against any person or group that appears to be intentional and motivated by prejudice or bias."  *Id.* The Form goes on to state that "[s]uch incidents are usually associated with negative feelings and beliefs about another's race, ethnicity, national origin, religion, gender, gender identity, sexual orientation, age, social class, political affiliation, or disability."  *Id.*  The Form further states that "[t]his process provides information to LCPS leadership (specifically the Equity Office) that will be used for the Share, Speak-up, Speak-out sessions, as well as inform next steps for professional learning and support for school staff."  *Id.*  Finally, the Form declares that "LCPS is committed to providing and ensuring a respectful, safe, supportive, culturally-responsive learning space for every LCPS student."  *Id.*

The Form requests the name of the school, the date of the incident and the location of the incident.  *Id.*  Under "Type of Bias Incident," the form requires that the reporting student check the box of all the listed categories of bias that apply.  Listed categories are "Harassment or Intimidation," "Racial Slur," "Offensive Language, Teasing or Taunting Language/Verbal Exchange," "Exclusion or victim of lack of inclusivity," "Gender Identity and Expression," "Ability Status," "Religious Practices," and "Sexual Orientation."  *Id.*  It then asks for a description of "what happened,"  explaining that "[s]haring details in the space will contribute to

topics used to address biases during the Share, Speak Up, Speak Out sessions with the Student Equity Ambassadors from every middle and high school." *Id*.

The Form ends with the section "Official Incident Reporting," which is the focus of Plaintiffs' constitutional challenge to the use of the Form. *Id.* That section states that "[t]he primary use of this Form is for the Office of Equity to capture stories and incidents of bias in an anonymous manner. Would you like this particular incident investigated by the administrators at your school?" *Id.* The following responses are listed: (a) "No, I do not want to report this to my school."; (b) "No, I have already reported this to my school."; and (c) "Yes, if yes, please provide your name below." *Id.*

A submitted Form goes directly to the Equity Office and the information on the Form is only used by the Equity Office to generate discussion points for the "Share, Speak-up, Speak-out" meetings held with the SEAs. Spurlock Decl. ¶¶ 13, 14; Compl. ¶ 40. LCPS will only investigate reported "bias incidents" if the person who submits the Form provides his or her name and indicates on the Form that he or she would like the school administrators to investigate the particular incident reported. Compl. ¶ 41. However, according to the Director of the Equity Office, the Reporting System is separate from the LCPS disciplinary system; the Form does not constitute the filing of a formal complaint with school administration; no disciplinary action is taken as a result of anything provided in the bias reporting form; and it does not replace or supersede established School Board policies or procedures relating to investigating or addressing racial incidents. Spurlock Decl. ¶ 16.

Plaintiffs are either parents of current LCPS students or parents of students who enroll their children elsewhere currently but intend to enroll them in LCPS next year and who are or will be subject to the Defendant's policies challenged in this case.

Plaintiffs contend that the set of initiatives instituted through the Action Plan is intended to implement an ideological orthodoxy across public schools in Loudoun County.  *Id.* ¶ 22.  In support of the Motion, each Plaintiff parent has submitted a declaration that states that (1) they and their children are opposed to Critical Race Theory ("CRT") and "believe that everyone is equal and that we should strive for a colorblind society;" (2) that each has "taught my child to treat everyone with respect and dignity regardless of their race, . . . that each individual is unique and special, and that we should consider others not based on their color of their skin but the content of their character."  *See, e.g.*, App. at 117-19 (Decl. of Patti Hidalgo Menders ¶ 7).  They and their children also "have the desire to speak freely about our views within the LCPS community on 'social justice,' CRT, race, gender, identity, and other controversial political issues."  And each parent "encourage[s] and teach[es] [his/her] child to share their views on the subject with his peers."  *Id.* ¶ 10.   Nevertheless, their "views on these subjects are often not shared by other residents or young people Loudoun County . . . [and] when others have shared views similar to ours on CRT, race, gender identity, and other controversial political issues, that speech has prompted vitriolic, threatening, and persecutorial responses from others in Loudoun County, including within the Health CPS community."  *Id.* ¶ 11.  As a result, they and their children "are concerned that if [their child] shares [his/her] views on CRT, race, gender identity and other controversial political issues freely, that [his/her] speech will be reported as a 'bias' through the Bias Incident Reporting System."  *Id.* ¶ 12.  They are also "concerned that LCPS will investigate, publicly disclose, and or even discipline [him/her] if [he/her] shares [his/her] views and that this will negatively impact [his/her] standing in the school community or ruin his college prospects."  *Id.*  Based on these concerns, they believe that the Reporting System violates the free speech rights of their children and that they are aware that at other schools, similarly

6

worded speech codes or definitions of "bias" have been used "to sanction those supporting President Trump, saying "Make America Great Again," or celebrating the Second Amendment." *See id.* ¶ 13.

