IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |
|---|---|
| Patti Hidalgo Menders; Scott Mineo; and Jane Does #1, #2, and #3, on behalf of their minor children R.M.; A.M.; Jane Does #4, #5, and #6; and John Does #1 and #2. <br><br> Plaintiffs, <br><br> v. <br><br> Loudoun County School Board, <br><br> Defendant. | Case No. 1:21-cv-00669 <br><br><br> **First Amended Complaint** |

1.     Writing on whether a school district could force high school students to show their support for a viewpoint they found objectionable, Justice Jackson penned some of the most memorable lines in constitutional law: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).[1]

2.     Yet basic principles like the First Amendment have not stopped the Loudoun County School Board from prescribing exactly what shall be orthodox for its students. LCPS is all-in on a curricular framework that expects students to speak,

---

[1] Plaintiffs file this First Amended Complaint "as a matter of course" according to Federal Rule of Civil Procedure 15(a)(1)(B).

act, and think in line with a particular ideology. Any dissent from that ideology can be labeled as "bias" and anonymously reported to the speech police, a group of hand-picked students who share the LCPS administration's ideology, charged to pass judgment on those classmates that their peers turn in.

3.      In the name of "dismantling systemic racism," LCPS has implemented explicit racial distinctions between its students. The official LCPS "Action Plan to Combat Systemic Racism" creates a new position of "Student Equity Ambassador" ("SEA"), which is limited to certain students on account of their race, and discriminates against students on the basis of their viewpoint. The Board has also implemented a viewpoint discriminatory "bias reporting system" that chills students' speech on matters of important public concern. Each of these policies violates the Constitution's guarantees of free speech and equality before the law. Plaintiffs, parents in LCPS, sue on behalf of their minor children to put a stop to these constitutional violations. They therefore bring this action pursuant to 42 U.S.C. § 1983 for declaratory and injunctive relief, as well as nominal damages.

## PARTIES

4.      Plaintiff Patti Hidalgo Menders is a resident of Loudoun County, Virginia, and the parent of a child, RM, who attends Briar Woods High School in the Loudoun County School District.

5.      Plaintiff Scott Mineo is a resident of Loudoun County, Virginia, and the parent of a child, AM, who attends Stone Bridge High School in the Loudoun County School District.

2

6. Plaintiff Jane Doe #1 is a resident of Loudoun County, Virginia, and the parent of three children (Jane Doe #4 and John Does #1 and #2) who will attend a LCPS middle school.

7. Plaintiff Jane Doe #2 is a resident of Loudoun County, Virginia, and the parent of a child (Jane Doe #5) who attends a LCPS middle school.

8. Plaintiff Jane Doe #3 is a resident of Loudoun County, Virginia, and the parent of a child (Jane Doe #6) who attends a LCPS middle school.

9. Defendant Loudoun County School Board is the official policy-making body of LCPS, which is headquartered at 21000 Education Court, Ashburn, VA 20148, in the Eastern District of Virginia.

## JURISDICTION AND VENUE

10. This case raises claims under the Fourteenth Amendment of the U.S. Constitution and 42 U.S.C. § 1983. The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

11. Venue is appropriate under 28 U.S.C. § 1391(b) because a substantial portion of the events giving rise to the claims occurred in the Eastern District of Virginia. The Alexandria Division is appropriate because all plaintiffs live in and the Defendant is headquartered in Loudoun County, which is in that division.

## FACTUAL ALLEGATIONS

12. Plaintiffs Patti Hidalgo Menders, Scott Mineo, Jane #1, Jane Doe #2, and Jane Doe #3, are parents of children who attend LCPS.

13. Plaintiff Patti Hidalgo Menders is the parent of a high school student,

RM, who is subject to the Board policies challenged in this case. Her child would not meet the SEA criteria established by LCPS and would not describe his views as "social justice" as LCPS uses that term.

