**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

Menders, et al.,

Plaintiffs,

v.

Loudoun County School Board,

Defendant.

Case No. 1:21-cv-00669

**RESPONSE OF PLAINTIFFS IN OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS FIRST AMENDED COMPLAINT**

**INTRODUCTION**

This Court is already familiar with the basics of this case from the preliminary injunction. Plaintiffs contend the Loudoun County School Board was motivated by race to adopt a racially discriminatory student leadership program (the equity ambassadors), that it adopted and retains viewpoint-based criteria for admission to the leadership program, and that it is implementing a bias incident response system that chills the speech of LCPS students. The Court declined to issue a preliminary injunction because "based on the current record, Plaintiffs have not established, as required, a likelihood of success on the merits of their claims, as well as the other requirements for the extraordinary relief requested." ECF 24 at 2.

We are here now on a motion to dismiss, where the record is irrelevant and all facts alleged in the complaint must be taken as true. And whereas Plaintiffs were the ones seeking "extraordinary relief" on the preliminary injunction, it is now Defendant who must meet the high bar to show "beyond all doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 317 (4th Cir. 2006).

This the Board cannot do. Plaintiffs deserve the opportunity to take discovery to prove their theory that race motivated the ambassadors criteria, that the widely circulated draft criteria were a wink-and-nod as to what was expected of principals, that "social justice" is code for a political viewpoint as used in this context, and that a student of ordinary firmness would chill his speech to avoid a bias incident report. Thus, the motion to dismiss should be denied in its entirety.

## FACTS

Around June 23, 2020, LCPS published its "Action Plan to Combat System Racism," which outlines a complex set of initiatives to implement a divisive and controversial new ideology across its schools. First Am. Compl. ("FAC") ¶ 24. Those initiatives include prohibiting the "wearing/flying of flags, images, or symbols on LCPS property that represent racist or hateful ideology," *id.* at ¶ 26, "[f]inaliz[ing] the Protocol for Responding to Racial Slurs and Hate Speech in Schools," *id.*, and "consider[ing] the potential renaming of the Loudoun County High School mascot, the Raiders." *Id.*

As Part of LCPS' Action Plan, it developed the "Student Equity Ambassador" ("SEA") program, which the Plaintiffs challenge here. *Id.* at ¶ 28. The SEA program is a formal office the school endows with particular authority to speak on behalf of the student body. *Id.* at ¶¶ 29, 31, 44. Each school principal selects two to three students to serve in the SEA program. *Id.* at ¶ 24. Students are selected based on particular criteria, and they serve as a liaison collaborating with the district-wide Supervisor of Equity during regularly occurring student "*Share, Speak-up, Speak-out* meetings." *Id.* ¶ 31. These meetings and the program generally are "a forum to amplify the voices of Students of Color and those who have experienced or witnessed injustices, marginalization, or discrimination" according to an LCPS high school's "Equity Team." *Id.* at ¶ 58. The LCPS Equity Director also described the Program as "students coming together in this forum." *Id.* at ¶ 57.

Originally, the process for selecting student ambassadors included as its first guideline that "[t]his opportunity is open to all Students of Color." *Id.* at ¶ 33. And

2

the LCPS' formal publication on the matter included a Frequently Asked Questions ("FAQ") section where the first entry read:

> [Question:] My child would like to participate as a Student Equity Ambassador and is not a student of color. Can they participate?
>
> [Answer:] Thank you for your interest but this opportunity is specifically for students of Color. However, students at each school have an option of creating an affinity group for students of Color who all share a similar racial identity and they may also include allies.

*Id.* at ¶ 34.

> The next FAQ read:
>
> [Question:] Are there other opportunities for students to get involved?
>
> [Answer:] Students may reach out to their school's activity coordinator or the equity lead if they would like to be involved in other equity opportunities.

*Id.* at ¶ 35. A flyer accompanying the FAQ document from the district explained that equity ambassadors must "amplify the voices of students of color" and "represent your peers of color." *Id.* at ¶ 36. The Action Plan adopted by the Board said four different times on a single slide that the program was for "students of color." FAC Ex. B at 19.

But LCPS revised the program's description after facing backlash over the "student of color" requirement and removed that requirement but did not change anything else or explain the change. FAC at ¶ 31. After this revision, a parent asked whether their child (who is not a student of color) can apply for the SEA program. *Id.* at ¶¶ 37-38. An LCPS official responded: "[t]hough all students (white or otherwise) are more than welcome to potentially serve as ambassadors, their focus is to raise the voice of their classmates of color during these meetings." *Id.* at ¶ 41.

The revised version retains other criteria upon which principals are supposed to select students, such as "[s]tudents who have a passion for social justice and are willing to serve." *Id.* at 43. The flyer inviting students to engage in the program similarly solicits applicants who "want to be a voice for social justice." *Id.* LCPS's equity director described the equity ambassadors as part of the district's work to "empower students to make meaningful contributions to their world through a social justice lens." *Id.* A LCPS high school announcing the SEA program told parents that having "a passion for social justice" is the first quality students "serving in th[e] role" of Student Equity Ambassador must possess. *Id.* The Action Plan to Combat Systemic Racism adopted by the Board similarly said one goal of the equity ambassadors was "to build forward momentum in using student voice" for a "social justice lens to develop greater awareness and build student empathy, leadership and advocacy skills." FAC Ex. B at 19.

The Plaintiffs' children would not have qualified for the SEA program as originally conceived or practically implemented. FAC at ¶¶ 52-64. None of them identify as students of color, and they and their children hold views about important public issues that they believe conflict with LCPS's definition of social justice. *Id.* They challenge the SEA Program on Equal Protection grounds (Count I) for its racial preferences, and First Amendment and Equal Protection grounds for its viewpoint discrimination. (Counts II and III).

