IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| PATTI H. MENDERS, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 1:21-cv-669 (AJT/TCB) |
| ) | |
| LOUDOUN COUNTY SCHOOL BOARD, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

**MEMORANDUM OPINION AND ORDER**

Defendant Loudoun County School Board has moved to dismiss Plaintiffs' First Amended Complaint. [Doc. No. 37] (the "Motion"). Upon consideration of the Motion, the memoranda submitted in support thereof and in opposition thereto, the arguments of counsel at the hearing held on November 10, 2021, and for the reasons that follow, the Motion is GRANTED and this action is DISMISSED.

**I.   BACKGROUND**

Unless otherwise noted, the following facts are taken from the Amended Complaint, [Doc. No. 30] ("Am. Compl."), and the documents referenced therein integral to the Amended Complaint. *See Witthohn v. Fed. Ins. Co.*, 164 Fed. App'x. 395, 396 (4th Cir. 2006) ("[A] court may consider official public records, documents central to plaintiff's claim, and documents sufficiently referred to in the complaint without converting the motion to dismiss into one for summary judgment so long as the authenticity of these documents is not disputed.") (alterations omitted).

In June 2019 the Loudoun County Public Schools ("LCPS") commissioned an outside consultant, The Equity Collaborative, which issued a Report titled Systemic Equity Assessment:

A Picture of Racial Equity Challenges and Opportunities in the Loudon County School System, attached to the Amended Complaint as Exhibit A.

On June 23, 2020, LCPS published its "Action Plan to Combat Systemic Racism" ("the Action Plan"), attached to the Amended Complaint as Exhibit B. *Id.* ¶ 24. The Action Plan consists of sixteen "action items," the fifteenth of which, the only one at issue in this case, is that "LCPS will collect qualitative data regarding racial incidents to amplify student voices." *Id.*, Ex. B at 18. Toward that end, the "LCPS administration will support the concept of LCPS staff amplifying student voices regarding racial incidents they have experienced in school" and "create an electronic form for LCPS students to anonymously share their stories regarding issues of racism, injustice and inequity." *Id.* In addition, "Student Equity Ambassadors" ("SEAs") will be selected and "[s]tories and experiences will be reviewed and shared by the Supervisor of Equity and the Student Equity Ambassadors during regularly occurring student Share, Speak-up, Speak-out meetings." Am. Compl. ¶ 29. As explained by the LCSB in court, these Share, Speak-up, Speak-out meetings are intended to occur multiple times during the year and are open only to students who are SEAs.

**A. The Bias Reporting Form**

The online electronic form used to report bias incidents is titled the Bias Reporting Form. Am. Compl., Ex. H. The Form states that "[s]tories of bias shared through this platform will be used in an anonymous manner for the Share, Speak Up, Speakout sessions with Student Equity Ambassadors." *Id.* A "bias incident," as stated in the Form, is "an act of discrimination, harassment, and intimidation directed against any person or group that appears to be intentional and motivated by prejudice or bias." *Id.* As stated in the Form, "[s]uch incidents are usually associated with negative feelings and beliefs about another's race, ethnicity, national origin, religion, gender, gender identity, sexual orientation, age, social class, political affiliation, or

disability." *Id.* The Form further states that "[t]his process provides information to LCPS leadership (specifically the Equity Office) that will be used for the Share, Speak-up, Speak-out sessions, as well as inform next steps for professional learning and support for school staff." *Id.* Finally, the Form declares that "LCPS is committed to providing and ensuring a respectful, safe, supportive, culturally-responsive learning space for every LCPS student." *Id.*

The Form requests the name of the school, the date of the incident and the location of the incident. *Id.* Under "Type of Bias Incident," the form requires that the reporting student check the box of all the listed categories of bias that apply. Listed categories are "Harassment or Intimidation," "Racial Slur," "Offensive Language, Teasing or Taunting Language/Verbal Exchange," "Exclusion or victim of lack of inclusivity," "Gender Identity and Expression," "Ability Status," "Religious Practices," and "Sexual Orientation." *Id.* It then asks for a description of "what happened," explaining that "[s]haring details in the space will contribute to topics used to address biases during the Share, Speak Up, Speak-out sessions with the Student Equity Ambassadors from every middle and high school." *Id.*

