**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

Patti Hidalgo Menders et al.,

               Plaintiffs,

v.

Loudoun County School Board,

               Defendant.

Case No. 1:21-cv-00669

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

This case is about whether the Loudoun County School Board ("LCSB") can enforce overbroad race-based policies that prevent students from voicing their personal views. LCSB cannot.

The First Amendment guarantees freedom of communication by prohibiting government entities from enacting laws or policies that abridge individuals' freedom of speech—including students at public schools. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506–07 (1969). This litigation was brought to hold LCSB accountable for the harm it has inflicted on students and parents in the Loudoun County community with its unconstitutional Bias Incident Reporting System ("Bias System"). LCSB (and its agents within the Loudoun County Public School system ("LCPS")) improperly prioritizes its ideological agenda over the constitutional rights of its students.

LCSB's Bias System does not simply target actual discrimination, intimidation, or harassment. It encourages students to report each other—and threatens to punish students—just for speaking their minds on controversial issues. For example, according to LCSB's own policies, "bias incidents" worthy of reporting can include statements akin to "white privilege does not exist" and "I believe in a colorblind society." Such policies have the obvious effect of chilling student speech, and Plaintiffs have provided evidence that LCSB's policies did, in fact, have that effect. LCSB has provided no competing evidence to dispute Plaintiffs' assertions.

Further, the Court should reject LCSB's argument that Plaintiffs' case is moot simply because LCSB asserts that it discontinued the use of one of the forms used as part of its Bias System. The Bias System itself still exists, and the policies that chill student speech are still

1

being enforced. Thus, Plaintiffs continue to be harmed by LCSB's Bias System, and their claims are not moot.

The Court should therefore grant summary judgment in favor of Plaintiffs.

STATEMENT OF UNDISPUTED FACTS

**A.  LCSB developed and implemented its Bias System policies.**

Around June 23, 2020, LCSB published its "Action Plan to Combat Systemic Racism," which outlines a complex set of initiatives to push a divisive and controversial new ideology across its schools. First Am. Compl. ("FAC") ¶ 24; Decl. of Emily Rae ("Rae Decl.") Ex. A. (LCSB000395–452); *see also* Ex. I (LCSB000367–94) at LCSB000386 (third-party report recommending in June 2019 that LCSB "establish clear policies with built-in accountability for addressing racially motivated acts and speech"). Those initiatives include prohibiting the "wearing/flying of flags, images, or symbols on LCPS property that represent racist or hateful ideology," FAC ¶ 26; Rae Decl. Ex. A at LCSB000423, "[f]inaliz[ing] the Protocol for Responding to Racial Slurs and Hate Speech in Schools," *id.* at LCSB000425, and "consider[ing] the potential renaming of the Loudoun County High School mascot, the Raiders." *Id.* at LCSB000432.

As Part of LCSB's Action Plan, it developed the "Student Equity Ambassador" ("SEA") program. FAC ¶ 28; Rae Decl. Ex. B (LCSB001869–72). The SEA program is a formal office the school endows with particular authority to speak on behalf of the student body. FAC ¶¶ 29, 31, 44; Rae Decl. Ex. B at LCSB001870. Each school principal selects two to three students to serve in the SEA program. FAC ¶ 28; Rae Decl. Ex. B at LCSB001870. Students are selected based on particular criteria, and they serve as a liaison collaborating with the district-wide Supervisor of Equity during regularly occurring student "Share, Speak-up, Speak-out" meetings. FAC ¶ 31; Rae Decl. Ex. B at LCSB001870. A LCSB high school's "Equity Team" describes

2

these meetings and the program generally as "a forum to amplify the voice of Students of Color and those who have experienced or witnessed injustices, marginalization, or discrimination." FAC ¶ 58; Rae Decl. Ex. C (LCSB002059).

Alongside the SEA Program, LCSB also implemented the Bias System, which encouraged students to report "bias incidents," either directly to a school administrator or teacher, or anonymously to SEA using a "bias reporting form." FAC ¶ 56; Rae Decl. Ex. D at LCSB004571; Ex. E (LCSB000535–37). As part of the fight against bias incidents, Student Equity Ambassadors work to identify "microaggressions" within their school. FAC ¶ 50 Rae Decl. Ex. F (PLAINTIFFS000467–99) at PLAINTIFFS000472, 77. A PowerPoint presentation delivered at a LCSB meeting explained that "[m]icroaggressions are defined as the everyday, subtle, intentional—and often unintentional—interactions or behaviors that communicate some sort of bias toward historically marginalized groups." FAC ¶ 51; Rae Decl. Ex. F at PLAINTIFFS000477. Some examples of "microaggressions" identified in this presentation include "denial[s] of racial reality," such as "I don't think that white privilege exists," and asserting the value of "colorblindness," which sees people as individuals rather than members of a race. FAC ¶ 52; Rae Decl. Ex. F at PLAINTIFFS000478, 81.