Plaintiffs do not state explicitly whether their children intend to apply for selection as an SEA or have an interest in becoming an SEA.  However, each Plaintiff does believe that "my child would not meet the SEA criteria established by the LCPS and would not describe [his/her] views on 'social justice' as LCPS uses that term" and that it, like the Reporting System, interferes with their children's rights to free speech and equal protection.  App. 118-19 (Decl. of Patti Hidalgo Menders ¶¶ 6-13); App. 121-22 (Decl. of Scott Mineo ¶¶ 6-13); App. 137 (Decl. of Jane Doe #1 ¶¶ 6-13); App. 139-40 (Decl. of Jane Doe # 2 ¶¶ 6-13); App. 142-43 (Decl. of Jane Doe #3 ¶¶ 6-13); Compl. ¶¶ 12–17.

On June 2, 2021, Plaintiffs filed their Complaint, alleging (1) the SEA Program violates the Fourteenth Amendment's guarantee of equal protection because it discriminates against students on the basis of race (Count I); (2) the SEA Program violates the First Amendment's guarantee of freedom of speech because it discriminates on the basis of viewpoint by requiring that SEAs express a government-approved orthodox viewpoint in order to participate in the Program (Count II); and (3) the Reporting System violates the First and Fourteenth Amendments because the scope of "bias incidents" includes protected speech and therefore chills that speech (Count III).  They further allege that there is no compelling or important government interest that justifies any of these constitutional violations; and neither the SEA Program nor the Reporting System is narrowly tailored to serve any government interest.  Plaintiffs seek: (1) a declaration that the SEA Program impermissibly discriminates on the basis of race; (2) a declaration that the SEA Program impermissibly discriminates on the basis of viewpoint; (3) a declaration that the

Bias Reporting System impermissibly discriminates on the basis of speech content and

viewpoint; and (4) an injunction preventing LCSB from operating the SEA Program and the

Reporting System.[2]  On June 25, 2021, Plaintiffs filed the pending Motion for Preliminary

Injunction and related Motion to Judicially Notice Certain Facts, at issue before the Court.  [Doc.

Nos. 9, 10].  On July 30, 2021, the Court held a hearing on the Motion for Preliminary

Injunction, following which it took the Motion under advisement.

## II.    LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy intended to protect the status quo

and prevent irreparable harm during the pendency of a lawsuit."  *Di Biase v. SPX Corp.*, 872

F.3d 224, 230 (4th Cir. 2017).  A party seeking a preliminary injunction must make (1) a clear

showing that he is likely to succeed on the merits; (2) a clear showing that he is likely to suffer

irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his

favor, and (4) that an injunction is in the public interest.  *Winter v. Natural Res. Defense Council,*

*Inc.*, 555 U.S. 7, 20 (2008); *The Real Truth About Obama v. Federal Election Com'n*, 575 F.3d

342, 346-47 (4th Cir. 2009), *vacated and remanded*, 559 U.S. 355 (2010), *reissued in pertinent*

*part upon remand*, 607 F.3d 355.

## III.    ANALYSIS

### A.  Plaintiffs have failed to make the required showing that they are likely to succeed on their claim that the SEA Program Violates the Equal Protection Clause.[3]

---

[2] Plaintiffs also seek nominal damages, costs and attorney's fees under 42 U.S.C. § 1988, and such other relief to which Plaintiffs may be entitled.  [Doc. No. 1].  On June 25 and 28, 2021, Plaintiffs also filed a Motion to Proceed Anonymously and a related Motion of Plaintiffs for Court to Judicially Notice Certain Facts in Support of their Motion to Proceed Anonymously [Doc. Nos. 7, 8, 11], which were granted on July 28, 2021 [Doc. No. 22].

[3] As an initial matter, Defendant challenges Plaintiffs' standing to make their challenges on their own behalf as to Counts I and II, as their Complaint purports to do, since adult parents are not eligible to participate in the SEA Program and the Bias Reporting System is limited to use by students, and also their standing to raise even on behalf of their children the First Amendment challenges in Count III with respect to the Bias Reporting System.  Because Defendant does not contest that the Plaintiffs have standing to assert the claims in Counts I and II on behalf of their children, *see Rivers v. McLeod*, 252 F.3d 99, 102 (2d Cir. 2001) ("Although generally a party may not assert the rights of third parties, parents ordinarily have standing to assert the claims of their minor children") (citing *Altman*

Plaintiffs contend that the SEA Program, with its selection criteria and program objectives, violates the Equal Protection Clause.  In that regard, Plaintiffs claim that the SEA Program was adopted with an invidious discriminatory purpose, to discriminate against white students, and is therefore subject to strict scrutiny, which it cannot survive since the Program is not narrowly tailored to achieve a compelling government purpose.  In opposition, Defendant contends that (1) Plaintiffs have not shown that the SEA Program was adopted with a discriminatory motive or purpose; and (2) the SEA Program would have been adopted even if race were not considered.

Even where a law does not use a formal racial classification, "a facially neutral law, like the one at issue here, can be motivated by invidious racial discrimination." *N. Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016).  Where, as here, the SEA Program does not contain an explicit racial classification, Plaintiffs must demonstrate that the Program (1) was established with discriminatory intent; and (2) has an actual discriminatory impact.  *N. Carolina State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 302 (4th Cir. 2020) (citing *NC State Conference of NAACP v. McCory*, 831  F.3d 204, 231(2016)).