14.     Plaintiff Scott Mineo is the parent of a high school student, AM, who is subject to the Board policies challenged in this case. His child would not meet the SEA criteria established by LCPS and would not describe her views as "social justice" as LCPS uses that term.

15.     Plaintiff Jane Doe #1 is the parent of three LCPS students who are subject to the Board policies challenged in this case. Her children would not meet the SEA criteria established by LCPS and would not describe their views as "social justice" as LCPS uses that term.

16.     Plaintiff Jane Doe #2 is the parent of a middle school student who is subject to the Board policies challenged in this case. Her child would not meet the SEA criteria established by LCPS and would not describe her views as "social justice" as LCPS uses that term.

17.     Plaintiff Jane Doe #3 is the parent of a middle school student who is subject to the Board policies challenged in this case. Her child would not meet the SEA criteria established by LCPS and would not describe her views as "social justice" as LCPS uses that term.

18.     All five families raise their children to be active, engaged citizens in their community and country. Their families frequently discuss current events and public affairs in a thoughtful, respectful way. The plaintiff parents encourage and teach their children to also share their views with their peers. They know that their

4

children discuss politics and public affairs with classmates and friends in person, via phone, text, or on social media. These views on politics, candidates, and public policy are often not shared by other residents or young people in Loudoun County. These views have prompted vitriolic, threatening, and persecutorial responses from others in Loudoun County, including within the LCPS community.

19.     The plaintiffs all currently enroll their children in LCPS.

20.     Defendant Board oversees LCPS, the public school system for Loudoun County, Virginia.

21.     LCPS operates 17 High Schools, 17 Middle Schools, and 51 Elementary Schools, serving approximately 84,000 children and employing approximately 5,700 teachers.

22.     Around June 6, 2019, LCPS commissioned a 2019 report by an outside consultant, The Equity Collaborative. That report is attached as **Exhibit A**.[2] One of the consultant's observations about the campus climate within LCPS was that "[t]here are limited opportunities for Black/African-American and Muslim students to convene in a network of social and cultural support." Based on that observation, the consultant recommended that LCPS "[e]stablish student affinity groups at all levels to support the social and cultural identities of students of color." The groups would serve as "a formal structure that serves as a network of care for marginalized student populations and establishes a safe place for students to unpack feelings and emotions in times of social or cultural conflict." The need for a "formal structure" that

---

[2] Exhibit A is downloaded from LCPS's website:
https://www.lcps.org/cms/lib/VA01000195/Centricity/domain/60/equity_initiative_documents/LCPS_Equity_Report_FINALReport12_2_19.pdf.

"support[s] the social and cultural identities of students of color" became the Student Equity Ambassadors program that is one of the subjects of this lawsuit.

23.     "Affinity groups," as that term is used in the equity literature, refers to groups that are limited to people based on their shared race.

24.     On June 23, 2020, LCPS published its "Action Plan to Combat Systemic Racism," which outlines a complex set of initiatives to implement an ideological orthodoxy across public schools in Loudoun County. The action plan is attached as **Exhibit B**.[3]

25.     That LCPS is on an ideological mission with its Action Plan is seen in the corresponding "LCPS Comprehensive Equity Plan," where LCPS "calls for all students, staff, families, and other members of our community to engage in the disruption and dismantling of white supremacy, systemic racism, and hateful language and actions based on race, religion, country of origin, gender identity, sexual orientation, and/or ability. LCPS rejects racist and other hateful behavior and language, recognizing that it encourages discrimination, hatred, oppression, and violence." The "LCPS Comprehensive Equity Plan" is attached as **Exhibit C**.[4]

26.     The 29 slides in the Action Plan to Combat SystemicRacism (Exhibit B) include numerous proposals, including to "[p]rohibit the wearing/flying of flags, images, or symbols on LCPS property that represent racist or hateful ideology,"

---

[3] This exhibit was downloaded directly from LCPS's website:
https://www.lcps.org/cms/lib/VA01000195/Centricity/domain/60/equity_initiative_documents/Detailed_Plan_to_Combat_Systemic_Racism_August_2020.pdf.
[4] This exhibit was downloaded directly from LCPS's website:
https://www.lcps.org/cms/lib/VA01000195/Centricity/domain/60/equity_initiative_documents/Comprehensive_Equity_Plan-9_2020rev.pdf.