Alongside the SEA Program, LCPS also implemented the Bias Incident Reporting System. LCPS distributed a form to parents and students to "capture

incidents of bias in an anonymous manner." FAC ¶ 47 & Ex. H. The form includes

check boxes for the "Type of Bias Incident" being reported, including "Harassment or

Intimidation," "Racial Slur," "Offensive Language, Teasing or Taunting

Language/Verbal Exchange," "Exclusion or victim of lack of inclusivity," "Gender

Identity and Expression," "Ability Status," "Religious Practices," and "Sexual

Orientation." *Id.* at ¶ 49 & Ex. H. The LCPS equity director further explained that a

"bias incident" is an "act of discrimination, harassment, [or] intimidation directed

against any person or group that appears to be intentional and motivated by prejudice

or bias." *Id.* at ¶ 53. The equity director continued: "Such are usually associated with

negative feelings and beliefs with respect to others [sic] race, ethnicity, national

origin, religion, gender, gender identity, sexual orientation, age, social class, political

affiliation, or disability." *Id.*

LCPS will investigate "bias incidents" if the person submitting the form

provides his or her name and indicates on the form that they would like school

administrators to investigate the "particular incident" they are reporting. *Id.* at ¶ 48

& Ex. H. Also as part of its Action Plan, LCPS is finalizing a "LCPS Protocol for

Responding to Racial Slurs and Hate Speech in Schools." *Id.* at ¶ 56. LCPS's equity

office emphasizes in its messages about the bias response system, "Students should

still report discipline incidents to a trusted adult or members of the administrative

team." *Id.* The incidents reported on this form are also used in the "Share, Speak-up,

Speak-out" meetings with the Student Equity Ambassadors. *Id.* at ¶ 47. Nothing

about the form limits its application to only on-campus speech; students can report incidents involving other students for off-campus speech as well. *Id.* at ¶ 54.

As part of the fight against bias incidents, Student Equity Ambassadors "work to identify microaggressions" within their school. *Id.* at ¶ 50. Three Student Equity Ambassadors gave a presentation to the LCPS Board where they said: "Microaggressions are defined as the everyday, subtle, intentional — and often unintentional — interactions or behaviors that communicate some sort of bias toward historically marginalized groups." *Id.* at ¶ 51. Some example "microaggressions" they identified included: "denial[s] of racial reality" like 'I don't think that white privilege exists'" or asserting the value of "colorblindness," which sees people as individuals rather than members of a race. *Id.* at ¶ 52.

The Plaintiffs are parents of children attending LCPS ("parents"). The parents raise their children to be active, engaged citizens in their community and country. *Id.* at ¶ 62. The parents encourage and teach their children to share their views with their peers. *Id.* As such, the parents and children are concerned that if their students share their views about political or social issues, including those touching on religion, race, and human sexuality, they will be reported and investigated for bias incidents. *Id.* at ¶¶ 60-65.

They fear such a report, investigation, or public disclosure could negatively impact their standing in the school community and ruin their children's college or career prospects. *Id.* at ¶ 65. They are aware that in other school settings nationwide, "bias incident" response or disciplinary systems have been invoked against students

based on similarly worded standards for sharing their political or religious views. *Id.* at ¶ 64.

As demonstrated at much greater length in the Plaintiffs' motion to proceed anonymously, the environment in Loudoun County surrounding hot-button political issues like Critical Race Theory is intense, prompting this Court to grant the Plaintiffs' motion to proceed anonymously. *See* ECF 7-1 and ECF 22.

Given that these parents and their children believe that their views conflict with LCPS's definition of "social justice" and that their views may provoke a "heckler's report" by students or others who disagree with their views, they challenge the Bias Incident Reporting System on First Amendment grounds (Counts IV and V).

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. In other words, a plaintiff must provide sufficient detail to show that he has a more-than-conceivable chance of success on the merits." *Terry v. Perdue*, No. 20-2016, 2021 U.S. App. LEXIS 23223, at *1-2 (4th Cir. Aug. 5, 2021).

## ARGUMENT

**I.    The SEA Program violates the Equal Protection Clause because racial considerations improperly motived it.**

**A.    Race motivated the SEA Program.**

When a state law interferes with "fundamental constitutional rights" or "involve[s] suspect classifications," such as race, the law is subject to strict scrutiny. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16 (1973).

"Even where a law does not use a formal racial classification, a facially neutral law, like the one at issue here, can be motivated by invidious racial discrimination." ECF 24 (order on preliminary injunction) at 9 (citations omitted). "[W]hether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). Courts look at the following factors:

- "the historical background of the challenged decision;"

- "the specific sequence of events leading up to the challenged decision;"

- "departures from normal procedural sequence;"

- "the legislative history of the decision; and"

- "the disproportionate impact of the official action—whether it bears more heavily on one race than another."

*N.C. State Conference of the NAACP v. McCrory*, 831 F.3d 204, 220-21 (4th Cir. 2016) (citing *Arlington Heights*).

Here, the history, sequence of events leading up to the SEA Program's current iteration, and legislative history all show that benefitting "students of color," but not others, motivated this Program. Before its implementation during the 2020-21 school year, the SEA Program appeared in the June 23, 2020, LCPS "Action Plan to Combat Systemic Racism." FAC ¶ 28. Thus, it appeared alongside initiatives such as: "prohibiting the wearing/flying of flags, images, or symbols on LCPS property that represent racist or hateful ideology," "finalizing the Protocol for Responding to Racial

Slurs and Hate Speech in Schools," and "considering the potential renaming of the Loudoun County High School mascot, the Raiders." *Id.* at ¶ 26 (cleaned up).