The Form ends with the section "Official Incident Reporting," which is the focus of Plaintiffs' constitutional challenge to the use of the Form. *Id.* That section states that "[t]he primary use of this Form is for the Office of Equity to capture stories and incidents of bias in an anonymous manner. Would you like this particular incident investigated by the administrators at your school?" *Id.* The following responses are listed: (a) "No, I do not want to report this to my school."; (b) "No, I have already reported this to my school."; and (c) "Yes, if yes, please provide your name below." *Id.*

A submitted Form goes directly to the Equity Office and the information on the Form is used by the Equity Office to generate discussion points for the "Share, Speak-up, Speak-out" meetings held with the SEAs. Am. Compl. ¶ 47. LCPS will only investigate reported "bias

incidents" if the person who submits the Form provides his or her name and indicates on the Form that he or she would like the school administrators to investigate the particular incident reported. *Id.* ¶ 48. However, according to the slide deck on the Action Plan to Combat Racism, the Reporting System is separate from the LCPS disciplinary system.

### B. The SEA Selection Process

SEAs are selected based on nominations by school staff, administrators, fellow students, or themselves and, from the pool of nominated students, each middle and high school principal selects two or three students to serve as a SEA for one school year term, with new ones selected each year. Am. Compl., Ex. D (Student Equity Ambassador Information Packet) at 2. If more than three students show interest from any particular school, the selection process becomes a competitive one, without regard to race, based on "student attributes," which are listed as follows:

  a. Honest and able to speak the truth, while also listening;

  b. Have "a passion for social justice" and are willing to serve;

  c. Are sympathetic and sensitive;

  d. Have the respect and credibility of their peers; and

  e. Will be empowered by this opportunity and have the potential for leadership.

*Id.* at 3. Selected students will be expected to "be responsible for amplifying the voice of Students of Color by engaging in discussions about student stories/experiences regarding issues of racism, injustice and inequity" and "serve as equity ambassadors for their school." *Id.* Although an initial version of the SEA program stated that "[t]his opportunity is open to all Students of Color," *id.* at 2, under the SEA program as adopted, all students may be considered for selection as SEAs. *See* Am. Compl. at ¶ 41.

4

Plaintiffs are either parents of current LCPS students or parents of students who had enrolled their children elsewhere when the Amended Complaint was filed on August 30, 2021, but who intended at that time to enroll them in LCPS in the next school year and who are or will be subject to the Defendant's policies challenged in this case.  The Plaintiffs' children hold views about important public issues that they believe conflict with LCPS' definition of social justice.  *Id.* ¶ 60.  Ostensibly at the core of that belief is that Plaintiffs and their children are opposed to the ideology known as Critical Race Theory ("CRT"), which they allege teaches that white people are evil or oppressors and that our nation's institutions are inherently racist.  *Id.* ¶ 61.  Instead, they believe that everyone is equal and that we should strive for a color blind society.  Plaintiffs assert they have taught their children to treat everyone with respect and dignity regardless of their race.  *Id.*  Plaintiffs' children wish to speak out on topics such as CRT, race, and gender identity, but their

> views on these subjects are often not shared by other residents or young people Loudoun County . . . [and] when others have shared views similar to the Plaintiffs and their children on CRT, race, gender identify [sic], and other controversial political issues, that speech has prompted vitriolic, threatening, and persecutorial responses from others in Loudoun County, including within the LCPS community.

*Id.* ¶¶ 62- 63.  As a result, Plaintiffs "are concerned that if [their child] shares [his/her] views . . . on CRT, race, human sexuality, and other controversial political issues, they will be reported and investigated for 'bias incidents.'"  *Id.* ¶ 65.  They are also concerned that such a report, investigation, and public disclosure could negatively impact their children's standing in the school community or ruin their college prospects.  *Id.*  Based on these concerns, they believe that the Reporting System violates the free speech rights of their children.

Plaintiffs do not allege explicitly whether their children have applied for or intend to apply for selection as an SEA or have an interest in becoming an SEA.  However, Plaintiffs

5

allege that their children would not qualify for the SEA program as originally conceived or practically implemented. *Id.* ¶ 59.