Another component of the Bias System involved LCSB distributing a form to parents and students to report incidents of "bias" anonymously. FAC ¶ 47; Rae Decl. Ex. D (LCSB004571), Ex. E (LCSB000535–37). The form included check boxes for the "Type of Bias Incident" being reported, including "Harassment or Intimidation," "Racial Slur," "Offensive Language, Teasing or Taunting Language/Verbal Exchange," "Exclusion or victim of lack of inclusivity," "Gender Identity and Expression," "Ability Status," "Religious Practices," and "Sexual Orientation." FAC ¶ 49; Rae Decl. Ex. E at LCSB000536. The LCSB equity director further explained that a "bias

3

incident" is an "act of discrimination, harassment, [or] intimidation directed against any person or group that appears to be intentional and motivated by prejudice or bias." FAC ¶ 53; Rae Decl. Ex. E at LCSB000535. The equity director continued: "Such incidents are usually associated with negative feelings and beliefs about another's race, ethnicity, national origin, religion, gender, gender identity, sexual orientation, age, social class, political affiliation, or disability." *Id.*

The form stated LCSB will investigate "bias incidents" if the person submitting the form provides his or her name and indicates on the form that they would like school administrators to investigate the "particular incident" they are reporting. FAC ¶ 48; Rae Decl. Ex. E at LCSB000536. Also, as part of its Action Plan, LCSB developed the "LCPS Protocol for Responding to Racial Slurs and Hate Speech in Schools." FAC ¶ 56; Rae Decl. Ex. J (LCSB001075–97) at LCSB001082. In addition to the bias reporting form, LCSB emphasized that, under its Bias System, "[s]tudents should still report discipline incidents to a trusted adult or members of the administrative team." FAC ¶ 56; Rae Decl. Ex. D at LCSB004571. The incidents reported on the bias reporting form or through other means were used in the "Share, Speak-up, Speak-out" meetings with the Student Equity Ambassadors. FAC ¶ 47; Rae Decl. Ex. D at LCSB004571. Notably, nothing about the form or the Bias System generally limits its application to only on-campus speech; students can report incidents involving other students for off-campus speech as well. FAC ¶ 54; *see generally* Rae Decl. Ex. E (LCSB000535–37).

**B.  LCSB's Bias System policies chilled Plaintiffs' speech.**

The Plaintiffs are parents of children attending schools governed by the LCSB ("parents"). The parents raise their children to be active, engaged citizens in their community and country. FAC ¶ 62; Declaration of Patti Hidalgo Menders ("Menders Decl.") ¶ 10; Declaration of Scott

Mineo ("Mineo Decl.") ¶ 10; Declaration of Jane Doe #2 ("Doe #2 Decl.") ¶ 10. The parents

encourage and teach their children to share their views with their peers. *Id.* Plaintiffs are

therefore concerned that, if their children share their views about political or social issues,

including those touching on religion, race, and human sexuality, they will be reported and

investigated for bias incidents. FAC ¶¶ 60–65; Menders Decl. ¶¶ 11–12; Mineo Decl. ¶¶ 11–12;

Doe #2 Decl. ¶¶ 11–12.

The parents and children fear such a report, investigation, or public disclosure of the

children's personal political views could negatively impact their standing in the school

community and ruin the child Plaintiffs' college or career prospects. FAC ¶ 65; Menders Decl. ¶

12; Mineo Decl. ¶ 12; Doe #2 Decl. ¶ 12. They are aware that in other school settings

nationwide, "bias incident" response or disciplinary systems have been invoked against students

based on similarly worded standards for sharing their political or religious views. FAC ¶ 64;

Menders Decl. ¶ 13; Mineo Decl. ¶ 13; Doe #2 Decl. ¶ 13.

As demonstrated at much greater length in the Plaintiffs' motion to proceed anonymously,

the environment in Loudoun County surrounding hot-button political issues like Critical Race

Theory is intense. *See* Dkt. Nos. 7-1, 22.

Given that Plaintiffs' views conflict with LCPS's definition of "social justice" and may

provoke a "heckler's veto" by school administrators or students who disagree with their views

(therefore chilling Plaintiffs' speech), Plaintiffs challenge the Bias System on First Amendment

overbreadth grounds (Counts IV and V).

This Court previously granted Defendant's motion to dismiss. On appeal, the Fourth Circuit

affirmed this Court's decision as to Counts I (Fourteenth Amendment race discrimination), II

(First Amendment viewpoint discrimination), and III (Equal Protection Clause viewpoint

5

discrimination), but vacated dismissal and remanded as to Counts IV (First and Fourteenth Amendment content-based speech restrictions) and V (First and Fourteenth Amendment viewpoint discrimination) of Plaintiffs' FAC, finding Plaintiffs' allegations sufficiently showed "that the bias reporting system caused the parents' children to experience a non-speculative and objectively reasonable chilling effect on their speech," such that Plaintiffs had standing to proceed with these claims. *Menders v. Loudoun Cnty. Sch. Bd.*, 65 F.4th 157, 165 (4th Cir. 2023).