Determining whether a facially neutral law was enacted with discriminatory intent is a factual inquiry involving a two-step process in which the challenger bears the burden of showing that racial discrimination was  a "'substantial' or 'motivating factor' factor behind enactment of the law." *Hunter v Underwood*, 471 U.S.222, 228 (1985) (cited in *Raymond*, 981 F.3d at 303).  In that regard, "a court must undertake a 'sensitive inquiry into such circumstantial and direct

---

*v. Bedford Cent. Sch. Dist.,* 245 F.3d 49, 70 (2d Cir. 2001)), there is no need for the purposes of the Motion for Preliminary Injunction to rule on whether Plaintiffs have standing in their own right; and Plaintiffs' standing to assert on behalf of their children the claim in Count III is discussed within the context of the Court's analysis of that Count III, *infra*.

evidence of intent as may be available,'" considering factors such as "the historical background of the challenged decision; the specific sequence of events leading up to the challenged decision; departures from normal procedural sequence; the legislative history of the decision; and . . . the disproportionate impact of the official action—whether it bears more heavily on one race than another." *McCrory*, 831 F.3d at 220–21 (quoting *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266–67 (1977)) (alterations and internal quotation marks omitted). A discriminatory purpose need not be the "sole" or even a "primary" motive for the legislation; a challenger need only show that it was "a motivating factor." *Id.* (quoting *Arlington* Heights, 429 U.S. at 265–66). However, an inquiry into the legislative intent in *enacting* a law should not credit disparate impact that may result from poor enforcement of that law. *Raymond*, 981 F.3d at 310. If Plaintiffs meet their burden to show discriminatory intent, only then does the burden shift to Defendant to show that the law would have been enacted without racial discrimination and "scrutinize the legislature's *actual* nonracial motivations to determine whether they *alone* can justify the legislature's choices." *Raymond*, 981 F.3d at 303 (emphasis in original).

   The final approved version of the SEA Program made clear that SEA positions are open to all students, regardless of color; and the Program has in fact resulted in the selection of students other than those of color. Nevertheless, despite the facially race neutral selection criteria for SEAs, Plaintiffs contend that the SEA Program was motivated by and adopted with the purpose of discriminating against white students in the selection of SEAs, as evidenced by the historical events leading up to its adoption, including the 2019 Report prepared by The Equity Collaborative, the Action Plan generated as a result of the 2019 Report, the draft description of the SEA Program and FAQs, as well as the criteria and objectives that remain part

and parcel of the SEA Program, as adopted, and the Program's disparate impact on white students.

As the LCSB argues, the relevant history for the purposes of assessing the SEA Program's purpose begins not with the 2019 Report but with the decades of *de jure* discrimination that existed within the LCPS, which was one of the last counties in the country to desegregate; and as the Plaintiffs note, the LCSB commissioned the 2019 Report to "identify and address deep-seated racial inequities[,]" [Doc. No. 20] (Reply Br. of Pls. in Supp. of Their Mot. for a Prelim. Inj.) (hereinafter "Reply") at 4.  The 2019 Report clearly makes race conscious findings, observations and recommendations concerning past discrimination against students of color, its continuing effects, and what may be appropriate to address that historical legacy and its present effects.  However, those statements in the 2019 Report relied upon by Plaintiffs to show a discriminatory purpose in the subsequently adopted SEA Program, do not evidence, as Plaintiffs contend, that the SEA Program it recommended was adopted for the purpose of discriminating against white students.[4] *See* App. at 89 (2019 Report).  And while the original, short-lived,[5] unapproved draft of the SEA Program stated explicitly that the SEA position was "open to all Students of Color," as did the FAQs and other relied upon statements in that draft,[6] it

---

[4] Plaintiffs' relied upon statements from the 2019 Report include that the campus climate within LCPS afforded "limited opportunities for Black/African-American and Muslim students to convene in a network of social and cultural support," App. at 97; and the recommended creation of " student affinity groups at all levels to support the social and cultural identities of students of color" in order to "create a formal structure that serves as a network of care for marginalized student populations and establishes a safe place for students to unpack feelings and emotions in times of social and cultural conflict." App. at 101.

[5] The draft description of the SEA Program, with draft FAQs, was posted to the BoardDocs website on October 23, 2020 and was removed and replaced with the LCSB approved SEA Program criteria on October 28, 2020.  Spurlock Decl. ¶ 10.

[6] The relied upon draft FAQs state the following:
> [Question:] My child would like to participate as a Student Equity Ambassador and is not a student of color. Can they participate?
> [Answer:] Thank you for your interest but this opportunity is specifically for students of Color. However, students at each school have an option of creating an affinity group for students of Color who all share a similar racial identity and they may also include allies.
> [Question:] Are there other opportunities for students to get involved?

11

likewise was clearly directed to addressing the current effects of racial discrimination rather than discriminating against white students, although that may have been the effect had that draft been adopted.  In any event, under the SEA Program, as adopted, the SEAs are not limited to students of color.  Likewise, the relied upon statements in the Action Plan,[7] while evidencing a consciousness of race, do not sufficiently evidence a discriminatory purpose.  Similarly, with the relied upon statements from the SEA Program, as adopted.[8]  *See, e.g.,* App. at 29 ((Sample

---

[Answer:] Students may reach out to their school's activity coordinator or the equity lead if they would like to be involved in other equity opportunities.