"[f]inalize the Protocol for Responding to Racial Slurs and Hate Speech in Schools," and "consider the potential renaming of the Loudoun County High School mascot, the Raiders." Its fifteen "action items" include "developing racial literacy; raising racial consciousness," "build . . . racial consciousness," finalize a "protocol for responding to racial incidents when they occur in our schools," "reduce racial/ethnicity discipline disproportionality," setting quotas for "racially diverse interview panels" for hiring, and "meet[ing] biannually" with only "LCPS staff members of color" to "connect and offer a safe space to listen and learn." As the Action Plan says at its close, "the Action Plan to Combat Systemic Racism has a laser focus on systemic racism, oppression, and the need for the disruption and dismantling of ineffective systems."

27.     Additionally, Action Item 9 promises "LCPS will revise hiring protocols, practices, and resources for hiring managers to include but not limited to setting forth requirements for racially diverse interview panels." Action Item 11 promises that only "LCPS staff members of color" will be invited to exclusive, regular meetings with LCPS senior leadership to "connect and offer a safe space to listen and learn about their experiences in LCPS." It further explains, "As a vehicle for increasing racial consciousness; a welcoming and affirming school system for Staff of Color, during the school year LCPS Superintendent, Cabinet, and LCSB members who serve on the Equity Committee will host a minimum of two 'listen and learn' sessions for Staff of Color." The Action Item lists among its "Remaining Questions under Consideration" "What is the participation option for a non-Person of Color (who desires to serve as allies) to engage in these sessions?"

28.     The LCPS' Action Plan also developed the "Student Equity

7

Ambassador" program based on the 2019 Equity Collaborative report. Two to three students from each LCPS high school and middle school are selected by each school principal for the program.

29.     LCPS developed the Student Equity Ambassador Program to implement Action Item 15 in the Action Plan to Combat Systemic Racism. That action item says that "[s]tories and experiences will be reviewed and shared by the Supervisor of Equity and LCPS student leaders of Color during regularly occurring student *Share, Speak-up, Speak-out* meetings . . ." It further states: "These meetings "will be used to amplify the voice(s) of Students of Color." It also notes: that the "questions for consideration" ask "What will be the process for selecting Students of Color to serve in this way?" and "How can we create a Student Leaders of Color (i.e. student equity ambassador) network division-wide with student representatives at schools and bring those students together as a means to amplify student voices?" *Id*. Four different times, in other words, Action Item 15 limits the Student Equity Ambassadors and "Share, Speak-up, Speak-out meetings" to only students of color.

30.     LCPS's Equity Ambassadors program is part of a larger national movement to emphasize "student voice" in education, one component of which is providing students a forum to discuss issues within the school community with administrators.

31.     Students are selected based on particular criteria, and they serve as a liaison collaborating with the district-wide Supervisor of Equity during regularly occurring student "*Share, Speak-up, Speak-out* meetings."

32.     LCPS' original "Student Equity Ambassador Information Packet"

included a section explaining the "Process for Selecting Student Equity Ambassadors." That packet is attached as **Exhibit D**.[5]

33.   The "Process for Selecting Student Equity Ambassadors" included as its first guideline for selection of SEAs that "[t]his opportunity is open to all Students of Color."

34.   Lest there be any ambiguity as to the meaning of that guideline, the LCPS' publication included a Frequently Asked Questions ("FAQ") section. The very first entry in that FAQ explained directly that the SEA program discriminated on the basis of race:

> [Question:] My child would like to participate as a Student Equity Ambassador and is not a student of color. Can they participate?
>
> [Answer:] Thank you for your interest but this opportunity is specifically for students of Color. However, students at each school have an option of creating an affinity group for students of Color who all share a similar racial identity and they may also include allies.