According to LCPS, "The SEA program and the bias reporting forms were developed to implement" the fifteenth action item in the Action Plan. Def's Mem. Opp. Mot. of Pl's. Preliminary Inj. 3, ECF-17. That action item says that "[s]tories and experiences will be reviewed and shared by the Supervisor of Equity and LCPS **student leaders of Color** during regularly occurring student Share, Speak-up, Speak-out meetings . . ." (emphasis added). FAC ¶ 24 & Ex. B, at 20. These meetings "will be used to amplify the voice(s) of **Students of Color**." *Id.* (emphasis added). The "questions for consideration" ask "What will be the process for selecting **Students of Color** to serve in this way?" and "How can we create a **Student Leaders of Color** (i.e. student equity ambassador) network division-wide with student representatives at schools and bring those students together as a means to amplify student voices?" *Id.* (emphasis added). And the LCPS Comprehensive Equity Plan makes "disruption and dismantling of **white supremacy**" a goal of LCPS. FAC ¶ 24, Ex. C, at 9 (ECF No. 30-3) (emphasis added). No wonder, then, that the Student Equity Ambassador Program started off with an explicit racial classification. The Program's information packet originally stated that the leadership position "is open to all Students of Color." *Id.* at ¶¶ 32-33 & Ex. D.

LCPS dropped the SEA's explicit racial classification after facing an outcry from parents that it was engaging in explicit racial discrimination. *Id.* at ¶ 37. Despite the revisions, in an email exchange between a parent and LCPS administrator, the

administrator stated: "[t]hough all students (white or otherwise) are more than welcome to potentially serve as ambassadors, their focus is to raise the voice of their classmates of color during these meetings." *Id.* at ¶¶ 40-41 & Ex. F. Elsewhere in the FAQs, LCPS stated that the SEA Program is focusing on race instead of other forms of minority status, like faith or disability, because it is important to "recognize students who have been marginalized." *Id.* at ¶ 42.

Even after it dropped the explicit race classification for admission to the SEA Program, LCPS remains focused on promoting "students of color." The revised packet's flyer still asks "Are you interested in Amplifying the **Student Voice of Color**"? FAC ¶¶ 36, 39 & Ex. E, at 5 (ECF No. 30-5) (emphasis added). The revised packet says ambassadors "will be responsible for amplifying the voice of **Students of Color** . . . ." FAC ¶ 38 & Ex. E, at 3 (emphasis added). An LCPS high school sent a letter stating that the SEA Program's "goal is to provide a forum to amplify the voice of **Students of Color** and those who have experienced or witnessed injustices, marginalization, or discrimination." *Id.* at ¶ 43 & Ex. G, at 2 (ECF No. 30-7) (emphasis added). Thus, the SEA Program remains tainted with a desire to prefer "Students of Color" over all others.

Finally, Plaintiffs have alleged that the program has had an actual discriminatory impact, as white students are substantially underrepresented among student ambassadors. FAC at ¶ 45. Plaintiffs cannot further develop this allegation at this stage because all the relevant information is in the hands of the Defendant, and can only be accessed through discovery. *Contra* ECF No. 38 at 7-8. Plaintiffs have

not offered conclusory allegations; they have offered the best they have at this early stage in the case, and now require the opportunity to prove their case from the facts held by the Defendant.[1]

It will be Plaintiffs' burden to eventually prove all of the elements of their case with testimony from district officials and verified record evidence from the current school year, but they have certainly alleged sufficient facts at this stage to show "discriminatory purpose was a motivating factor" by looking wholistically at all five factors. *N.C. State Conference*, 831 F.3d at 220.

The Board and this Court, in considering the preliminary injunction, also emphasize that, in the Board's view, the SEA Program is only trying to "combat and remedy discrimination" and is not discriminating against "white students" while it seeks to promote "Students of Color," but strict scrutiny applies nonetheless. LCPS Br. 7, ECF No. 38. *See* ECF No. 24 at 13 ("the current record does not sufficiently establish that the SEA Program was motivated, adopted or implemented with an intent or purpose to discriminate against white students."). However, the Plaintiffs

---

[1] *See* ECF No. 24 at 13: "the record is insufficient to show discriminatory impact. While the number of white students that were selected as SEAs appears to be disproportionate to their representation within the general student population, there is no information concerning how their representation among selected SEAs compares to the demographics of those who applied or were considered, including how many white students who were nominated were not selected or even whether there were more students than available SEA positions or to what extent the competitive selection criteria was even applied in connection with the SEAs selected for the past academic year. And, of course, there is no information concerning the group from which the coming academic year's SEAs will be selected." Plaintiffs can only establish these facts by being permitted to move forward with their case and access the relevant records, all of which are held in the hands of the Defendant.

do not need to prove that the Board was motivated to discriminate *against* white students; proving it was motivated to discriminate *in favor* of students of color suffices. This is so because discrimination in favor of one racial group, even if undertaken to remedy past discrimination against that group, is necessarily discrimination *against* the non-favored race. *La. Associated Gen. Contractors v. State ex rel. Div. of Admin., Office of State Purchasing*, 669 So. 2d 1185, 1204 n.12 (La. 1996) ("Although defendants assert the instant Act does not discriminate against anyone but only discriminates in favor of certain races to remedy past discrimination, discrimination in favor of one race is necessarily discrimination against members of another race."). *See Adarand Constructors v. Pena*, 515 U.S. 200, 276 n.* (1995) (Thomas, J., concurring) ("It should be obvious that every racial classification helps, in a narrow sense, some races and hurts others.").