On June 2, 2021, Plaintiffs filed their Complaint. [Doc. No. 1]. On June 25, 2021, Plaintiffs filed a Motion for Preliminary Injunction, [Doc. No. 9], which, after briefing and a hearing on July 30, 2021, the Court denied on August 13, 2021, [Doc. No. 24]. On August 16, 2021, LCSB filed its Answer and on August 18, 2021, the Court issued its Order denying Plaintiffs' motion for a preliminary injunction, which is incorporated herein by reference as background to the pending Motion and also for its analysis of the substantive law pertaining to Plaintiffs' Equal Protection and First Amendment claims [1]

On August 30, 2021, Plaintiffs filed an Amended Complaint, alleging that (1) the SEA Program violates the Equal Protection Clause of the Fourteenth Amendment because it discriminates against students on the basis of race (Count I); (2) the SEA Program violates the First Amendment's guarantee of freedom of speech because it discriminates on the basis of viewpoint by requiring that SEAs express a government-approved orthodox viewpoint in order to participate in the Program (Count II); (3) the SEA Program violates the Equal Protection Clause because it discriminates on the basis of viewpoint (Count III); (4) the Reporting System violates the First and Fourteenth Amendments because it chills speech through content based speech restrictions (Count IV); and (5) the Reporting System violates the First and Fourteenth Amendments because it chills speech through viewpoint discrimination (Count V).

---

[1] In its Order denying the preliminary Injunction, the Court held, *inter alia,* that Plaintiffs had failed to sufficiently establish that they would succeed on the merits. In that regard, the Court observed that Plaintiffs had failed to make the required showing that (1) the SEA Program was motivated, adopted or implemented with an intent or purpose to discriminate against white students in violation of the Equal Protection Clause of the Fourteenth Amendment; or (2) that the LCSB had officially endorsed, adopted, or excluded viewpoints, particularly when associated with the other character trait criteria used and the lack of any investigation or inquiry into the substance of a particular students' views as part of the selection process. *See* [Doc. No. 24].

Plaintiffs seek: (1) a declaration that the SEA Program impermissibly discriminates on the basis of race; (2) a declaration that the SEA Program impermissibly discriminates on the basis of viewpoint in violation of the First Amendment and the Equal Protection Clause; (3) a declaration that the Bias Reporting System impermissibly discriminates on the basis of speech content and viewpoint; (4) an injunction preventing LCSB from operating the SEA Program; and (5) an injunction preventing LCSB from operating the Reporting System.[2] On September 13, 2021, Plaintiffs filed the pending Motion to Dismiss. [Doc. No. 37]. On November 10, 2021, the Court held a hearing on the Motion, following which it took the Motion under advisement.

## II. LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the complaint. *See Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994); *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1994). A claim should be dismissed "if, after accepting all well-pleaded allegations in the plaintiff's complaint as true . . . it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999); *see also Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001). In considering a motion to dismiss, "the material allegations of the complaint are taken as admitted," *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969) (citations omitted), and the court may consider exhibits attached to the complaint, *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F. 2d 1462, 1465 (4th Cir. 1991).

Moreover, "the complaint is to be liberally construed in favor of plaintiff." *Id.*; *see also Bd. of Trs. v. Sullivant Ave. Props., LLC*, 508 F. Supp. 2d 473, 475 (E.D. Va. 2007). In addition, a motion to dismiss must be assessed in light of Rule 8's liberal pleading standards, which

---

[2] Plaintiffs also seek nominal damages, costs and attorney's fees under 42 U.S.C. § 1988, and such other relief to which Plaintiffs may be entitled. [Doc. No. 30]. On June 25 and 28, 2021, Plaintiffs also filed a Motion to Proceed Anonymously and a related Motion of Plaintiffs for Court to Judicially Notice Certain Facts in Support of their Motion to Proceed Anonymously, [Doc. Nos. 7, 8, 11], which were granted on July 28, 2021, [Doc. No. 22].

require only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. Nevertheless, while Rule 8 does not require "detailed factual allegations," a plaintiff must still provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (the complaint "must be enough to raise a right to relief above the speculative level" to one that is "plausible on its face"); *see also Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). As the Supreme Court stated in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2008), "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw a reasonable inference that the defendant is liable for the conduct alleged."