<h2 style="text-align:center">LEGAL STANDARD</h2>

Summary judgment is appropriate if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958–59 (4th Cir. 1996). The party seeking summary judgment has the initial burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

To defeat a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 247–48. Whether a fact is considered "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. On a motion for summary

6

judgment, the facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party. *Zenith*, 475 U.S. at 255; *see also Lettieri v. Equant Inc.*, 478 F.3d 640, 642 (4th Cir. 2007).

## ARGUMENT

This Court should grant Plaintiffs' Motion for two reasons. *First*, because LCSB cannot point to a single material fact to dispute that LCSB's Bias System is overbroad and chilled Plaintiffs' speech in violation of the First and Fourteenth Amendments. *Second*, because Counts IV and V of Plaintiffs' FAC are not moot—LCSB is continuing to use its Bias System to chill speech. LCSB has argued that its decision to voluntarily cease using a particular form as part of its larger Bias System renders Plaintiffs claims moot, but LCSB misses the point. *See* Dkt. No. 71. LCSB never stopped enforcing its Bias System policies. And, even if LCSB's discontinued use of a single form is of any consequence, LCSB would still be subject to the voluntary cessation exception to mootness.

### A. LCSB's "Bias Incident Reporting System" violates the First and Fourteenth Amendments by chilling Plaintiffs' speech through content-based restrictions and viewpoint discrimination.

LCSB's broad Bias System policies designed to police student speech are unconstitutional. *First*, student speech—like the speech at issue here—is constitutionally protected; the law applied to the facts of this case leaves no question that LCSB violated Plaintiffs' free-speech rights by chilling their speech. *Second*, none of the few exceptions that allow school administrators to censor student speech apply here. *Third*, neither *Abbott* nor *Reyes* change this analysis—*Abbott* supports Plaintiffs' positions, and *Reyes* involves issues that are not at issue in this litigation and therefore does not apply. The Court should therefore enjoin enforcement of the Bias System, declare that these policies are unconstitutional, and award Plaintiffs nominal damages.

7

### 1.   The First Amendment protects Plaintiffs' speech at issue in this case.

The Supreme Court and the Fourth Circuit have repeatedly held that the First and Fourteenth Amendments protect student speech. It is well-established that "students do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Starbuck v. Williamsburg James City Cty. Sch. Bd.*, 28 F.4th 529, 536 (4th Cir. 2022) (quoting *Tinker*, 393 U.S. at 506–07).

Yet, LCSB still attempts to strip its students of their constitutional right to free speech via its Bias System. By threatening students (including the student Plaintiffs in this case) whose views may be subjectively seen by others as "microaggressions" with potential administrative discipline or reputational harm, LCSB has done exactly what the law prohibits.

A broad speech code, such as the Bias System here, violates the First Amendment when it is "likely to deter a person of ordinary firmness from the exercise of First Amendment rights."[1] *Cooksey v. Futrell*, 721 F.3d 226, 235–36 (4th Cir. 2013). In the case of middle- and high-school students, the test isn't whether the speech code would deter an adult of "ordinary firmness" from speaking; it is whether a middle- or high-school student of "ordinary firmness" would be deterred. *Crozier v. Westside Cmty. Sch. Dist.*, 973 F.3d 882, 891 (8th Cir. 2020). Indeed, the Supreme Court has held that "there are heightened concerns with protecting freedom of conscience from subtle coercive pressures in the elementary and secondary public schools." *Lee v. Weisman*, 505 U.S. 577, 592 (1992).

Further, the Fourth Circuit has held that, in nonpublic forums such as schools, the government may only regulate speech to the extent the regulation "is reasonable and not an effort

---

[1] Moreover, a First Amendment overbreadth claim does not require a showing that the Bias System caused students to cease speech activities altogether. *Cooksey v. Futrell*, 721 F.3d 226, 235–36 (4th Cir. 2013).

to suppress expression merely because public officials oppose the speaker's view." *Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Sch.*, 457 F.3d 376, 381 (4th Cir. 2006). "[V]iewpoint neutrality requires not just that a government refrain from explicit viewpoint discrimination, but also that it provide adequate safeguards to *protect* against the improper exclusion of viewpoints." *Id.* at 384 (emphasis in original).

A plaintiff need not "first expose himself to actual arrest or prosecution" to bring a pre-enforcement challenge. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). Nor must individuals silently chill themselves for months or years to see whether someone else gets penalized to establish a credible threat of enforcement. The existence of a rule or policy "implies a threat" to enforce that rule or policy if someone breaks it. *Bauer v. Shepard*, 620 F.3d 704, 708 (7th Cir. 2010); *see also ACLU v. Alvarez*, 679 F.3d 583, 593–94 (7th Cir. 2012).