App. at 127.  Plaintiffs also point to the statement in the draft FAQs that the Program was "focusing on race because it is important to recognize students who have been marginalized," App. at 127; and the following flyer that accompanied the draft FAQ section:



[7] Plaintiffs' relied upon statements include "the real smoking gun," Action Item 15, which says that "[s]tories and experiences will be reviewed by the Supervisor of Equity and LCPS student leaders of Color during the regularly occurring student Share, Speak Up and Speak Out meetings. App.22."  Reply at 6.  They also point to "Remaining Questions under Consideration" in Action Item 15 ("What will be the process for selecting Students of Color to serve in this way?" and "How can we create a Student Leaders of Color (i.e. student equity ambassadors) network division-wide with student representatives at schools and bring those students together as a means to amplify student voices?").  *Id*.  Plaintiffs' other relied upon statements in the Action Plan include that it was adopted to "combat systemic racism" (and not, says Plaintiffs, "to combat systemic genderism, or systemic hostility to different faith groups, but explicitly, only, race."), *id*. at 4; and that other action items include "developing racial literacy; raising racial consciousness," App. 7; "build . . . racial consciousness," App.8; finalizing a "protocol for responding to racial incidents when they occur in our schools," App. 11; "reducing] racial/ethnicity discipline disproportionality," App. 12; revising "hiring protocols, practices, resources for hiring managers to include but not limited to setting forth requirements for racially diverse interview panels," App. 15,; and meeting biannually with "LCPS staff members of color to connect and offer a safe place to listen and learn," App. 17.  Reply at 2, 5.
[8] The relied upon statements in the SEA Program include that a recommended attribute of SEAs is that they "have a passion for social justice and are willing to serve" and that they "want to be a voice for social justice." App. at 29-30.

Contents from the Student Ambassador Information Packet) (stating information from the SEA Program "will be used to amplify student voices and inform LCPS about the experiences of our students.  This qualitative data will also be useful to determine steps to take to ensure a welcoming, inclusive, and affirmative environment for each student")).  Nor do the relied upon exchanges between parents and school administrators.[9]  For all these reasons, the events leading up to the adoption of the SEA Program do not evidence an intent to discriminate against white students.

Likewise, the record is insufficient to show discriminatory impact. While the number of white students that were selected as SEAs appears to be disproportionate to their representation within the general student population, there is no information concerning how their representation among selected SEAs compares to the demographics of those who applied or were considered, including how many white students who were nominated were not selected or even whether there were more students than available SEA positions or to what extent the competitive selection criteria was even applied in connection with the SEAs selected for the past academic year.  And, of course, there is no information concerning the group from which the coming academic year's SEAs will be selected.

For the above reasons, the current record does not sufficiently establish that the SEA Program was motivated, adopted or implemented with an intent or purpose to discriminate against white students; and Plaintiffs have therefore failed to make a clear showing that they are

---

[9] The relied upon statements are in an e-mail exchange on November 4, 2020 between a parent and a LCPS high school's Equity Lead in which the Lead listed having "a passion for social justice" as the first "[s]tudent attribute[] that will be considered when recommending students, App. at 131 (Declaration of Scott Mineo) ¶ 17, Ex. B, and later in the chain, after the parent asked about the SEA Program and whether his or her child, who is not a student of color, was eligible to apply, to which the Equity Lead responded, "[t]hough all students (white or otherwise) are more than welcome to potentially serve as ambassadors, their focus is to raise the voice of their classmates of color during these meetings," *id*.

likely to succeed on their claim that the SEA Program as adopted and implemented constitutes a violation of the Equal Protection Clause of the Fourteenth Amendment.[10]

**B. Plaintiffs have failed to make a clear showing that they are likely to succeed on their claim that the SEA Program Violates the First Amendment.**

Plaintiffs argue because the SEA's role is to "amplify the voice of students of color" and that a recommended student attribute for selection is a "passion for social justice," the SEA Program engages in viewpoint discrimination in violation of the First Amendment.

Viewpoint discrimination is "discrimination in which the government targets not subject matter, but particular views taken by speakers on a subject." *Rosenberger v. Rector & Visitors of Univ. of Va*., 515 U.S. 819, 829 (1995); *see also Judson v. Bd. of Supervisors of Mathews Cty., Virginia*, 436 F. Supp. 3d 852, 865 (E.D. Va.), *aff'd*, 828 F. App'x 180 (4th Cir. 2020) As the Plaintiffs concede, the School Board has the ability to create a subject specific limited nonpublic forum for the purpose of providing an opportunity to students of color to express themselves with respect to race and the impact of race. *See Child Evang. Fellowship, Md. v. Montgomery Schools,* 457 F.3d 376 (4th Cir. 2006) ("In a limited public forum, . . . [a public school system] may be justified in reserving its forum for certain groups or for the discussion of certain topics, subject only to the limitation that its action must be viewpoint neutral and reasonable") (internal quotations and alterations omitted). Plaintiffs also concede that the LCSB may limit access to such a nonpublic forum based on a competitive or noncompetitive basis, and under current judicial precedent, may even have some limited ability to discriminate based on viewpoint in allowing access to that forum. *See Buxton v. Kurtinitis*, 862 F.3d 423, 430 (4th Cir.