35.   Driving home the point, the second entry in another FAQ suggested alternatives for those who were racially barred from applying to be SEA:

> [Question:] Are there other opportunities for students to get involved?
>
> [Answer:] Students may reach out to their school's activity coordinator or the equity lead if they would like to be involved in other equity opportunities.

36.   The flyer accompanying the FAQ document from the district explains that equity ambassadors must "amplify the voices of students of color" and "represent

---

[5] App. Supp. Pls'. Mot. for Prelim. Inj. and to Proceed Anonymously 122, 124-28, ECF No. 9-2 (Decl. of Scott Mineo ¶ 16 & Ex. A).

your peers of color."



## *Share, Speak-up, Speak-out*

Do you want to be a **Voice** for **Social Justice**?

Are you interested in **Amplifying** the **Student Voice of Color**?

Do you want to **Represent** your **Peers of Color** by sharing their experiences in LCPS?



*You can do all of this by serving as one of our **Student Equity Ambassadors**. See XXXX for more information or visit this website for the information packet.*

37.    After LCPS posted this document online, the explicit racial discrimination in the SEA program was criticized.

38.    On or about October 28, 2020, LCPS removed the SEA program description from its website and replaced it with a revised version without any explanation for the revision. The revised version is attached as **Exhibit E**.[6]

39.    The revised version of the SEA program description was almost entirely identical to the prior version, except that it deleted the requirement that the SEA program was open only to people of color, and the two related FAQ entries quoted above.

40.    On November 5, 2020, emails were published between a concerned parent and an administrator at LCPS. The parent asked about the SEA program, and

---

[6] This exhibit is drawn from BoardDocs, which is a contractor website service that LCPS uses to organize and house documents for its School Board: https://go.boarddocs.com/vsba/loudoun/Board.nsf/files/BUSM2L5829AB/$file/Revised10_27_20%20SB%20-%20Student%20Equity%20Ambassador%20Packet.pdf.

whether their child, who is not a student of color, was eligible to apply. Relevant portions of those emails are attached as **Exhibit F**.[7]

41.    The LCPS administrator responded "[t]hough all students (white or otherwise) are more than welcome to potentially serve as ambassadors, their focus is to raise the voice of their classmates of color during these meetings."

42.    Though students may report "bias incidents" about gender, gender identity, religion, or politics, LCPS is clear that the focus of the program, and the focus of the principals selecting the student ambassadors, is fixed on race: "We are focusing on race because it is important to recognize students who have been marginalized." *See* Ex. E, at 3. Apparently LCPS believes the marginalization of other students, whether because of their religious faith, political beliefs, gender, income, or other factors, is not worthy of such focus.

43.    The revised version retains other criteria upon which principals are supposed to select students, such as "[s]tudents who have a passion for social justice and are willing to serve." The flyer inviting students to engage in the program similarly solicits applicants who "want to be a voice for social justice." In a presentation, LCPS's equity director described the equity ambassadors as part of the district's work to "empower students to make meaningful contributions to their world through a social justice lens." Likewise, the Action Plan to Combat Systemic Racism says the Student Equity Ambassadors Program is a "Student Leaders of Color network division-wide" with the purpose of "build[ing] forward motion in using

---

[7] App. Supp. Pls'. Mot. for Prelim. Inj. and to Proceed Anonymously 122, 129-32, ECF No. 9-2 (Decl. of Scott Mineo ¶ 17 & Ex. B).

student voice" to use a "Social-Justice lens to develop greater awareness and build student empathy, leadership and advocacy skills." One LCPS school's "equity lead" teacher has said: "Student Equity Ambassadors "are promoting cultural awareness and growth by . . . be[ing] a voice for social justice." In a letter to parents from an LCPS high school announcing the SEA program, the high school's equity team lists having "a passion for social justice" as the first quality students "serving in th[e] role" of Student Equity Ambassador must possess. That letter is attached as **Exhibit G.**[8] In other words, to qualify for this program, a student must be on board with LCPS's vision for social justice.