We can see this principle in operation quite clearly in two recent sets of cases involving explicit racial preferences in favor of farmers of color and restaurant owners of color. In both instances, courts consistently held that white farmers and white restauranteurs were victims of race-based discrimination because of their exclusions from the program, even if the programs were benignly intended to provide a positive benefit to people of color whose racial groups had experienced past discrimination. *Vitolo v. Guzman*, 999 F.3d 353 (6th Cir. 2021); *Wynn v. Vilsack*, No. 3:21-CV-514-MMH-JRK, 2021 WL 2580678 (M.D. Fla. June 23, 2021); *Greer's Ranch Cafe v. Guzman*, No. 4:21-CV-00651-O, 2021 WL 2092995 (N.D. Tex. May 18, 2021); *Faust v. Vilsack*, No. 21-C-548, 2021 WL 2409729 (E.D. Wis. June 10, 2021); *Holman v.*

*Vilsack*, No. 21-1085-STA-JAY, 2021 WL 2877915 (W.D. Tenn. July 8, 2021). Preferring one race over the other for a government benefit can only be justified by a compelling state interest. *Vitolo*, 999 F.3d at 361.

Quite simply, the Board asserts a benign motive for its racial discrimination: it was endeavoring to help students of color as redress for a school district burdened by the historic legacy of segregation. But a benign motive to discriminate based on race is still discrimination based on race, which the law carefully cabins to instance of compelling interest. The Supreme Court has several times rejected an effort to provide "relaxed judicial scrutiny" for racial preferences stemming from "benign" or "remedial" motives. *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007); *Shaw v. Reno*, 509 U.S. 630, 653 (1993); *Richmond v. J. A. Croson Co.*, 488 U.S. 469, 494 (1989). *See Adarand Constructors*, 515 U.S. at 241 (Thomas, J., concurring) ("government-sponsored racial discrimination based on benign prejudice is just as noxious as discrimination inspired by malicious prejudice. In each instance, it is racial discrimination, plain and simple.").

Simply consider a hypothetical where the races were reversed. If the Board adopted a student equity ambassadors program open only to white students, would this Court hesitate for a moment to strike it down? Would it matter if the Board asserted it was remedying past hostility to European immigrants who arrived in the United States from 1870-1900, when the Irish and others were victims of vicious discrimination? And would it matter to this Court if the Board amended its draft

program guide to no longer explicitly favor white students, but instead said that ambassadors could be anyone willing to "raise the voices of white students"?

The Board's defense that it was acting from a benign purpose to remedially discriminate in favor of students of color is just one more piece of evidence this whole program flunks the *Arlington Heights* test for racially discriminatory motives.

## II. The SEA Program violates the First Amendment and the Equal Protection Clause by discriminating based on viewpoint.

### A. The SEA Program violates the First Amendment.

Choosing students for the SEA Program based on their viewpoint violates the First Amendment. Viewpoint discrimination is "an egregious form of content discrimination." *Judson v. Bd. of Supervisors*, 436 F. Supp. 3d 852, 865 (E.D. Va. 2020) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). "The First Amendment is a kind of Equal Protection Clause for ideas." *Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335, 2354 (2020) (plurality) (quoting *Williams-Yulee v. Florida Bar*, 575 U. S. 433, 470 (2015) (Scalia, J., dissenting)).

### 1. *LCPS may not discriminate on the basis of viewpoint in this nonpublic forum.*

The Equity Ambassadors program is best categorized as a nonpublic forum. The LCPS Equity Director described the SEA Program as "students coming together in this forum." FAC ¶ 50. One LCPS high school also said that "[t]he goal is to provide a forum to amplify the voices of Students of Color and those who have experienced or witnessed injustices, marginalization, or discrimination." *Id.* at ¶ 51.

As a nonpublic forum occurring outside the classroom, LCPS may not discriminate based on viewpoint. Admittedly, "[n]either the Supreme Court nor [the

Fourth Circuit] has decided whether restrictions on school-sponsored student speech must be viewpoint neutral under *Hazelwood [Sch. Dist. v. Kuhlmeier,* 484 U.S. 260 (1988)], and other circuits are split on this question." *Robertson v. Anderson Mill Elem. Sch.*, 989 F.3d 282, 290 (4th Cir. 2021).[2] This Court should follow the majority of circuits that have considered the issue in holding that *Hazelwood* does not permit viewpoint discrimination in school-sponsored programs, for three reasons.

*First*, though the Fourth Circuit has not taken a formal position on the issue, it has leaned one way in the debate. In *Child Evangelism Fellowship of Maryland, Inc. v. Montgomery County Public Schools*, considering extra-curricular activities in a school building, the Fourth Circuit held that "even in a nonpublic forum, government regulation must be not only reasonable but also viewpoint neutral." 457 F.3d 376, 384 (4th Cir. 2006). It also noted that "viewpoint neutrality requires not just that a government refrain from explicit viewpoint discrimination, but also that it provide adequate safeguards to protect against the improper exclusion of viewpoints." *Id.*

*Second*, the majority of circuits that have considered the question have concluded that schools cannot discriminate based on viewpoint in school-sponsored

---

[2] That the Board may discriminate on other qualifications unrelated to viewpoint in defining access to a nonpublic forum is not contested, ECF 38 at 10-11; the Board's argument about rationally related selection criteria is irrelevant when the one criterion on which the Board may not discriminate is viewpoint. *Am. Freedom Def. Initiative v. Suburban Mobility Auth.*, 978 F.3d 481, 501 (6th Cir. 2020) ("For decades, the Supreme Court has said that even in nonpublic forums—the forums in which the government has the most leeway to regulate speech—the government may still not engage in viewpoint discrimination.").