### III.  ANALYSIS

Plaintiffs have challenged the SEA selection process and the Bias Reporting form on Equal Protection and First Amendment grounds. Overall, Plaintiffs summarized their challenge as follows:

> [B]asic principles like the First Amendment have not stopped the Loudoun County School Board from prescribing exactly what shall be orthodox for its students. LCPS is all-in on a curricular framework that expects students to speak, act, and think in line with a particular ideology. Any dissent from that ideology can be labeled as "bias" and anonymously reported to the speech police, a group of handpicked students who share the LCPS administration's ideology, charged to pass judgment on those classmates that their peers turn in.
>
> In the name of "dismantling systemic racism," LCPS has implemented explicit racial distinctions between its students. The official LCPS "Action Plan to Combat Systemic Racism" creates a new position of "Student Equity Ambassador" ("SEA"), which is limited to certain students on account of their race, and discriminates against students on the basis of their viewpoint. The Board has also implemented a viewpoint discriminatory "bias reporting system" that chills students' speech on matters of important public concern. Each of these policies violates the Constitution's guarantees of free speech and equality before the law. Plaintiffs, parents in LCPS, sue on behalf of their minor children to put a stop to these constitutional violations.

Am. Compl. at ¶¶ 2-3.

**A. Plaintiffs' Equal Protection Claims (Counts I and III)**

8

In Counts I and III, Plaintiffs assert an Equal Protection claim pursuant to 42 U.S.C. § 1983 on the grounds that the SEA program, which does not contain an explicit racial classification, nevertheless discriminates against white students on the basis of race (Count I) and also discriminates based on viewpoint (Count III). More specifically in support of their Equal Protection challenges, Plaintiff make the following conclusory allegations:

- LCPS' Student Equity Ambassador program is an invidious racial classification that discriminates against students on the basis of race. Am. Compl. ¶ 75.
- LCPS has a policy and practice of apportioning the benefits of the Student Equity Ambassadors program among students on account of their race. *Id.* ¶ 76.
- There is no compelling government interest in LCPS discriminating among students on account of their race. *Id.* ¶ 77.
- The Student Equity Ambassador program is not narrowly tailored to serve any government interest, especially when the SEA program is tied to race, but its bias-investigation mandate includes bias based on gender, gender identity, sexuality, and political beliefs. *Id.* ¶ 78.
- There is no important government interest in defining the Student Equity Ambassadors program based on race. *Id.* ¶ 79.
- The Student Equity Ambassadors program is not substantially related to any government interest. *Id.* ¶ 80.

To assert an Equal Protection claim based on race, as in Count I, Plaintiffs must allege facts that make plausible that the challenged policy (1) was enacted with discriminatory intent; and (2) has an actual discriminatory impact. *See N. Carolina State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 302 (4th Cir. 2020); *Monroe v. City of Charlottesville*, 579 F.3d 380, 388 (4th Cir. 2009). To determine whether a statute was enacted with discriminatory intent, the

9

challenger first bears the burden of showing that racial discrimination was a "'substantial' or 'motivating' factor behind enactment of the law." *Raymond*, 981 F. 3d at 303 (quoting *Hunter v. Underwood*, 471 U.S. 222, 228 (1985)). "Satisfying that burden requires looking at the four factors from the Supreme Court's *Arlington Heights* decision: (1) historical background; (2) the specific sequence of events leading to the law's enactment, including any departures from the normal legislative process; (3) the law's legislative history; and (4) whether the law 'bears more heavily on one race than another.'" *Id.* (quoting *Arlington Heights*, 429 U.S. at 265–69). Only if the challengers have met their burden of showing discriminatory intent does the Court reach the second step where "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without" racial discrimination. *Id.* (quoting *Hunter*, 471 U.S. at 228).