Here, the undisputed facts show that in June 2020, LCSB created the Bias System to "combat systemic racism." LCSB contemporaneously developed the SEA Program, part of which entailed collecting reports of bias incidents to discuss during "Share, Speak-up, Speak-out" meetings with the Student Equity Ambassadors. FAC ¶ 47; Rae Decl. Ex. C at LCSB002059, Ex. H at LCSB00471; *see generally* Ex. F (PLAINTIFFS000467–99). The Bias System also included creating and distributing a form to parents and students to capture incidents of bias in an anonymous manner. FAC ¶ 47; Rae Decl. Ex. D (LCSB004571), Ex. E (LCSB000535–37). The LCSB equity director further explained that a "bias incident" is an "act of discrimination, harassment, [or] intimidation directed against any person or group that appears to be intentional and motivated by prejudice or bias." FAC ¶ 53; *see* Rae Decl. Ex. D (LCSB004571). While preventing discrimination, harassment, or intimidation is important, LCSB's policies in practice do not narrowly target cases of *real* discrimination and harassment. *See Newsom v. Albemarle*

9

*Cnty. Sch. Bd.*, 354 F.3d 249, 260–61 (4th Cir. 2003) (reversing lower court's denial of a preliminary injunction regarding a school policy prohibiting clothing with references to any weapons because the policy was "unconstitutionally overbroad"). Rather, LCSB's policies are so broad that they prohibit students from speaking about controversial political issues, such as CRT or the belief that people should be judged by the content of their character rather than the color of their skin.

There are multiple ways in which "bias incidents" can be reported and ultimately investigated. One way is if a student reports an incident using the bias form, provides his or her name, and indicates on the form that they would like school administrators to investigate the incident they are reporting. FAC ¶ 48; Rae Decl. Ex. D (LCSB004571). But LCSB has indicated its preference that students directly "report discipline incidents to a trusted adult or members of the administrative team." *Id.* Nothing about the form—or the Bias System generally—limits its application to only on-campus speech; students can report incidents involving other students for off-campus speech as well. FAC ¶ 54; *see generally* Rae Decl. Ex. E (LCSB000535–37).

Included within the realm of speech that LCSB encourages students to report are "microaggressions," which include "the everyday, subtle, intentional—and often unintentional— interactions or behaviors that communicate some sort of bias toward historically marginalized groups." FAC ¶ 51; Rae Decl. Ex. F at LCSB000477. These "microaggressions" can include "denial[s] of racial reality" (such as believing not all members of a certain race are either oppressed or oppressors) and opining that society should be "colorblind" (valuing individuals' character more than their race or appearance). FAC ¶ 52; Rae Decl. Ex. F at LCSB000478, 81. But what LCSB calls "microaggressions," the Supreme Court calls "constitutionally protected speech." *See Tinker*, 393 U.S. at 509.

The parent Plaintiffs have submitted declarations on behalf of themselves and their children stating that their children have the "desire to speak freely about [their] views within the LCPS community on 'social justice,' CRT, race, gender identity, and other controversial political issues," but have concerns that sharing their views on this subject will result in their speech being "reported as a 'bias incident,'" that will cause LCSB to "investigate, publicly disclose, or even discipline" their children and "negatively impact [their] standing in the school community or even ruin [their] college or career prospects." *See* Menders Decl. ¶¶ 10, 12; Mineo Decl. ¶¶ 10, 12; Doe #2 Decl., ¶¶ 10, 12. LCSB has not presented evidence of any fact to refute these allegations. This is a classic case of the government chilling constitutionally protected speech, and LCSB and its Bias System are to blame.

For these reasons, the Court should grant Plaintiffs' motion for summary judgment as to Counts IV and V of the FAC in its entirety.

### 2.   None of the exceptions to student speech rights apply here.

There are only a few exceptions to the rule that student speech in public schools is protected. None of those exceptions apply here.

***First***, schools may censor speech or conduct that "materially and substantially interfere[s] with the requirements of appropriate discipline in the operation of the school." *Tinker*, 393 U.S. at 509. It is not enough that an administrator simply fears a disturbance that may stem from the speech. *Tinker*, 393 U.S. at 508. The *Tinker* Court acknowledged that "[a]ny departure from absolute regimentation may cause trouble[; a]ny variation from the majority's opinion may inspire fear[; and a]ny word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance." *Id.* But, recognizing the importance of protecting student speech, the Supreme Court decreed that "our

11

Constitution says we must take this risk . . . and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society." *Id.*

In fact, the Supreme Court has held that schools have "an interest in protecting a student's unpopular expression." *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2046 (2021). "America's public schools are the nurseries of democracy." *Id.* "Our representative democracy only works if we protect the 'marketplace of ideas' [because] free exchange facilitates an informed public opinion, which, when transmitted to lawmakers, helps produce laws that reflect the People's will." *Id.* "Thus, schools have a strong interest in ensuring that future generations understand the workings in practice of the well-known aphorism, 'I disapprove of what you say, but I will defend to the death your right to say it.'" *Id.*

Thus, instead of LCSB chilling Plaintiffs' speech with its overbroad Bias System policies, LCSB should be defending "to the death" Plaintiffs' right to voice their opinions.