---

[10] Plaintiffs rely on the Sixth Circuit's decision in *Vitolo v. Guzman*, 999 F.3d 353 (6th Cir. 2021), which concluded that a general intention to remedy past discrimination could not justify race based discrimination. But, in that case, the program at issue contained an explicit race preference and qualification. Here, the SEA selection criteria is concededly race neutral. *See* Reply at 2 (conceding that the Program is facially neutral).

14

2017) (holding "[t]he government must be able to take the viewpoints expressed in an interview into consideration when choosing between candidates in a competitive process"). What the school board cannot do, as Plaintiffs contend it has done, is categorically condition access to such a forum based on students' adopting an officially endorsed or encouraged viewpoint.

In support of their viewpoint discrimination claim, Plaintiffs point centrally to the SEA Program's identification of "passion for social justice" as a recommended student attribute and its objective of "amplifying the voices of students of color," which they claim implicitly and necessarily impose viewpoint discrimination with respect to race relations.[11] This viewpoint discrimination is apparent, Plaintiffs contend, because "'[s]ocial justice' is obviously a viewpoint" and a "clearly a 'politically charged concept'" and "'amplifying the voice of Students of Color' is not action, it is an expectation of a viewpoint." Reply at 12-13. But even if "social justice" is considered a viewpoint, the Court finds it difficult to necessarily attribute any particular content to such a viewpoint, which is animated by wide ranging notions of fairness and equity; and Plaintiffs understandably do not articulate specifically what the substance of that officially sanctioned viewpoint is,[12] other than to say that it does not embrace their or their children's views, which they claim necessarily disqualifies them from being selected as SEAs. More to the point, determining whether a student has "a passion for social justice" would appear to more centrally assess whether a student has a particular disposition for his particular views,

---

[11] Plaintiffs also refer to a comment of a staff Equity Lead from one High School to a student newspaper that the role of an SEA will be to "work to identify microaggressions," [Doc. No. 9-1] at 7-8, and the presentation by three SEAs from another high school to the LCSB, where "Microaggressions" were defined as "the everyday, subtle, intentional — and often unintentional — interactions or behaviors that communicate some sort of bias toward historically marginalized groups," with certain relied upon examples of "microaggressions." App. at 42, 46; [Doc. No. 9-1] at 8. The substance of these references does not appear elsewhere in the record and does not appear to be part of the SEA Program description, as adopted by the LCSB.
[12] Although Plaintiffs mention in their Complaint and Declarations how their views and those of their children on social justice differ from their understanding of Critical Race Theory, Plaintiffs' counsel made clear at the hearing that Plaintiffs' contention that the SEA Program imposes viewpoint discrimination is not premised on the teaching or promotion of Critical Race Theory.

15

whatever they may be, rather than a particular substantive viewpoint.  Likewise, it is difficult to see any particular content specific viewpoint in a willingness to "amplify the voices of students of color regarding racial incidents they have experienced in school," which Plaintiffs essentially concede is a constitutionally permissible objective of the limited non-public forum that the SEA Program establishes.

Moreover, the record does not sufficiently establish any school administration endorsed descriptions of what substantive viewpoints are required to have a "passion for social justice" or to "amplify the voices of students of color." There is no evidence that any students were interviewed or screened with respect to the particular substance of their views on either topic or that any school administrator who selected SEAs excluded or would exclude students holding the beliefs of Plaintiffs' children.[13]  And while Plaintiffs believe that their children's views on social justice disqualify them from becoming SEAs, there is nothing in the record to suggest that would be the case other than those students' subjective beliefs that might cause them not to pursue the opportunity to become an SEA, particularly since they appear to very much have a "passion for social justice."[14]  In sum, the Court cannot sufficiently infer any officially endorsed, adopted, or excluded viewpoints, particularly when associated with the other character trait criteria used and

---

[13] The Court recognizes that certain students may be influenced in their stated views by what they perceive as views acceptable to or encouraged by their peers or their faculty and that other students who think their particular views unpopular may self-censor themselves for fear of receiving the disapproval of their peers or school administrators. But those possible realities exist separate and apart from any impact of the SEA Program.

[14] Plaintiffs' claim of a First Amendment violation in connection with selection of SEAs becomes more problematic in light of the greater discretion that has been recognized for public schools administrators in fashioning an educational program.  In *Hazelwood Sch. Dist. v. Kuhlmeier*, the United States Supreme Court recognized the constitutional ability of public schools to "exercise greater control over . . . student expression [that the public might reasonably perceive to bear the imprimatur of the school] to assure that participants learn whatever lessons the activity is designed to teach." 484 U.S. 260, 570 (1988).  There being no restriction on how students may speak on that topic, there is no reason for the Court to "unduly constrain[] the school] from fulfilling [its] role as 'a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment.'"  *Id.* (quoting *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954)).

the lack of any investigation or inquiry into the substance of a particular students' views as part of the selection process.[15]

### C. Plaintiffs have not made a clear showing that they are likely to succeed on their claim that the Bias Incident Reporting System violates the First Amendment.