44.    The Student Equity Ambassador program is not simply another extracurricular student club or activity, like the Debate Team, or 4H, or the French Club. Rather, it is a formal office the school endows with particular authority to speak on behalf of the student body, and as with any student leadership position, it is a valuable credential for students looking to improve their resumes.

45.    LCPS implemented the Student Equity Ambassador Program during the waning months of the 2020-2021 school year. Yet of the students that LCPS chose to serve as student equity ambassadors during that time only seventeen percent identified as "white only," despite "white only" students making up forty-seven percent of LCPS enrollment.

46.    The "*Share, Speak-up, Speak-out*" meetings in which Student Equity Ambassadors are entitled to take part are not an everyday opportunity for student-

---

[8] *Id.* at 123, 134 (Decl. of Scott Mineo ¶ 18 & Ex. C).

faculty engagement. Rather they are part of an explicit initiative to stifle speech under the guise of eliminating "bias."

47.     To this end, the LCPS Office of Equity distributed to parents and students a "Share, Speak Up, Speak Out form" to "capture incidents of bias in an anonymous manner." That form is attached as **Exhibit H.**[9] The incidents reported on this form are then used in the "*Share,Speak-up, Speak-out*" meetings with the Student Equity Ambassadors. LCPS developed the bias incident reporting form to implement Action Item 15 in the Action Plan to Combat Systemic Racism.

48.     LCPS will investigate "bias incidents" if the person submitting the form provides his or her name and indicates on the form that they would like school administrators to investigate the "particular incident" they are reporting. The slide deck on the Action Plan to Combat Racism says the "electronic form will be used to anonymously collect student stories and to ascertain whether or not the student would like their account of the issue investigated."

49.     The form includes check boxes for the "Type of Bias Incident" being reported, including "Harassment or Intimidation," "Racial Slur," "Offensive Language, Teasing or Taunting Language/Verbal Exchange," "Exclusion or victim of lack of inclusivity," "Gender Identity and Expression," "Ability Status," "Religious Practices," and "Sexual Orientation."

50.     One LCPS "equity lead" described the equity ambassadors' role to a student newspaper as to "work to identify microaggressions" within their school.

---

[9] Defs.' Mem. Opp'n to the Mot. of Pls.' for Prelim. Inj., Ex. A, ECF No. 17-1 (Decl. of Lottie Spurlock ¶ 13, Ex. 3).

51.     On May 11, 2021, three student equity ambassadors from Lightridge High School presented to the LCPS Board. In their slideshow, they said, "Microaggressions are defined as the everyday, subtle, intentional — and often unintentional — interactions or behaviors that communicate some sort of bias toward historically marginalized groups."

52.     The presentation continues by citing examples of microaggressions that are "denial[s] of racial reality" like "I don't think that white privilege exists." Another slide says that to assert a framework of "colorblindness" which sees people as individuals rather than members of a race is a microaggression.

53.     In a webinar for the Virginia Department of Education, the LCPS equity director presented a slide that stated, "A bias incident is an act of discrimination, harassment, [or] intimidation directed against any person or group that appears to be intentional and motivated by prejudice or bias. Such are usually associated with negative feelings and beliefs with respect to others [*sic*] race, ethnicity, national origin, religion, gender, gender identity, sexual orientation, age, social class, political affiliation, or disability."

54.     Nothing about the bias reporting system limits the covered speech to on-campus activities. Speech on social media or via text message or even in-person or telephone conversations outside school but involving students could constitute a "bias incident."