fora. *See Peck ex rel. Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 632-33 & n.9 (2d Cir. 2005); *Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1011 (9th Cir. 2000); *Planned Parenthood of S. Nev., Inc. v. Clark Cty. Sch. Dist.*, 941 F.2d 817, 829 (9th Cir. 1991)*; Searcey v. Harris*, 888 F.2d 1314, 1319 n.7 (11th Cir. 1989). A number of other circuit judges, writing in instances where their colleagues avoided the question, concluded that viewpoint neutrality applies to student speech in school fora. *See C.H. v. Oliva,* 226 F.3d 198, 210-12 (3d Cir. 2000) (Alito, J., dissenting); *Busch v. Marple Newtown Sch. Dist.*, 567 F.3d 89, 109 (3d Cir. 2009) (Hardiman, J., concurring/dissenting); *Morgan v. Swanson*, 659 F.3d 359, 390 n.1 (5th Cir. 2011) (en banc) (Jones, C.J., concurring); *Matter of Macula v. Bd. of Educ.*, 75 A.D.3d 1118, 1120, 906 N.Y.S.2d 193, 194 (App. Div. 4th Dept.). Moreover, in *Hazelwood* itself, the petitioners conceded that the school had to act in a viewpoint neutral way, a point that Justice Brennan noted in his concurrence. *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 287 n.3 (1988) (Brennan, J., concurring).

*Third*, the majority rule is right for simple matters of doctrine and constitutional law: "if schools could impose viewpoint-based restrictions on all student speech that might be perceived as school-sponsored, the promise of *Tinker*— that students 'do not shed their constitutional rights to freedom of speech or expression at the schoolhouse gate'—would mean very little." *Busch*, 567 F.3d at 108 (Hardiman, J., concurring/dissenting). Thus, this court should follow most other courts and recognize that First Amendment rights, including their protection against viewpoint discrimination, remain in force in school-sponsored fora.

To be sure, LCPS attempts to analogize the SEA Program to *Buxton v. Kurtinitis* so that it evades First Amendment scrutiny, but that analogy is flawed. *See* LCPS Br. 9, ECF 38 (relying on 862 F.3d 423, 429–30 (4th Cir. 2017)). In *Buxton*, the Fourth Circuit rejected a student's appeal who alleged retaliation based on viewpoint when the public college denied his admission to a competitive radiology program after he mentioned his faith during the admission process. *Id.* at 425. The Circuit rejected forum analysis because he "has not pointed to a single case in which a court applied—as he requests here—forum analysis to a Free Speech retaliation claim." *Id.* at 428. The *Buxton* court noted, "Excluding a speaker from participating and retaliating against the speaker for his speech are two different actions, to which we apply different analytical frameworks." 862 F.3d at 428.

So the question of whether this Court should separately analyze designation as an equity ambassador and participation in a "speak up" session is simple: is this case more like excluding a speaker from participating or retaliating against a speaker after-the-fact for his speech? The answer is the first: Defendant is excluding Plaintiffs' children from participating before any speech is made. By its own terms, *Buxton* is the wrong analytical framework.

Additionally, the radiology program's purpose in *Buxton* was not to promote speech, rather it was teaching students how to treat patients. But here, everything about the SEA Program is about speech—speech in a "speak up, speak out" session. FAC ¶¶ 29, 46-47. Speech "to amplify student voices." *Id.* at ¶¶ 29, 58. Speech "to share their stories." *Id.* at ¶ 24 & Ex. B, at 19. Speech "to build forward motion in

using student voice." *Id.* at ¶ 24 & Ex. B, at 20. No wonder, then, that LCPS employees refer to the program as a whole as a "forum." *Id.* at ¶¶ 57-58, 85.

Nor can LCPS claim that the admissions process is separate from the "speak up, speak out" sessions; they are two sides of the same coin. To be a student equity ambassador is to be admitted to the "share, speak up, speak out" sessions; to be denied the designation of student equity ambassador is to be excluded from participating in the sessions. *See* FAC at ¶ 24 & Ex. B, at 20 (Action Plan to Combat Systemic Racism) ("How can we create a Student Leaders of Color (i.e. student equity ambassador) network division-wide with student representatives at schools and bring those students together as a means to amplify student voices? This allows for an opportunity to build forward motion in using student voice."). Accordingly, this Court should apply forum analysis to the entire SEA Program, and follow the constitutional rule banning viewpoint discrimination.

### 2. *LCPS engages in viewpoint discrimination with the SEA.*

In order to become a student equity ambassador, a candidate must check two explicitly ideological boxes. He or she must promise to "amplify the voices of students of color" and he or she must have a proven track record of "passion for social justice." FAC ¶¶ 30, 37 51.

LCPS now says that white students qualify for the program, but only if their "focus is to raise the voice of their classmates of color during these meetings." *Id.* at ¶ 35. LCPS says that the ambassadors must "represent [their] peers of color" and "amplify the voices of students of color." *Id.* ¶¶ 30, 33, 37, 51. The expectation that

18

any student who comes to the forum must "amplify" or "represent" or "raise" "the voices of students of color" is a viewpoint-check at the admission gate to this forum.

In order to qualify to participate in the forum, students are equally expected to be youthful social justice warriors. LCPS materials tell principals to appoint students "who want to be a Voice for Social Justice," and "who have a passion for social justice." *Id.* at ¶ 29, 30, 66. One school's "equity lead" teacher says Student Equity Ambassadors "are promoting cultural awareness and growth by . . . be[ing] a voice for social justice." *Id.* at ¶ 66. The LCPS Equity Director also described equity ambassadors as part of the district's work to "empower students to make meaningful contributions to their world through a social justice lens." FAC ¶ 37. In other words, to qualify for this program, a student must be on board with LCPS's vision for social justice. That is viewpoint discrimination in access to a nonpublic forum.