Plaintiffs do not specifically allege that the SEA program was enacted with a discriminatory intent. Rather, Plaintiffs contend that such an intent can be reasonably inferred from the Exhibits attached to the Amended Complaint, and the plausibility of Plaintiffs' claim must therefore be evaluated based on the substance of those exhibits. In that regard, Plaintiffs allege that with its Action Plan, which outlines "a complex set of initiatives to implement an ideological orthodoxy across public schools in Loudoun County[,]" Am. Compl. ¶ 24, the LCSB is on "an ideological mission," as seen in its "LCPS Comprehensive Equity Plan," attached as Exhibit C, *id.* at ¶ 25 (the "Equity Plan"). More specifically, Plaintiffs reference the Equity Plan's statements that (1) the LCPS "calls for all students, staff, families, and other members of our community to engage in the disruption and dismantling of white supremacy, systemic racism, and hateful language and actions based on race, religion, country of origin, gender identity, sexual orientation, and/or ability[;]" (2) the "LCPS rejects racist and other hateful behavior and language, recognizing that it encourages discrimination, hatred, oppression, and violence[;] and (3) "the [Action Plan] has a laser focus on systemic racism, oppression, and the

10

need for the disruption and dismantling of ineffective systems." *Id.* ¶¶ 25, 26. Plaintiffs also reference certain proposals listed in the Action Plan,³ *Id.* at ¶ 26, and a description of the SEA program that appeared briefly on the LCSB website before the actual Plan was adopted, which stated that the SEA program was open to students of color,⁴ the response of a school administrator to a parent's question about the program,⁵ and the comments by an SEA.⁶

Notwithstanding Plaintiffs' conclusory allegations and characterizations, the Exhibits attached to the Amended Complaint do not make plausible that the SEA program was adopted with a discriminatory intent. As stated in the Action Plan, it was adopted following the issuance of a Report, attached as Exhibit A, prepared by an outside consultant after a series of focus group sessions and interviews at twenty-four LCPS schools that included elementary, middle, and high school students, staff, parents and administrators. As Plaintiffs allege, that Report concluded that "there are limited opportunities for Black/African -American and Muslim students to convene in a network of social cultural support[]" and recommended that LCPS "establish student affinity groups at all levels to support the social and cultural identities of student students of color[]" to

---

³ Those initiatives are alleged to include proposals to (1) "[p]rohibit the wearing/flying the flags, images or symbols on LCPS property that represent racist or hateful ideology," (2) "[f]inalize the Protocol for Responding to Racial Slurs and Hate Speech in Schools," (3) "consider the potential renaming of the Loudoun County High School mascot, the Raiders," together with 15 "action items" that include (a) "developing racial literacy; raising racial consciousness", (b) "build . . . racial consciousness," (c) finalize a "protocol for responding to racial incidents when they incur in our schools", (d) "reduce racial/ethnicity discipline disproportionality," (e) setting quotas for "racially diverse interview panels" for hiring, (f) "meet[ing] biannually" with only "LCPS staff members of color" to "connect and offer a safe space to listen and learn," with a "Remaining Question[] under Consideration" on "What is the participation option for a non-Person of Color (who desires to serve as allies) to engage in these sessions?" and (g) revising "hiring protocols, practices, and resources for hiring managers to include but not limited to setting forth requirements for racially diverse interview panels." Am. Compl. ¶¶ 26, 27.
⁴ *See* Am. Compl. ¶ 33 ("The 'Process for Selecting Student Equity Ambassadors' included as its first guideline for selection of SEAs that '[t]his opportunity is open to all Students of Color.'") (quoting LCPS' original "Student Equity Ambassador Information Packet," attached to the Am. Compl. as Ex. D)).
⁵ *See* Am. Compl. ¶¶ 40–41 ("On November 5, 2020, emails were published between a concerned parent and an administrator at LCPS. The parent asked about the SEA program, and whether their child, who is not a student of color, was eligible to apply. . . . The LCPS administrator responded "[t]hough all students (white or otherwise) are more than welcome to potentially serve as ambassadors, their focus is to raise the voice of their classmates of color during these meetings.") (quoting emails attached to the Am. Compl. as Ex. F)).
⁶ *See* Am. Compl. ¶¶ 51–52 (describing a presentation made by SEAs that cites examples of microaggressions, including "denial[s] of racial reality" such as "I don't think that white privilege exists" and asserting "a framework of 'colorblindness'").