***Second***, schools may censor speech or conduct that is obscene, sexually explicit, lewd, indecent, or promotes drug use if it "would undermine the school's basic educational mission." *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 685 (1986) (addressing obscene, sexually explicit, lewd, and indecent speech); *see also Morse v. Frederick*, 551 U.S. 393, 403 (2007) (addressing speech promoting drug use). It is undisputed that this exception is not at issue in this case.

***Third***, schools may censor speech or conduct that are "school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school . . . so long as their actions are reasonably related to legitimate pedagogical concerns." *Hazelwood Sch. Dist. v. Kuhlmeier*,

484 U.S. 260, 271, 73 (1988). If student speech is "so closely connected to the school that it appears the school is somehow sponsoring the speech," the school may have an interest in exercising control over the content of that speech. *Fleming v. Jefferson Cnty. Sch. Dist. R-1*, 298 F.3d 918, 925 (10th Cir. 2002).

This exception also does not apply because LCSB's policies prevent Plaintiffs from expressing their personal views rather than school-sponsored views.

In sum, because the speech LCSB has targeted with its Bias System is political speech governed by the *Tinker* rule—and because that speech does not "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school," 393 U.S. at 509, is not subject to the exception for obscenity and similar speech, and does not imply school sponsorship—it is constitutionally protected and LCSB may not enact policies to chill such speech.

### 3. Neither the *Abbott* nor *Reyes* Fourth Circuit opinions support LCSB's positions.

In its July 3, 2023 order, the Court directed the parties to brief how or if the *Abbott v. Pastides*, 900 F.3d 160 (4th Cir. 2018) and *Reyes v. City of Lynchburg*, 300 F.3d 449 (4th Cir. 2002) decisions apply to the analysis in this case. Dkt. No. 77. *Abbott* supports Plaintiffs' positions, and *Reyes* is inapposite because it did not involve a claim of content discrimination.

In *Abbott*, the court rejected a First Amendment claim because the student plaintiffs—unlike Plaintiffs here—could not show that their speech had actually been chilled by their school's actions.

The case involved university students who claimed the University of South Carolina ("USC") violated their First Amendment freedom of speech rights by meeting with a student after an

event to discuss certain complaints USC received related to the event.[2]  900 F.3d at 164–65. In that case, students asked USC to approve a "Free Speech Event" they planned to hold regarding "various threats to free speech on campuses." *Id.* at 164. The event would include "symbols and speeches that have been censored in the past, including an Indian good luck symbol that resembles a swastika . . . [and a poster] featuring the word 'wetback.'" *Id.* at 165 (some internal quotation marks omitted). USC approved the event, which then proceeded without USC intervening. *Id.*

During the event, several faculty and other USC community members complained, "object[ing] to the display of 'offensive symbols and racial slurs,'" that the students holding the event "engag[ed] rudely with USC students," and that the students "made 'sexist and racist statements.'" *Id.* The Director of Campus Life, who had approved the event, responded by defending the event, stating, "This is free speech and . . . if they are being respectful and trying to help learn and create dialogue then I am not sure how to help those who are uncomfortable." *Id.*

Nonetheless, USC scheduled a 30-to-45-minute meeting with two students from the group that organized the event for the purpose of gathering information. *Id.* at 166. During the meeting, USC repeatedly assured the students that "nobody had been charged with a violation," that the meeting "was a standard 'practice of the University' in response to complaints," and that USC had not yet "determine[d] whether it even would investigate the incident." *Id.* Approximately two weeks later, USC sent Plaintiffs a letter stating it had "found no cause for investigating" and would "not move any further in regard to this matter." *Id.*

---

[2] *Abbott* also addressed a First Amendment overbreadth claim alleging that USC's policy was facially unconstitutional. *Id.* at 175. This discussion is inapposite, because the court found that the plaintiffs did not have standing to assert their claim. *Id.* Plaintiffs here do have standing. *See Menders*, 65 F.4th at 165.

The Plaintiffs alleged that their speech was chilled between the time USC contacted them to set up a meeting and the date they filed their complaint. *Id.* at 170. The Court disagreed, finding that, at most, Plaintiffs could only reasonably claim that their speech was chilled up through the point of receiving the letter informing them the matter was dropped (from November 24 through December 23). *Id.* Because Plaintiffs did not "identif[y] any speech event they had planned or wished to sponsor during the brief time in question—perhaps because, as the plaintiffs explain, [the time period] overlap[ped] with the Thanksgiving holiday, final exams, and the start of winter vacation . . . it d[id] not appear that the plaintiffs c[ould] establish a past 'chill' sufficient to sustain their damages claim." *Id.*

This case presents facts that are the opposite of the facts in *Abbott*. In *Abbott*, the university *expressly allowed* students to engage in speech others deemed "racist" and "offensive" and *defended* their right to do so after others complained. Here, in contrast, LCSB is *threatening* to *investigate* students who would engage in speech that offends others. The students in *Abbott* had no reason to believe they would be investigated or punished for their speech because the university had already protected their right to engage in that speech. The students here, however, have every reason to believe that they could be investigated and punished for their speech.