Plaintiffs argue the Bias Incident Reporting System violates the First Amendment because it is overbroad[16] and chills student speech.[17]  To establish a First Amendment overbreadth claim, Plaintiffs must first demonstrate that they have standing on behalf of their children to make the claim by showing either (1) "that [their children] intend to engage in conduct at least arguably protected by the First Amendment but also proscribed by the policy they wish to challenge, and that there is a credible threat that the policy will be enforced against them when they do so," or (2) "[their children] may refrain from exposing themselves to sanctions under the policy, instead making a sufficient showing of self-censorship—establishing, that is, a chilling effect on their free expression that is objectively reasonable." *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018).  "Either way, a credible threat of enforcement is critical." *Id.*

Here, Plaintiffs claim standing based on their children's predicted self-censorship caused by the Reporting System.  In that regard, Plaintiffs assert their children would like to discuss various views on race relations, gender identity, and other controversial political issues from the premise that  "everyone is equal and that we should strive for a color blind society," but, if they

---

[15] Because Plaintiffs have not made the required showing that the SEA Program was adopted with a discriminatory purpose, the Court does not consider whether the LCSB has made sufficiently established that it would have adopted the SEA Program even if race were not considered.

[16] According to the Complaint, the Reporting System does not limit "bias incidents" to on-campus activities and speech, but would appear to include speech on social media, text messages, in-person, or telephone conversations outside of school but involving students.  Compl. ¶ 47.

[17] Plaintiffs also allege that the Reporting System does not "guarantee[] that those accused of bias will enjoy any due process rights, a presumption of innocence, a right to counsel, or any privacy or confidentiality protections."  Compl. ¶ 48.  Plaintiffs do not assert, however, any Due Process claims as the basis for relief.

express those views, they are credibly threatened with the filing of a bias incident report that might cause them to be investigated and disciplined by school officials and castigated by their peers. *See* App. at 117 (Declaration of Patti Hidalgo Menders ¶ 7),

As with Plaintiffs' other Fourteenth and First Amendment Claims, the issue is not whether the Bias Reporting System is good or bad educational policy or whether it promotes or undermines a healthy and supportive student environment. Rather, the issue is whether it chills protected speech sufficiently and without adequate justification to violate the First Amendment.

The Supreme Court has long made clear that public school students are not constitutional strangers to the First Amendment and that "students in the public schools do not 'shed their constitutional rights to freedom of speech or expression at the school has gate.'" *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (quoting *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503 at 506 (1969)); *see also B.L. by & through Levy v. Mahanoy Area Sch. Dist.*, 964 F.3d 170, 177 (3d Cir. 2020), *cert. granted*, 141 S. Ct. 976 (2021), *and aff'd*, 141 S. Ct. 2038 (2021).

Here, the identified areas in which a student might perceive bias on the part of another student are exceptionally broad and include areas unrelated to race. The categories listed also lend themselves to a student's perceiving bias based on protected speech, particularly if one adds "microaggressions," which in many instances would likely be based in large part purely on protected speech. Given the breadth of subject matter identified in Form as the possible basis for an incident report and that a student's speech alone could well cause another student to report that speech as an incident of bias, a student could reasonably conclude that by "sharing, speaking up and speaking out" his or her speech could result in the filing of a bias incident report by another student. The issue then becomes whether that student faces a credible threat of discipline

18

or other consequences based on his speech that sufficiently "chill' his or her First Amendment rights.

In *Abbott v. Pastides*, 900 F.3d 160 (4th Cir. 2018), the Fourth Circuit considered in detail the circumstances under which a university policy creates an unconstitutional chill on First Amendment liberties. Specifically, the Court considered whether the University of South Carolina's "Student Non-Discrimination and Non-Harassment Policy," formally adopted as STAF 6.24 following an Department of Justice investigation into allegations of racial discrimination, created a credible threat of adverse consequences sufficient to chill the exercise of First Amendment speech.

STAF 6.24, which had been reviewed and approved by the Department of Justice, prohibited harassment, defined as a "specific type of illegal discrimination" consisting of conduct which may be "written," "oral," "graphic," or "physical," which is directed at students because of a protected characteristic such as race, religion, national origin or sex. 900 F.3d at 164. It states, however, that its prohibitions extend only to "behavior and speech that is not constitutionally protected and which limits the rights of students to participate or benefit in the educational program." *Id.* at 164. Indeed, the definition of harassment is limited to conduct that is "sufficiently severe, pervasive, or persistent so as to interfere with or limit the ability" of the targeted students to "participate in or benefit from the programs, services, and activities provided by the University." *Id.* Provided examples of such "harmful conduct" include "objectionable epithets" and "demeaning depictions or treatment" as well as "threatened or actual abuse or harm." *Id.* STAF 6.24 also established a complaint procedure for students whereby any student may file a complaint with the University's Office of Equal Opportunity Programs against another student "believed to have violated the policy or otherwise engaged in discriminatory or harassing

behavior."  The officer then designates a staff member to review the complaint and "ensure that [it] is fairly and expeditiously investigated and if necessary, that appropriate sanctions are assessed."  *Id*.  Anonymous complaints are investigated by interviewing any identified witnesses or alleged offenders.  *Id.*