55.     Nothing about the bias reporting system guarantees that those accused of bias will enjoy any due process rights, a presumption of innocence, a right to counsel, or any privacy or confidentiality protections.

14

56. LCPS already has in place a robust policy against bullying and cyber-bullying, LCPS Policy 8250. As part of its Action Plan, LCPS has also adopted a "LCPS Protocol for Responding to Racial Slurs and Hate Speech in Schools." LCPS's equity office emphasizes in its messages about the bias response system, "Students should still report discipline incidents to a trusted adult or members of the administrative team." Thus, the bias reporting system functions alongside and in conjunction with the disciplinary system.

57. In the Virginia Department of Education presentation, the director described the SEA as "students coming together in this forum."

58. In a letter to parents from an LCPS high school announcing the SEA program, the high school's equity team says "[t]he goal is to provide a forum to amplify the voices of Students of Color and those who have experienced or witnessed injustices, marginalization, or discrimination."

59. The Plaintiffs' children would not have qualified for the SEA program as originally conceived or practically implemented.

60. The Plaintiffs' children hold views about important public issues that they believe conflict with LCPS's definition of social justice.

61. The Plaintiffs' and their children are opposed to the ideology known as Critical Race Theory ("CRT"), which teaches that white people are evil or oppressors and that our nation's institutions are inherently racist. Instead, they believe that everyone is equal and that we should strive for a color blind society. Indeed, the Plaintiffs' have taught their children to treat everyone with respect and dignity regardless of their race. They have also taught them that each individual is unique

15

and special, and that we should consider others not based on the color of their skin but the content of their character.

62.     The Plaintiffs' children wish to speak out on CRT, race, and gender identity, and other controversial political issues within the LCPS community. The Plaintiffs encourage and teach their children to share their views on these subjects with their peers.

63.     But the views of the Plaintiffs and their children on these subjects are often not shared by other residents or young people in Loudoun County. Indeed, when others have shared views similar to the Plaintiffs and their children on CRT, race, gender identify, and other controversial political issues, that speech has prompted vitriolic, threatening, and persecutorial responses from others in Loudoun County, including within the LCPS community.

64.     Plaintiffs are aware that in other school settings nationwide, "bias incident" response or disciplinary systems have been invoked against students based on similarly worded standards for wearing clothing supporting President Trump, saying "Make America Great Again," or celebrating the Second Amendment.

65.     Plaintiffs are concerned that if their students share their views about political or social issues, including those touching on CRT, religion, race, human sexuality, and other controversial political issues, they will be reported and investigated for "bias incidents." They fear such a report, investigation, public disclosure, could negatively impact their students' standing in the school community and ruin their college or career prospects.

66.     An LCPS school district spokesperson told a newspaper, "The specific

reason behind this action step is to utilize it as a means to amplify and elevate student voice." Yet it will have the opposite effect: rather than amplifying or elevating student voices, it will chill them by creating a process for anonymously ratting out classmates for anything anyone finds offensive, with no burdens of proof or due process protections.  It is a heckler's veto in a kangaroo court.

## COUNT I

**Defendant's Student Equity Ambassador Program violates the Fourteenth Amendment's guarantee of equal protection because it discriminates on the basis of race.**

67.    The allegations in the preceding paragraphs are incorporated herein by reference.

68.    "When the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny." *Parents Involved in Cty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007); *see also Adarand Constructors v. Pena*, 515 U.S. 200, 224 (1995) ("[A]ny person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny").

69.    Even where a policy is formally race-neutral, it can still be shown to be discriminatory where its historical context, legislative history, and implementation show it was adopted with a race-discriminatory motive. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977).

70.    "[D]iscrimination in favor of one race is necessarily discrimination against members of another race." *La. Associated Gen. Contractors v. State ex rel.*

*Div. of Admin., Office of State Purchasing*, 669 So. 2d 1185, 1204 (La. 1996).