In *Rosenberger*, the Supreme Court rejected the argument that the nonpublic forum at issue in that case was viewpoint neutral by excluding all religious viewpoints because "[i]f the topic of debate is, for example, racism, then exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one." 515 U.S. at 831. Here, LCPS' viewpoint discrimination is even more sweeping because it excludes any student with a viewpoint on the question of racism that varies from LCPS's preferred viewpoint. That sort of discrimination cannot stand.

At the preliminary injunction stage, the Court found that Plaintiffs had failed to prove on the extant record that "social justice" is a viewpoint. ECF No. 24 at 15.

On a motion to dismiss, however, Plaintiffs have reasonably alleged that social justice *is* a viewpoint, and they deserve the opportunity to develop facts to prove that theory. They may do this, for instance, by witness testimony from district officials about what they believe it means for a student to have a demonstrated "passion for social justice." They may explore in depositions what the equity director means by a "social justice lens." They may introduce expert witness testimony, drawing from documents in the education field, to demonstrate that "social justice" is a term of art in the equity education space associated with political views and values. *See, e.g.,* David Randall, *Social Justice Education in America*, Nat'l Ass'n of Scholars (Nov. 29, 2019);[3] Mollie A. Gambone, "Teaching the Possible: Justice-Oriented Professional Development for Progressive Educators," 27 Brock Ed. J. 53 (2017).[4] In other words, they can show that though "social justice" is a term used by many scholars and speakers throughout history, and may sometimes have generic meanings in a dictionary, the term *in this context* refers to a particular ideology associated with progressive politics.

Similarly, record development is necessary to show that phrases like "raise the voices of students of color" is a term of art in this context that commands students to express certain acceptable opinions and to avoid unwanted opinions. This can again be shown through depositions, documents, and expert testimony about the use of language like this in the K-12 educational equity community.

**B.** **The SEA Program's viewpoint discrimination violates the Equal Protection Clause.**

---

[3] https://www.nas.org/reports/social-justice-education-in-america/full-report.
[4] https://files.eric.ed.gov/fulltext/EJ1165958.pdf.

Even if LCPS is correct that forum analysis does not apply to the SEA Program because it is a "competitive process" for receiving a public benefit, it would still violate the Equal Protection Clause, which forbids the government from engaging in "invidious discrimination" in that context. *See Buxton*, 862 F.3d at 430.

As explained above, *Buxton* held that the student did not have a First Amendment viewpoint discrimination claim because the radiation program's selection process was not a forum for speech and was instead a "competitive interview." 862 F.3d at 430. But the court noted that the Equal Protection Clause could still be used to challenge "invidious discrimination" based on viewpoint during a competitive selection process for a government benefit. *Id.* at 430-31. But because the student did not allege an equal protection claim, the court did not consider it.

For all the reasons explained above on why the SEA Program discriminates on viewpoint, this Court should strike it down on equal protection grounds if it determines that First Amendment forum analysis does not apply. Strict scrutiny applies because it applies to classifications that involve fundamental rights, and free speech is a fundamental right. *Clark v. Jeter*, 486 U.S. 456, 461 (1988).

Here, the SEA Program cannot satisfy scrutiny for the reasons explained above. Additionally, discriminating against students who oppose LCPS' progressive vision of "social justice" is not narrowly tailored. Thus, the SEA Program's viewpoint discrimination violates equal protection.

**III. Plaintiffs have standing to bring their fourth and fifth claims because they have alleged a credible threat of enforcement.**

Defendant stakes its entire attack on the Plaintiffs' fourth and fifth counts, against the bias incident response system, on the lack of a credible threat of enforcement. ECF No. 38 at 11-13.

Here, the Plaintiff students have said with particularity they wish to speak out on Critical Race Theory, race, and gender identity, and other controversial political issues. FAC at ¶¶ 61-65. They desire to share these views within the LCPS school community. *Id.* at ¶ 62. They are aware that views like this have prompted bias incident reports in other educational settings. *Id.* at ¶ 64.

LCPS' Bias Incident Reporting System sweeps in speech of these views because it defines a "bias incident" as an "act of discrimination, harassment, [or] intimidation" that "appears to be intentional and motivated by prejudice or bias." *Id.* at ¶ 46. LCPS notes that "[s]uch [acts] are usually associated with negative feelings and beliefs with respect to others [sic] race, ethnicity, national origin, religion, gender, gender identity, sexual orientation, age, social class, political affiliation, or disability." *Id.* "Bias incidents" are shared with Student Equity Ambassadors who work to "identify microaggressions" within LCPS, which three ambassadors defined as opinions like "I don't think that white privilege exists," "society should be colorblind," or "we should see people as individuals rather than members of a race." *Id.* at ¶¶ 44-45. Thus, if Plaintiffs' students express their views on these issues, their speech will fall within the definition of a "bias incident." Defendant does not argue this point.

As a result, the Plaintiffs fear that the Bias Incident Reporting System will be used to discipline or shame their students for their views. *Id.* at ¶ 65. Indeed, the reports will be reviewed and logged by the equity supervisors and ambassadors, who are handpicked student social-justice warriors. LCPS also invites students submitting incidents to the Bias Incident Reporting System to indicate whether they want the school to investigate. *Id.* at ¶¶ 48-49.

Defendant contends Plaintiffs have not established "a credible threat of enforcement" because "Plaintiffs do not allege any facts that show there is a credible threat that they will suffer any consequences as a result of the bias reporting form. Plaintiffs do not allege that there have been any students disciplined or even investigated as a result of the bias reporting forms. Nor do Plaintiffs allege that any investigation conducted by school officials as a result of a bias reporting form submission itself poses some significant burden, independent of any ultimate consequence." ECF No. 38 at 12.