11

serve as "a formal structure that serves as a network of care for marginalized student populations and establishes a safe place for students to unpack feelings and emotions in times of social cultural conflict." Am. Compl. ¶ 22. The substance of the Action Plan does not make plausible that these initiatives are intended to be at the expense of white students or are intended to disadvantage white students, but rather to promote a more inclusive educational environment by addressing discrimination and the lingering effects of past discrimination. Plaintiffs rely heavily on the original description of the program, which stated that the opportunity was "open to all Students of Color," Am. Compl. ¶¶ 33–34, but that description was short lived and the SEA program as adopted is open to all students, *see id.* ¶ 41.

The Amended Complaint also fails to allege facts that make plausible that the SEA program has a discriminatory impact. Plaintiffs allege that "only seventeen percent [who] identified as 'white only' [were selected as SEAs], despite 'white only' students making up forty-seven percent of the LCPS enrollment." *Id.* ¶ 45. But there are no factual allegations with respect to the racial/ethnic makeup of the schools from which the two to three students were selected or who applied or were considered from those schools or to what extent the two to three slots from each of the schools were filled through a competitive process. And as Plaintiffs have alleged with respect to their own children, white students may have decided not to apply for reasons other than race. *See, e.g.*, *id.* ¶¶ 13-17. For these reasons, Plaintiffs have failed to state an Equal Protection claim as a matter of law; and Count I will be dismissed for failure to state a claim.

In Count III, Plaintiffs assert that the SEA program violates the Equal Protection Clause because it discriminates on the basis of viewpoint. That claim must be assessed within the context in which the SEA program operates, which, as Plaintiffs have alleged, is a nonpublic forum. *See* Am. Compl. ¶ 85.

There is no fundamental right of access to a non-public forum and the SEA program needs only a rational relationship to a legitimate government purpose. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 54 (1983) (holding "[t]he school district's policy [with respect to a non-public forum] need only rationally further a legitimate state purpose.").

Among the purposes of the SEA program alleged in the Complaint, as reflected in the Exhibits, are addressing "racist and hateful behavior," *id*. at ¶ 25, "dismantle[ing] systemic racism," *id.* at ¶ 3, and "amplify[ing] the voices of students of color" with respect to stories/experiences regarding issues of racism, injustice and inequity," *id.* at ¶ 36; Ex. D at 3. These are clearly legitimate pedagogical/state purposes. Indeed, Plaintiffs do not allege that LCSB's purposes in adopting the SEA program are not legitimate, and at the hearing held on the Motion, Plaintiffs acknowledged that the LCSB may permissibly sponsor a non-public forum that facilitates discussions about the role of race within the school environment, as experienced by students of color. Rather, Plaintiffs only contend that the selection criteria for SEAs are not substantially or rationally related to any government interest, *see* Am. Compl. ¶ 80.

The LCSB has adopted selection criteria for SEAs that are substantially and rationally related to legitimate state purposes, viz., SEAs will be selected who are "honest and able to speak the truth," have "a passion for social justice and are willing to serve," "sympathetic and sensitive," "have the respect and credibility of their peers," and "will be empowered by this opportunity and have the potential for leadership." *See Perry*, 460 U.S. at 54, 55 (stating that, for the purposes of analyzing an Equal Protection claim based speech, "not all speech is equally situated, and the state may draw distinctions which relate to the special purpose for which the property is used").

In sum, while the specific course chosen by the LCSB to promote a more inclusive, non-discriminatory environment can be reasonably debated, addressing the effects of invidious

discrimination within the educational environment is clearly a legitimate pedagogical concern and the SEA program, and its selection criteria for SEAs, are clearly rationally and substantially related to that purpose. As the Fourth Circuit has recognized, local school boards, not the courts, have the responsibility and obligation to assess how best to advance those pedagogical concerns. *See Robertson v. Anderson Mill Elementary School*, 989 F.3d 282, 289 (2021) ("[I]t is not a court's obligation to determine which messages of social or moral values are appropriate in a classroom. Instead, it is the school board, whose responsibility includes the well-being of the students, that must make such determinations.") (quoting *Lee v. York Cnty. Sch. Div*, 484 F. 3d 687, 700 (4th Cir. 2007).