Plaintiffs here would like to be able to speak freely about controversial topics similar to the topics that USC permitted the students to discuss in *Abbott*, but are forced to self-censor because of LCSB's policies. Indeed, the *Abbott* court acknowledged that, presented with facts similar to the facts in this case, the result would likely be different. *Id.* ("Had this case played out differently—had the University informed Abbott that it had determined that an investigation of the Free Speech Event *was* warranted; and then instructed him *not* to display swastikas or 'wetback' signs or other controversial material at future events; and then warned him that it

15

would scrutinize future events to ensure that they conformed to [the policies]—then, we agree, a student of 'ordinary firmness' might well be deterred from engaging in similar speech activities.").

Here, LCSB's policies are so overbroad that they encompass and prohibit speech similar to the content that USC permitted at the student event in *Abbott*—namely, controversial political issues. LCSB's policies are still in effect, and the threat that LCSB may enforce them against Plaintiffs if they say something LCSB deems politically incorrect constantly lingers. Plaintiffs submitted declarations stating that they want to be able to discuss political issues, but are chilled from doing so. Menders Decl. ¶¶ 10–12; Mineo Decl. ¶¶ 10–12; Doe #2 Decl. ¶¶ 10–12. Therefore, unlike the plaintiffs in *Abbott*, Plaintiffs here have presented the necessary evidence that LCSB's Bias System policies unconstitutionally chill Plaintiffs' speech.

*Reyes* is inapposite because the ordinance the relevant plaintiff challenged had been repealed, and he had no reason to believe that he would be prosecuted for his speech.

*Reyes* involved plaintiffs who attended a protest at a public high school without a permit in violation of the city's "parade ordinance." 300 F.3d at 451. Plaintiff Reyes was subsequently indicted "for violating the ordinance, trespassing on school property and engaging in disorderly conduct," and was found guilty of trespassing, but was acquitted on the charges of violating the ordinance and engaging in disorderly conduct. *Id.* The city later repealed the ordinance. *Id.* at 452. Reyes then brought a Section 1983 claim "challenging the constitutionality of the parade ordinance on its face and as applied to Reyes and seeking declaratory relief and an injunction prohibiting the City from enforcing the parade ordinance in the future." *Id.*

The ordinance at issue in *Reyes* was a "time, place, and manner restriction[] . . . [that was] content neutral." *Id.* at 454. Reyes argued that his speech was chilled after he was indicted and

16

stood trial under the statute that was later found unconstitutional and repealed. *Id.* at 455 n.8. The court disagreed because Reyes alleged that he had been chilled from speaking at an event that occurred on March 13, 1998—but the ordinance he challenged had been repealed three days earlier, on March 10. *Id.* Further, a court had already held the ordinance in question to be unconstitutional, and he had been found not guilty for allegedly violating it in the past. "Under [those] facts," the court found his chilled-speech claim to have "no merit." *Id.* Also, Reyes could not recover for his past prosecution under the repealed ordinance because he had been acquitted and accorded due process. *Id.*

None of the legal issues that arose in *Reyes* exist here. Unlike the plaintiff in *Reyes*, Plaintiffs here *are* alleging content-based restrictions and viewpoint discrimination. Unlike the *Reyes* plaintiff, Plaintiffs here *do* have reason to believe the policies they challenge could be enforced against them in the future, as discussed further below. And, unlike the *Reyes* plaintiff, Plaintiffs here are not seeking to recover for a past prosecution under a since-repealed ordinance. Therefore, *Reyes* is inapposite and should not inform the Court's ruling in this case.

## B. LCSB's alleged voluntary cessation of its "Bias Incident Reporting System" is insufficient to moot Plaintiffs' claims.[3]

---

[3] Defendant is correct in its "Position Concerning What Issues Remain to be Decided in This Case," Dkt. No. 71 at 3, that the graduations of Plaintiffs RM and AM, the children of Plaintiffs Menders and Mineo, do not moot their requests for nominal damages or attorneys' fees. *See Mellen v. Bunting*, 327 F.3d 355, 365 (4th Cir. 2003) ("Although the Plaintiffs' claims for declaratory and injunctive relief are moot, their damage claim continues to present a live controversy.") Further, while RM and AM's requests for injunctive relief may be moot, a separate inquiry must be made regarding their request for declaratory relief. *Inmates v. Owens*, 561 F.2d 560, 562 (4th Cir. 1977) ("[E]ven though the injunctive relief is moot, a separate inquiry must be made regarding the declaratory relief which arguably was sought."); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 602 (rejecting argument that mooting claims seeking injunctive relief and compensatory damages also mooted claims seeking "nominal damages and declaratory relief"). Regardless, Jane Doe #5 is currently still enrolled in LCPS. *See* Doe #2 Decl. ¶¶ 3–5 ("I am the mother [of] one child (listed as Jane Doe #5 in the complaint) who attends a middle school in the [LCPS] System. I plan to enroll her in LCPS during the next