The First Amendment claims in *Abbott* arose in the aftermath of an on-campus, University approved "Free-Speech Event" intended to highlight perceived threats to free-speech on college campuses by displaying material that had provoked free-speech controversies in other schools, such as a swastika.  *Id.* at 168.  The event took place without interference, although the event did generate complaints from other students who objected to the displays and accused sponsors of making sexist and racist statements at the scene.  *Id.* at 163.  After receiving those complaints, a university official met with one of the students associated with the Free Speech Event, Abbott, an event sponsor, to review the complaints in order to determine whether an investigation was warranted.  *Id.*  A few weeks later, Abbott was notified that there was no cause for investigation and that the matter had been dropped.  *Id.*

After the matter had been administratively closed, the Plaintiffs in *Abbott*, University students who were involved in sponsoring the Free Speech Event, sought an injunction against the future enforcement of STAF 6.24 on the grounds that it was unconstitutionally broad and impermissibly vague on its face.  In that regard, they pointed to undefined terms like "objectionable epithets" and "demeaning depictions" as examples of conduct that may amount to harassment that would allow the University to punish multiple forms of protected First Amendment speech.  *Id.* at 175.  The plaintiffs further argued that the caveats in the policy, such as that it would apply only to conduct "sufficiently severe or pervasive or persistent," did not

save the policy from its unconstitutional impact.[18]  *Id.*  The District Court dismissed the *Abbot* Plaintiffs' challenge to STAF 6.24 on the grounds that they lacked standing to seek an injunction since, *inter alia*, they had not presented evidence of a credible threat of future injury through the enforcement against them of STAF 6.24 "to silence the kind of speech" in which they wished to engage.  *Id.* at 167.

On appeal, the Fourth Circuit affirmed the District Court's dismissal of the facial challenge to the STAF 6.24 for lack of standing.  In that regard, the Court concluded that the Plaintiffs had failed to show either that they intended to engage in conduct at least arguably protected by the First Amendment but proscribed by STAF 6.24 and they faced a credible threat that STAF 6.24 would be enforced against them when they did so or that they would engage in self-censorship based on the "chilling effect" caused by a threat of future discipline under STAF 6.24 that is objectively reasonable.  *Id.* at 176.

In reaching its decision, the Circuit Court first observed that "the most obvious way to demonstrate a credible threat or enforcement in the future, of course, is an enforcement action in the past."  *Id.* at 176; *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014).  It observed in that regard that the *Abbott* plaintiffs could point to no evidence of prior sanctions under STAF 6.24 against them or anyone else for the type of speech in which they wish to engage.  *Id.* at

---

[18] The *Abbott* Plaintiffs also sought damages based on their claim that the University "chilled" their exercise of protected speech in violation of their First Amendment rights (1) by making any inquiry into the event, because that inquiry created a reasonable fear of disciplinary action if they sponsored other events similar to the Free Speech Event and under a strict scrutiny standard, the University did not proceed in the least restrictive manner since it began its investigation with an interview with Abbott rather than the complaining students; and (2) by sending to Abbott a letter that informed him of the complaints, together with a document titled "Notice of Charge", and directed that he "[p]lease contact this office within the next five (5) working days . . . to arrange an appointment to fully discuss the charges as alleged."  The District Court rejected Plaintiffs' claim that the University's inquiry violated their First Amendment rights since the "temporary chill" in the form of self-censorship caused by the University's inquiry withstood strict scrutiny since the inquiry was "permissible as a 'narrowly drawn solution that was necessary to serve USC's compelling interest in protecting students' rights to be free from discrimination.'"  *Id.* at 167–68.

176–77.  It also rejected their argument that the University's inquiry into the Free-Speech Event established the necessary credible threat of enforcement that made it reasonable to expect that they would be sanctioned under STAF 6.24 if they sponsored similar events in the future.  *Id.*  In that regard, it concluded that a student of "ordinary firmness" no longer could have reason to fear discipline under STAF 6.24 for similar activity once Abbott had attended his meeting regarding the Free-Speech Event and then received written notice that neither an investigation nor a sanction would be forthcoming.  *Id.* at 177.  Likewise, it concluded that Plaintiffs could not establish a credible threat that the University would employ STAF 6.24 to sanction any future free-speech events since there was no evidence that the University threatened the plaintiffs with future disciplinary action under STAF 6.24 and the University had in fact dismissed student complaints about protected speech that they found offensive.  *Id.*  Finally, it distinguished the case from other cases that found credible threats based on historical evidence reflecting a university's intent to bar any expressions that others might find offensive, observing that in this case the University had made manifest its intent to allow speech even when it might or does cause offense.  *Id.* at 177–78.