71.    Creating new forms of discrimination to remedy old ones is not a solution to past racism. Rather, the U.S. Supreme Court has said "[t]he way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved,* 551 U.S. at 748.

72.    The Board, in making policy for LCPS, is acting under color of state law.

73.    Plaintiffs' children are being unlawfully discriminated against on account of their race.

74.    Plaintiffs' children are similarly situated in all relevant aspects to other parents and children attending LCPS.

75.    LCPS' Student Equity Ambassador program is an invidious racial classification that discriminates against students on the basis of race.

76.    LCPS has a policy and practice of apportioning the benefits of the Student Equity Ambassadors program among students on account of their race.

77.    There is no compelling government interest in LCPS discriminating among students on account of their race.

78.    The Student Equity Ambassador program is not narrowly tailored to serve any government interest, especially when the SEA program is tied to race, but its bias-investigation mandate includes bias based on gender, gender identity, sexuality, and political beliefs.

79.    There is no important government interest in defining the Student Equity Ambassadors program based on race.

80.    The Student Equity Ambassadors program is not substantially related

to any government interest.

81.     Plaintiffs are therefore entitled to declaratory and injunctive relief and nominal damages under 42 U.S.C. § 1983.

## COUNT II

**Defendant's Student Equity Ambassador Program violates the First Amendment's guarantee of freedom of speech because it discriminates on the basis of viewpoint.**

82.     The allegations in the preceding paragraphs are incorporated herein by reference.

83.     "The First Amendment is a kind of Equal Protection Clause for ideas." *Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335, 2354 (2020) (plurality) (quoting *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 470 (2015) (Scalia, J., dissenting)). A government violates this promise of equal treatment for ideas when it engages in viewpoint discrimination. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995).

84.     The Board, in making policy for LCPS, is acting under color of state law.

85.     The Student Equity Ambassadors Program and its "Share, Speak Up, Speak Out" are a nonpublic forum. LCPS officials have described it as a forum.

86.     LCPS requires that Student Equity Ambassadors express a government-approved orthodox viewpoint in order to participate in the program.

87.     There is no compelling government interest in LCPS discriminating among students on account of their viewpoint.

88.     The Student Equity Ambassador program's viewpoint requirement is

not narrowly tailored to serve any government interest.

89.     There is no important government interest in the Student Equity Ambassadors program.

90.     The Student Equity Ambassadors program is not substantially related to any government interest.

91.     Plaintiffs are therefore entitled to declaratory and injunctive relief and nominal damages under 24 U.S.C. § 1983.

## COUNT III

**Defendant's Student Equity Ambassador Program violates the Equal Protection Clause because it discriminates on the basis of viewpoint.**

92.     The allegations in the preceding paragraphs are incorporated herein by reference.

93.     The Fourteenth Amendment's Equal Protection Clause protects individuals from "arbitrary government decisionmaking, and against 'invidious discrimination' . . . ." *Buxton v. Kurtinitis*, 862 F.3d 423, 430 (4th Cir. 2017) (quotation omitted). A government violates the Equal Protection Clause when it discriminates on the basis of viewpoint. *Id.*

94.     The Board, in making policy for LCPS, is acting under color of state law.

95.     LCPS' requirement that Student Equity Ambassadors express a government-approved orthodox viewpoint in order to participate in the program violates the Equal Protection Clause.

96.     Plaintiffs are therefore entitled to declaratory and injunctive relief and nominal damages under 24 U.S.C. § 1983.

## COUNT IV

**Defendant's bias reporting system violates the First and Fourteenth Amendments because it chills speech through content based speech restrictions.**

97.   The allegations in the preceding paragraphs are incorporated herein by reference.

98.   "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. 819 at 829.

99.   Bias response systems chill speech even where there is no formal sanction against individual students. *See Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019) (holding that bias reporting systems create "an objective chill based on the functions of the Response Team").