Again, there is a limit to what Plaintiffs can establish at this stage because this is a motion to dismiss, and without having done any discovery, they cannot know how many reports have been filed and how many students have been investigated or disciplined, information that resides in the files of the Defendant alone. But Plaintiffs have pled the existence of the bias incident reports. FAC ¶ 47 and Ex. H. And they have alleged that requests for investigation will be taken seriously. FAC ¶ 48. Again, *at this stage* on a motion to dismiss, Plaintiffs do not need to prove that the form

exists, the form is used by students, and its referrals for investigation are taken seriously. They must only allege that it is so, and prove it later. This they have done.

That said, Plaintiffs have established a credible threat of enforcement. First of all, the Defendant misunderstands the relevant "enforcement." Plaintiffs are not alleging that LCPS's bullying policy is unconstitutional or that punishment under the bullying policy or some other school policy chills speech. Plaintiffs are alleging that the bias incident response system, in itself, the existence of the google form on the Internet available to students to fill out and submit, chills their speech.

The existence of the form, in itself, its continued presence on the Internet and as a matter of school policy, is the action being challenged. The Fifth and Sixth Circuits have both considered pre-enforcement challenges to similar bias response systems and found standing, as did Judge Brennan on the Seventh. *Speech First, Inc. v. Fenves*, 979 F.3d 319 (5th Cir. 2020); *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 770 (6th Cir. 2019); *Speech First, Inc. v. Killeen*, 968 F.3d 628, 652 (7th Cir. 2020) (Brennan, J., dissenting).

The Fifth Circuit in *Fenves* and Judge Brennan in *Killeen* recognized that the reporting system *in and of itself* chilled speech. *Fenves*, 979 F.3d at 338 ("That the CCRT invites anonymous reports carries particular overtones of intimidation to students whose views are 'outside the mainstream.'"); *Killeen*, 968 F.3d at 652 (Brennan, J., dissenting) ("potential 'offenders' may not speak at all if they fear that University officials are monitoring them for biased speech.").

The Sixth Circuit considered a similar "bias response team" system of student reporting in *Schlissel*, which that court found would chill the speech of an ordinary college student. 939 F.3d at 765. The Bias Response Team in *Schlissel* did not have "direct punitive authority," but it could "make referrals to police, [the Office of Student Conflict Resolution], or other school resources such as counselling services." *Id.* at 763. The court reasoned that the Bias Response Team's "ability to make referrals—i.e., to inform OSCR or the police about reported conduct—is a real consequence that objectively chills speech." *Id.* at 765. It explained that "referral subjects students to processes which could lead to" "criminal conviction or expulsion." *Id.* "The referral initiates the formal investigative process, which itself is chilling even if it does not result in a finding of responsibility or criminality." *Id.* The Sixth Circuit in *Schlissel* held this objectively chilled speech, and thus, the students had standing to sue.

So too with LCPS' Bias Incident Reporting System. The possibility that those running the system can refer the case to school administrators for possible discipline objectively chills speech. 939 F.3d at 762. Just as the observation and investigation process themselves chilled speech in these cases, the mere possibility that a LCPS student will be observed and investigated chills their speech. Again, it is the existence of the bias incident reporting system, with the threat of investigation, that constitutes the chill, not the actuality of investigation under the bullying policy, and so it is the existence of the system which must be credibly alleged, not the chances of discipline under the bullying policy.

Defendant misreads and misapplies *Abbott v. Pastides*, 900 F.3d 160 (4th Cir. 2018). A public university approved two student groups to hold an event on campus about free expression. *Id.* at 164-65. The fact that they intended to include visual materials often considered offensive in their event prompted complaints to the university from other students. *Id.* at 165. This led a university official to send the student a letter purporting to include a "Notice of Charge" and that required him to meet with the official to discuss the incident or face "investigation and ultimate recommendation to the University Provost and President." *Id.* at 164, 171. A few weeks later, the official notified one of the group's members that there was no cause for investigation and that the matter had been dropped. *Id.* at 163. The student argued that the letter and meeting was a credible threat of enforcement or alternatively that future meetings in and of themselves chill a reasonable college student's speech. *Id.* at 178.

The court held that the student lacked standing. It started by reasoning that any credible threat of enforcement was removed after the university met with the student and then told him that his activities did not violate its policies. But the court noted that it "do not doubt that a college student reasonably might be alarmed and thus deterred by an official letter from a University authority referring to an attached 'Notice of Charge' (even if no such notice actually is attached), raising the prospect of an investigation and ultimate recommendation to the University Provost and President." *Id.* at 171.

The court then rejected his argument that the threat of future mandatory meetings with school officials chills his speech. *Id.* at 178. The court reasoned that "a threatened administrative inquiry will not be treated as an ongoing First Amendment injury sufficient to confer standing unless the administrative process itself imposes some significant burden, independent of any ultimate sanction." *Id.* at 179. It concluded that having to meet with school administrators to explain your side of the story is neither a credible threat of enforcement, nor an onerous process. *Id.*

*Abbott* helps the Plaintiffs, not undermines them. The Fourth Circuit clearly said a student would be justified in being "alarmed" and "deterred" by a formal notice "raising the prospect of an investigation." The student lacked standing, however, because the school had made clear that it considered his future similar speech acceptable, and further the threat of future non-investigatory counseling sessions was not sufficient to chill speech. For Plaintiffs' children, they too are "alarmed" and "deterred" by "the prospect of an investigation" stemming from a bias incident report. FAC ¶¶ 40-41. And far from being told their speech on controversial topics is acceptable to the school, the school here has fought tooth-and-nail to retain its right to "limit speech that is 'biased or prejudiced'" as part of its responsibility to "awaken the child to cultural values and promote conduct consistent with the shared values of a civilized social order." ECF 17 at 14-15 (cleaned up). And rather than being assured that their speech will not result in future counseling, the district has adamantly maintained its right to include an investigation option on its bias incident form.