Nor do Plaintiffs state a plausible Equal Protection claim even if a "passion for social justice" is viewed as having embedded in it some aspects of a substantive viewpoint.[7] In *Hazelwood School District v Kuhlmeier*, the United States Supreme Court articulated the general principle that school officials "do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." 484 U.S. 260, 273 (1988); *see also Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 55 (1983) (stating a public school system "may draw distinctions which relate to the special purpose for which the property is used"). And as the Fourth Circuit recognized in *Buxton*, post-*Hazelwood*, the school system is permitted "to take the viewpoints expressed in an interview into consideration when choosing between candidates in a competitive process." *Buxton v. Kurtinitis*, 862 F.3d 423, 430 (4th Cir. 2017). For the above reasons, Plaintiffs have failed to allege facts that make plausible their Equal Protection claim in Count III.

---

[7] As the Fourth Circuit observed in *Robertson*, neither the Supreme Court nor the Fourth Circuit has decided whether restrictions on school-sponsored student speech must be viewpoint neutral under *Hazelwood* and other Circuits are split on the issues. *See Robertson*, 989 F.3d at 290.

### B. Plaintiffs' First Amendment Claims (Counts II, IV, and V)

In Count II, Plaintiffs allege that in violation of the First Amendment, the SEA program conditions a student's participation as a SEA on a certain viewpoint, specifically, a "passion for social justice," and therefore imposes unconstitutional viewpoint discrimination. Viewpoint discrimination is "discrimination in which the government targets not subject matter, but particular views taken by speakers on a subject." *Rosenberger v. Rectors & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *see also Judson v. Bd. of Supervisors of Mathews Cty., Virginia*, 436 F. Supp. 3d 852, 865 (E.D. Va.), *aff'd*, 828 F. App'x 180 (4th Cir. 2020).

Plaintiffs concede that the SEA program is a nonpublic forum, Am. Compl. ¶ 85, and do not allege that the "Share, Speak Up, Speak-out" sessions sponsored by the LCSB is necessarily an impermissible government activity. As mentioned above, at the hearing on the Motion, Plaintiffs agreed that it is constitutionally permissible for the LCSB to sponsor a non-public forum to afford students of color an opportunity to discuss how race has affected their lives and educational experiences. They contend, however, that the Defendant may not discriminate based on viewpoint in deciding who can participate in that non-forum. And that by including within the selection criteria, a "passion for social justice," it does just that.

There are no allegations in the Amended Complaint concerning what the substance of that unconstitutionally required viewpoint is. At the hearing, when pressed, Plaintiffs stated that the required "passion for social justice" viewpoint imposed a "liberal" or "progressive" viewpoint without any further detail.[8] But by simply listing "a passion for social justice" as one of multiple selection criteria in a competitive process, Plaintiffs have not sufficiently alleged facts that make plausible that the LCSB "targets not subject matter, but particular views taken by

---

[8] Although Plaintiffs allege in the Amended Complaint Critical Race Theory as a viewpoint is in conflict with their own views on racial equality, Plaintiffs have not alleged that the SEA program adopts Critical Race Theory as the required viewpoint and stated at the Preliminary Injunction hearing that their claims are not based on the teaching or promotion of Critical Race Theory. *See* [Doc. No. 24] at n.12.

15

speakers on a subject." *Rosenberger*, 515 U.S. at 829. The Plaintiffs have alleged nothing other than the existence of a selection factor that targets a certain subject matter, with no further allegations concerning how it is understood or applied by school administrators involved in the selection process. For example, there are no allegations that SEA candidates are questioned or investigated about what their "social justice" views are or should be. And in the abstract, as it is presented here, that selection criterion appears no more viewpoint specific than would a required "passion" for "fairness" or "equality." And as the Court observed in denying Plaintiffs' motion for preliminary injunction, that factor appears more related to a disposition than a particular viewpoint.

In sum, Plaintiffs' First Amendment claim essentially reduces to a relatively straight-forward issue: whether listing "a passion for social justice" as one of the SEA selection criteria imposes a particular viewpoint to participate in the program in violation of the First Amendment. The Court concludes that simply including "a passion for social justice" as a selection factor, which is essentially all that Plaintiffs have alleged, does not sufficiently allege a violation of the First Amendment.[9]

Nor have Plaintiffs' alleged a plausible First Amendment violation even if the SEA selection criteria references particular viewpoints, given its use of the selection criteria for the purposes of allocating a limited number of slots within a competitive process, the broad range of substantive views that can be embraced within that selection criteria, the clear pedagogical concerns over which the SEA program was adopted, and the close relationship between the section criteria and the purpose of the non-public forum in which those viewpoints are to be

---

[9] Plaintiffs have alleged that certain student ambassadors have expressed very specific views on the role of race and how race should be taken into account. *See* Am. Compl. ¶¶ 51–52 (describing a presentation made by SEAs that cites examples of microaggressions , which includes "denial[s] of racial reality" such as "I don't think that white privilege exists" and asserting "a framework of 'colorblindness'"). But as the Court observed in its Preliminary Injunction Order, those views have not been alleged or shown to be the required viewpoints for selection as a SEA.