### 1.   LCSB has not ceased enforcing its Bias System policies.

LCSB's statement that it does not intend to "reinstate or replace the bias reporting form with any similar reporting form" misses the mark. Dkt. No. 68-1 ¶ 13. Plaintiffs' FAC does not merely criticize LCSB's bias reporting *form*, it criticizes LCSB's entire bias reporting *system*. FAC ¶¶ 97–112 (using the phrases "bias reporting system," "bias response system," and "bias incidents" 13 times, but referencing the phrase "bias reporting form" 0 times). LCSB's declaration that it will not use its original bias reporting form does not establish that it has abandoned its "bias reporting system." Indeed, even if LCSB were to submit a declaration to that effect, such a declaration would not suffice because Fourth Circuit precedent requires an "'unconditional and irrevocable' agreement that prohibits [the government] from returning to the challenged conduct." *Porter v. Clark*, 852 F.3d 358, 364 (4th Cir. 2017). Moreover, it is public knowledge that that LCSB's Bias System is still in effect. *See* Scott Gelman, *How Loudon Co. schools are responding to rise in hate incidents*, WTOP News (June 10, 2023, 9:18 AM).[4] As recently as last month, LCSB's Equity Committee claimed it had recorded 861 "incidents [allegedly] involving hate speech or racial slurs" in the 2022-2023 school year. *Id.*

### 2.   LCSB cannot meet the high standard required to avoid application of the voluntary cessation exception.

Even if discontinuing the use of a single form utilized in LCSB's larger Bias System were enough to moot Plaintiffs claims (not so), LCSB still fails to meet the high threshold required under the voluntary cessation exception to mootness.

"It is well settled that a defendant's voluntary cessation of a challenged practice does not

---

school year that starts later this calendar year. If she stops attending LCPS while this lawsuit is pending, I will immediately inform my attorneys, who will inform the Court.").

[4] Available at https://wtop.com/loudoun-county/2023/06/how-loudon-co-schools-are-responding-to-rise-in-hate-incidents.

deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (internal quotation marks omitted). The voluntary cessation exception to mootness serves to prevent "a manipulative litigant from immunizing itself from suit indefinitely, altering its behavior long enough to secure a dismissal and then reinstating it immediately after." *Porter*, 852 F.3d at 364.

"[A] defendant claiming that its voluntary compliance moots a case bears the *formidable burden* of showing that it is *absolutely clear* the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (emphasis added). This heavy burden can only be met in cases where, for example, a defendant "enters into an 'unconditional and irrevocable' agreement that prohibits it from returning to the challenged conduct." *Id.*

LCSB claims that this action is moot because it purportedly discontinued the use of the bias reporting form at issue "in the summer of 2021." Dkt. Nos. 68-1 ¶ 13, 71 at 3. That LCSB claims there is "no intent to reinstate or replace the bias reporting form with any similar reporting form or any other mechanism" at this late stage of the litigation does not change the analysis. Dkt. No. 68-1 ¶ 13. Because LCSB "retains the authority and capacity" to reinstate the bias reporting form or related policies, it is still subject to the voluntary cessation exception to the mootness doctrine. *Porter*, 852 F.3d at 364.

### 3.  Other Circuits have found the voluntary cessation exception applies in similar "bias reporting" contexts.

Further, this Court should follow Fifth and Sixth Circuit holdings from analogous cases involving school bias reporting programs, which held that a school's decision to reverse or undo those policies in response to litigation did not moot claims for equitable or declarative relief. *See Speech First, Inc. v. Fenves*, 979 F.3d 319 (5th Cir. 2020) (finding a university's decision to change the language of certain policies related to its bias reporting program did not moot

19

plaintiff's First Amendment claims); *Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019)

(same).

Both the Fifth and Sixth Circuits considered three factors in determining that the public

schools' decisions to change the wording of various policies did not moot the litigations: "(1) the

absence of a *controlling statement* of future intention; (2) the suspicious timing of the change;

and (3) the university's continued defense of the challenged policies." *Fenves*, 979 F.3d at 328

(emphasis added); *see also Schlissel*, 939 F.3d at 769–70. These factors, applied here, show that

LCSB's conduct falls under the voluntary cessation exception and, therefore, Plaintiffs claims

are not moot.

***First***, as explained in Section B.1 above, LCSB's Bias System policies are still being

enforced, regardless of whether LCSB continues to use its original reporting form. *See* Gelman,

*supra*. In addition to the bias reporting form, LCSB's policy has always been to encourage

children to report bias incidents to a school administrator. *See* Rae Decl. Ex. D at LCSB004571.

Because LCSB has not made any statement of its future intentions regarding its Bias System as a

whole, let alone a *controlling statement*, this factor favors Plaintiffs.