Finally, the Court rejected the plaintiff's broader attack on STAF 6.24 on the grounds that even the kind of preliminary, limited investigation they faced in response to the exercise of First Amendment speech establishes a credible threat of a future investigation sufficiently chilling to generate reasonable self-censorship and therefore sufficient to establish  standing for their facial challenge.  *Id.* at 178.  The Court agreed that there may be some forms of pre-enforcement investigations that are so onerous that they become the functional equivalent of enforcement for standing purposes but concluded that "a threatened administrative inquiry will not be treated as an ongoing First Amendment injury sufficient to confer standing unless the administrative

22

process itself imposes some significant burden, independent of any ultimate sanction." *Id.* at

179.  The Court summarized its views on this point as follows:

> The single, nonintrusive meeting plaintiffs rely on here, followed two weeks later
> by an announcement that no further action would be taken, does not fall within this
> category [of a credible threat]. Even an objectively reasonable "threat" that the
> plaintiffs might someday have to meet briefly with a University official in a
> nonadversarial format, to provide their own version of events in response to student
> complaints, cannot be characterized as the equivalent of a credible threat of
> "enforcement" or as the kind of "extraordinary intrusive" process that might make
> self-censorship an objectively reasonable response. And because the plaintiffs can
> point to no reason to think they will be subjected to some different and more
> onerous process not yet experienced or threatened, the claimed injury by way of
> threatened "process" is purely speculative and thus insufficient to establish
> standing."

*Id.*

Given the pronouncements in *Abbott*, the Court cannot conclude that Plaintiffs have

standing at this point to seek an injunction against the future enforcement of the Bias Incident

Reporting System.  There are certainly difference between the STAF 6.24 discussed in *Abbott*

and the Bias Incident Reporting System.  Arguably, the Reporting System is broader and even

more vague in terms of its scope and meaning.  But as with the Plaintiffs in *Abbott*, Plaintiffs'

request for an injunction is based on the prospect of a future injury in the form of self- censorship

or constitutionally chilled speech because of a fear of consequences.  But the prospects of

adverse consequences would appear far less under the Bias Incident Reporting System than the

STAF 6.24 considered in *Abbott*, or indeed, LCPS' own harassment policy, which, as discussed

at the hearing on this Motion, Plaintiffs do not attack and essentially concede withstands

constitutional scrutiny.

The Bias Incident Reporting System was created for reasons wholly unrelated to

discipline, it falls far short of a direct prohibition on speech and that aspect of the Bias Incident

Reporting System that Plaintiffs find chilling is only a more limited and informal process than

what already exists under LCPS' harassment policy. And as in *Abbott*, there is no evidence that the Bias Incident Reporting System has resulted in any formal investigations or discipline or that it has resulted in any efforts or threats to restrict or punish protected speech or speech that others find simply offensive.[19]

Plaintiffs centrally argue that in assessing whether there is a chilling effect that is objectively reasonable, the Court must consider that the threshold for chilling speech in middle and high school students is much lower than for a University student of "ordinary firmness." While that may be true, particularly with respect to middle school students, there nevertheless must be some objectively reasonable basis for believing that protected speech will result in some consequence reasonably and objectively perceived as "chilling." Here, based on this record, that consequence is missing; based on this record, a middle and high school student who engages in protected speech is likely threatened with only the opportunity for a student to request an investigation of a reported incident and that the request will be reviewed by a school administrator, without further consequences. But the Fourth Circuit made clear in *Abbott* that the prospect that protected speech could generate a complaint that might be reviewed by school authorities, with no other consequences, is simply not enough to establish standing. The application of that principle likewise precludes standing in this case, albeit within a materially different context.

For the above reasons, Plaintiffs have not made a clear showing that they are likely to succeed on their claim that the Bias Incident Reporting System violates the First Amendment.[20]

---

[19] LCSB has submitted uncontradicted evidence that no investigations or discipline has resulted from the filing of any Bias Incident Reports. *See* Spurlock Decl. ¶ 16 ("During the 2020–21 school year, there were ten bias reporting forms submitted which requested an investigation, none of which resulted in any formal investigation or disciplinary action.").

[20] Because the Court has concluded that Plaintiffs have not made a clear showing of likely success on Counts I, II, or III, the Court does not consider whether the SEA Program or the Bias Incident Reporting System withstands strict scrutiny or is sufficiently narrowly tailored to achieving a sufficient pedagogical or government purpose.

**D. Plaintiffs have not made the required showing with respect to Irreparable Harm, Balance of the Equities, and Public Interest.**

Plaintiffs correctly contend that the deprivation of constitutional rights, in and of itself, can constitute irreparable injury. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). However, "in the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim." *WV Ass'n of Club Owners and Fraternal Services, Inc. v. Musgrave,* 553 F.3d 292, 298 (4th Cir. 2009). Given that Plaintiffs have failed to establish a likelihood of success on their constitutional claims, they have likewise failed to establish that they face an actual or imminent threat of irreparable injury. Likewise, they have not made the required showing that the balance of equities weighs in their favor or that the public interest favors the requested injunctive relief. In that regard, the SEA Program represents a substantial initiative to address the present effects of past discrimination, coupled with permissible pedagogical purposes.

## IV.   CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that the Motion of Plaintiffs for the Court to Judicially Notice Certain Facts in Support of Their Motion for a Preliminary Injunction [Doc. No. 10] be, and the same hereby is, GRANTED; and it is further

ORDERED that the Motion of Plaintiffs for a Preliminary Injunction [Doc. No. 9] be, and the same hereby is, DENIED.

The Clerk is directed to forward copies of this Order to all counsel of record.

Anthony J. Trenga
United States District Judge

Alexandria, Virginia
August 13, 2021

26