100.   Though the government may legitimately regulate speech that crosses the line into bullying, especially in the school setting*, Davis v. Monroe Cty. Bd. Of Educ.*, 526 U.S. 629, 650 (1999), the government does not have permission to grant a heckler's veto to any student who files a report based on a single incident of speech that the hearer found offensive.

101.   The Board, in making policy for LCPS, is acting under color of state law.

102.   LCPS, in defining the scope of "bias incidents," has created content-based regulations of speech subject to strict scrutiny, because only speech about certain matters can possibly be reported as "bias incidents."

103.   There is no compelling government interest in LCPS' bias reporting system.

104.   The bias reporting system is not narrowly tailored to serve any government interest.

105.   There is no important government interest in the bias reporting system.

106.   The bias reporting system is not substantially related to any government interest.

107.   Plaintiff is therefore entitled to declaratory and injunctive relief and nominal damages under 24 U.S.C. § 1983.

## COUNT V

**Defendant's bias reporting system violates the First and Fourteenth Amendments because it chills speech through viewpoint discrimination.**

108.   The allegations in the preceding paragraphs are incorporated herein by reference.

109.   "The First Amendment is a kind of Equal Protection Clause for ideas." *Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335, 2354 (2020) (plurality) (quoting *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 470 (2015) (Scalia, J., dissenting)). A government violates this promise of equal treatment for ideas when it engages in viewpoint discrimination. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995).

110.   The Board, in making policy for LCPS, is acting under color of state law.

111.   In defining what constitutes a "bias incident" for the bias incident reporting system, Defendant discriminates on the basis of viewpoint. The "bias incident" reporting system chills speech based on viewpoint given that the equity ambassadors who will judge their peers' speech must hold certain viewpoints in order to secure their positions. Defendant's viewpoint discrimination on these matters

violates the Fourteenth Amendment.

112.   Plaintiff is therefore entitled to declaratory and injunctive relief and nominal damages under 24 U.S.C. § 1983.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

a.     Declare that Loudoun County Public School's Student Equity Ambassador program impermissibly discriminates on the basis of race.

b.     Declare that Loudoun County Public School's Student Equity Ambassador program impermissibly discriminates on the basis of viewpoint in violation of the First Amendment and Equal Protection Clause.

c.     Declare that Loudoun County Public School's bias reporting system impermissibly discriminates on the basis of speech content and viewpoint.

d.     Enjoin the Loudoun County School Board from operating the Student Equity Ambassador program.

e.     Enjoin the Loudoun County School Board from operating the bias reporting system.

f.     Award Plaintiffs Nominal Damages.

g.     Award Plaintiffs their costs and attorney's fees under 42 U.S.C. § 1988.

h.     Award Plaintiffs any other relief to which they may be entitled.

Dated: August 30, 2021                    Respectfully submitted,

                                          /s/ Jeffrey D. Jennings

23

Jeffrey D. Jennings (VSB No. 87667)
Daniel R. Suhr (Admitted *pro hac vice*)
Reilly Stephens (Admitted *pro hac vice*)
141 W. Jackson St., Ste. 1065
Chicago, Illinois 60604
Telephone (312) 637-2280
Facsimile (312) 263-7702
jjennings@libertyjusticecenter.org
dsuhr@libertyjusticecenter.org
rstephens@libertyjusticecenter.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2021, a copy of the foregoing was sent to the following persons through the Court's ECF system:

>Stacy Haney
>Haney Phinyowattanachip PLLC
>Shaney@haneyphinyo.com
>
>*Counsel for Defendant Loudoun County School Board*

DATED: August 30, 2021

/s/ Jeffrey D. Jennings
Jeffrey D. Jennings (VSB No. 87667)
Liberty Justice Center
141 W. Jackson Blvd., Suite 1065
Chicago, Illinois 60604
Telephone (312) 263-7668
Facsimile (312) 263-7702
jjennings@libertyjusticecenter.org

*Attorneys for Plaintiffs*

25