*Second*, Plaintiffs' claims are stronger than those of the students in *Abbott* or any of the Speech First cases because the situation here is much more coercive than the university context. There, courts ask whether an objectively reasonable young adult would feel his speech chilled. Here, we ask whether students in middle and high school would self-censor rather than risk reporting, investigation, and review by the equity ambassadors. The Supreme Court has reasoned that "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." *Lee v. Weisman*, 505 U.S. 577, 592 (1992). *Lee's* concern with the vulnerability of school age children, like those in this case, is apt. *See Myers v. Loudoun Cty. Pub. Sch.*, 418 F.3d 395, 407 (4th Cir. 2005). Quite simply, an ordinary sixth or seventh grader is more likely to be chilled by a mere possibility of reporting and investigation of their speech by school officials than an adult college student subject to a bias response system. *Abbott* acknowledged that some investigations can give rise to First Amendment standing if they "impose[] some significant burden, independent of any ultimate sanction." Here, being reported to school administrators for "biased" speech significantly burdens middle and high school students' speech, regardless of eventual investigation and sanction for bullying.

Finally, this Court need not abandon its common sense in judging this argument. A plaintiff need not "first expose himself to actual arrest or prosecution" to bring a preenforcement challenge. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). Nor must he silently chill himself for several months to see if some

other sucker who does speak up gets arrested in order to establish a credible threat of enforcement. The "existence of a statute implies a threat to prosecute." *Bauer v. Shepard*, 620 F.3d 704, 708 (7th Cir. 2010). *See ACLU v. Alvarez*, 679 F.3d 583, 593-94 (7th Cir. 2012). The existence of a check-box for investigation on an official school form similarly implies a threat to refer for investigation. Plaintiffs have alleged all they must at this stage: the credibly allege a form for reporting bias incidents to school authorities exists, it includes an option for referral to investigation, and a reasonable middle or high school student would fear speaking out on controversial topics facing a report on such a form.

## CONCLUSION

Plaintiffs have alleged a racially discriminatory motive in creating the student equity ambassadors program. That the racial discrimination was benign, in favor of one group of students, and not intended as against another group of students, does not save it from the harsh reality of *Arlington Heights* and strict scrutiny. At the motion to dismiss stage, this court must extend the opportunity to assemble the full facts, many of which are solely in the possession of Defendant, to prove their case.

Plaintiffs have alleged a viewpoint discriminatory criterion for access to a nonpublic forum. That the viewpoint alleged was a term of art that has different meanings in different contexts does not mean Plaintiffs have not sufficiently alleged viewpoint discrimination in this context. Again, at this stage, they are entitled to proceed to prove their allegation that "social justice" is a term of art with a particular meaning in the education equity space, associated with a progressive political ideology.

Plaintiffs have alleged their speech on particular topics is chilled by the Defendant's bias incident reporting system. Again, at this stage, they are entitled to proceed to discover the extent to which Defendant is referring and completing investigations to justify their fears. But their standing is secure, as the Fifth and Sixth Circuits have held in very similar contexts, by the existence of the system with its threat of investigation. And the chill is all the more pronounced because these are children, in grades six through twelve, who are particularly vulnerable to official pressure to conform.

In closing, the Plaintiffs ask this Court to consider Justice Breyer's recent majority opinion for the Court on student speech in the K-12 context:

> [T]he school itself has an interest in protecting a student's unpopular expression, especially when the expression takes place off campus. America's public schools are the nurseries of democracy. Our representative democracy only works if we protect the "marketplace of ideas." This free exchange facilitates an informed public opinion, which, when transmitted to lawmakers, helps produce laws that reflect the People's will. That protection must include the protection of unpopular ideas, for popular ideas have less need for protection. Thus, schools have a strong interest in ensuring that future generations understand the workings in practice of the well-known aphorism, "I disapprove of what you say, but I will defend to the death your right to say it."

*Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2046 (2021). Nothing about the Board's policies here promotes a "marketplace of ideas" or a "free exchange" between students. The equity ambassadors creates a forum where the admission is conditioned on having the right viewpoint going in. And rather than teaching students to defend another's right to disagree on something controversial, the school is teaching students to turn one another in for "bias incidents." This goes against the entire heart of the First Amendment.

Dated: September 27, 2021                    Respectfully Submitted,

/s/ Jeffrey D. Jennings
Jeffrey D. Jennings (VSB No. 87667)
Daniel R. Suhr (*Pro Hac Vice*)
Liberty Justice Center
141 W. Jackson St., Ste. 1065
Chicago, Illinois 60604
Telephone (312) 263-7668
Facsimile (312) 263-7702
jjennings@libertyjusticecenter.org
dsuhr@libertyjusticecenter.org

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 27, 2021, a copy of the foregoing was E-Filed through the Court's CM/ECF system, which will send a copy to:

> Stacy Haney
> Haney Phinyowattanachip PLLC
>
> *Counsel for Defendant Loudoun County School Board*

DATED: September 27, 2021

/s/ Jeffrey D. Jennings
Jeffrey D. Jennings (VSB No. 87667)
Liberty Justice Center
141 W. Jackson St., Ste. 1065
Chicago, Illinois 60604
Telephone (312) 263-7668
Facsimile (312) 263-7702
jjennings@libertyjusticecenter.org

*Attorneys for Plaintiffs*