16

expressed.  *See Buxton v. Kurtiniti*s, 862 F.3d 423, 429-30 (4ᵗʰ Cir. 2017); *see also Robertson v. Anderson Mill Elementary School*, 989 F.3d 282, 288 (2021) (stating school officials' regulations of student speech is constitutionally valid so long as it is "reasonably related to legitimate pedagogical concerns") (citing *Hazelwood Sch. Dist. v. Kulmeier*, 484 U.S. 260, 273 (1988) (internal quotations omitted).

Accordingly, Plaintiffs have failed to allege that the SEA program amounts to unconstitutional viewpoint discrimination in violation of the First Amendment.

In Counts IV and V, Plaintiffs allege that the Bias Incident Reporting System violates the First Amendment.  To bring a First Amendment overbreadth claim, Plaintiffs must show they have standing, which can be done by showing either (1) "that [their children] intend to engage in conduct at least arguably protected by the First Amendment but also proscribed by the policy they wish to challenge, and that there is a credible threat that the policy will be enforced against them when they do so;" or (2) "[their children] may refrain from exposing themselves to sanctions under the policy, instead making a sufficient showing of self-censorship—establishing, that is, a chilling effect on their free expression that is objectively reasonable." *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018).

The question is whether the Bias Incident Reporting System chills protected speech sufficiently and without adequate justification to violate the First Amendment.  Here, Plaintiffs have failed to allege facts that make plausible that the Bias Incident Reporting System will harm them in any way.  Plaintiffs have not alleged that there have been any disciplinary incidents initiated as a result of the reporting forms; or that any alleged incidents have even passed beyond the Equity Office for an investigation.  Nor have they alleged facts that make plausible any claim that their children are being subjected to any greater risk of discipline through the Bias Reporting System than the School's disciplinary system, which Plaintiffs do not challenge.

17

Plaintiffs allege more generally that their children refrain from expressing their views for fear of an adverse reaction from their peers and school administrators. But, as reflected in Plaintiffs own allegations, that self-censorship would exist separate and apart from the Bias Reporting system, *see* Am. Compl. at ¶¶ 18, 62, 62; and the mere prospect of future injury through the Bias Reporting System is not sufficient to confer standing. *See, e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (stating one element of standing is that injury must be "'likely,' as opposed to merely 'speculative'"). Because Plaintiffs have failed to allege facts that make a credible threat of enforcement plausible as a result of any permissible speech, they cannot show that they have standing to bring their First Amendment claims.[10]

### III.   CONCLUSION

For the above reasons, it is hereby

ORDERED that the Motion to Dismiss First Amended Complaint [Doc. No. 37] filed by Defendant Loudoun County School Board be, and the same hereby is, GRANTED and this action is DISMISSED.

The Clerk is directed to forward copies of this Order to all counsel of record.

/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
January 22, 2022

---

[10] In opposing dismissal, Plaintiffs argue generally that they should have the opportunity to develop facts to support their claims and would expect to present, *inter alia*, expert testimony concerning what "a passion for social justice" really refers to. But it has long been recognized that a plaintiff may not file claims with the hopes of developing the necessary factual support for those claims through discovery. *See In re Kunstler*, 914 F.2d 505, 515 (4th Cir. 1990) (stating discovery is appropriate "to reveal *additional* facts to support claims which are well grounded in fact," however, it is inappropriate "to use discovery to support . . . claims for which there is *no* factual support") (emphasis in original). That principle has particular application to actions, such as this, which, by the nature of the allegations, have the potential to substantially disrupt the educational environment through discovery, including depositions, which would likely be aimed at students, parents, teachers and administrators.