***Second***, the timing of LCSB's purported decision to "discontinue[] all use of the bias

reporting form," Dkt. No. 68-1 ¶ 9, is highly suspicious. *See Schlissel*, 939 F.3d at 769 (finding

the plaintiff's claims were not moot when the "timing of the University's change . . . raise[d]

suspicions that its cessation [was] not genuine" because the policy changes occurred in response

to the litigation). Plaintiffs initiated this litigation on June 2, 2021. Dkt. No. 1. LCSB vaguely

asserts that it abandoned its bias reporting form "in the summer of 2021," while neglecting to

specify a date (or even a month) on which it made that decision. Dkt. No. 68-1 ¶ 9. The 2020-

2021 school year ran until June 15,[5] so any decision to discontinue use of the reporting form would necessarily have come after this litigation was filed at least two weeks earlier. Not only does it appear LCSB changed at least one policy (use of the reporting form) in response to this litigation, but LCSB waited until after the Fourth Circuit's appellate decision to even inform Plaintiffs or this Court of that development. Therefore, as in the *Speech First* decisions, LCSB's timing here bolsters a finding that the voluntary cessation exception applies. *See Fenves*, 979 F.3d at 329; *Schlissel*, 939 F.3d at 769.

**Third**, like the defendants in the *Speech First* cases, LCSB continues to defend its original policies related to its Bias System. *See Fenves*, 979 F.3d at 329 ("Finally, Fenves continues to defend the original policies originally as it did in the district court."); *Schlissel*, 939 F.3d at 770 ("Significantly, the University continues to defend its use of the challenged definitions. Although not dispositive, the Supreme Court has found whether the government 'vigorously defends the constitutionality of its . . . program' important to the mootness inquiry."). Despite claiming to have abandoned its bias reporting form (while not abandoning its Bias System generally), LCSB has defended its system and form throughout this litigation. It was not until the Fourth Circuit decided Plaintiffs have standing to assert claims challenging the Bias System that LCSB changed its tune.

---

[5] Rae Decl. Ex. G (downloaded from BoardDocs, which is a contractor website service that LCPS uses to organize and house documents for LCSB, available at https://go.boarddocs.com/vsba/loudoun/Board.nsf/files/BG7HUK47290C/$file/Calendar%20Opt ions%20B-D%20with%20chart%20for%20information%20item.pdf); *see also* John Battiston, *Loudoun County School Board adopts calendar for 2020-2021 school year*, Loudoun Times-Mirror (Oct. 29, 2019), https://www.loudountimes.com/news/loudoun-county-school-board-adopts-calendar-for-2020-2021-school-year/article_60f257bc-f9ef-11e9-a1aa-1faec 55bc765.html#:~:text=The%202020-2021%20school%20year%20will%20begin%20for%20 students,last%20day%20of%20classes%20will%20be%20June%2015 (noting that LCSB voted to approve "Draft Option D" as the 2020-2021 school year calendar).

Because LCSB "has not put forth enough evidence to satisfy its burden to show that its voluntary cessation makes it 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur,'" this Court should find Plaintiffs' remaining claims are not moot. *Schlissel*, 939 F.3d at 770 (quoting *Friends of the Earth*, 528 U.S. at 189).

## CONCLUSION

Because there is no genuine issue as to any material fact, this Court should: (1) find that LCSB's enforcement of its Bias System policies has chilled Plaintiffs' speech in violation of their First and Fourteenth Amendment rights; (2) reject Defendant's argument that Plaintiffs' claims are moot; and (3) enter summary judgment in Plaintiffs' favor.

Dated: July 31, 2023                   Respectfully Submitted,

                                       /s/ *Emily Rae*
                                       Emily Rae, Esq. (admitted *pro hac vice*)
                                       Reilly Stephens, Esq. (admitted pro hac vice)
                                       Liberty Justice Center
                                       440 N. Wells Street, Suite 200
                                       Chicago, IL60654
                                       (312) 637-2280 (main number)
                                       (312) 263-7702 (facsimile)
                                       erae@ljc.org
                                       rstephens@ljc.org
                                       *Attorneys for Plaintiffs*

                                       /s/ *Anthony J. Tamburro*
                                       Anthony J. Tamburro (VSB No. 96539)
                                       SETLIFF LAW, P.C.
                                       4940 Dominion Boulevard
                                       Glen Allen, VA 23060
                                       (804) 377-1260 (main number)
                                       (804) 377-1280 (facsimile)
                                       atamburro@setlifflaw.com
                                       *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2023, I E-Filed the foregoing through the Court's ECF system, which will send a copy to:

> Stacy Haney, Esq.
> Andrew Selman, Esq.
> HANEY PHINYOWATTANACHIP PLLC
> 9201 Arboretum Parkway, Suite 160
> Richmond, VA 23236
> Shaney@haneyphinyo.com
> Aselman@haneyphinyo.com
> *Attorneys for Defendant Loudon County School Board*

> /s/ Anthony J. Tamburro
> Anthony J. Tamburro (VSB No. 96539)
> SETLIFF LAW, P.C.
> 4940 Dominion Boulevard
> Glen Allen, VA 23060
> (804) 377-1260 (main number)
> (804) 377-1280 (facsimile)
> atamburro@setlifflaw.com
> *Attorneys for Plaintiffs*