UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| PATTI H. MENDERS, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 1:21-cv-669-AJT-TCB |
| ) | |
| LOUDOUN COUNTY SCHOOL BOARD, ) | |
| ) | |
| Defendant. ) | |

**LOUDOUN COUNTY SCHOOL BOARD'S
MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendant Loudoun County School Board ("School Board"), by counsel, and pursuant to Rules 12(b)(1) and 56 of the Federal Rules of Civil Procedure, states as follows in support of its motion for summary judgment.

**INTRODUCTION**

This lawsuit challenges the constitutionality of the now-defunct "Share, Speak Up, Speak Out: Bias Reporting Form," an online form that was used to collect students' anonymous stories about their experiences of racism, injustice, and inequity. The form's purpose was not to launch investigations or impose discipline, but rather to provide topics for discussion at Student Equity Ambassador meetings and to help determine next steps for professional learning and support for school staff. Far from creating "speech police" who "pass judgment" on their classmates that Plaintiffs portended, Compl. at ¶ 2, or causing a "public disclosure" that somehow "ruin[s] Plaintiffs'] college or career prospects," as Plaintiffs baselessly alleged, Compl. ¶¶ 65–66, the "Share, Speak Up, Speak Out" form was never used for anything but its stated purpose and never resulted in a single investigation, discipline or sanction of any student. When the inflammatory

1

rhetoric and bombastic assertions that have been the hallmarks of the Plaintiffs' case are stripped away, and the factual record—rather than unsubstantiated conjecture—is examined, the Plaintiffs' claims fail.

## **PROCEDURAL HISTORY**

In their First Amended Complaint ("Compl.") [ECF No. 30], Plaintiffs Patti Hidalgo Menders, Scott Mineo, and Jane Doe #2 (collectively, "Plaintiffs") asserted five separate counts on behalf of their minor children, R.M., A.M., and Jane Doe # 5.[1]  Counts I, II, and III, which related to the School Board's Student Equity Ambassador program, have been dismissed [ECF No. 65].  The two claims remaining before the Court—Counts IV and V—relate to the School Board's use of the Share, Speak Up, Speak Out form.  Specifically, Plaintiffs claim that the bias form violates the First and Fourteenth Amendments because it chills speech through content-based speech restrictions (Count IV) and through viewpoint discrimination (Count V).  Plaintiffs seek declaratory and injunctive relief as well as nominal damages and attorney's fees pursuant to 42 U.S.C. § 1988 [ECF No. 30, ¶¶ 107, 112].

Discovery has been completed and this matter is now ripe for summary judgment.  In its July 10, 2023, Order [ECF No. 82], this Court directed the parties to file their motions for summary judgment "giving particular attention to <u>Abbott v. Pastides</u>, 900 F.3d 160 (4th Cir. 2018) and <u>Reyes v. City of Lynchburg</u>, 300 F.3d 449 (4th Cir. 2002).

---

[1] Plaintiffs Jane Doe #1 and #3, the parents of Jane Does # 4 and #6 and John Does # 1 and 2, voluntarily dismissed their individual actions against the School Board [ECF No. 49].

2

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1. In an effort to identify and address deep-seated racial inequities based in part on its past practices, including being one of the last school divisions in the nation to desegregate its schools, the School Board commissioned a Systemic Equity Assessment for the school division in 2019. Action Plans to Combat System Racism ("Action Plans"), at LCSB 000414, the relevant pages of which are attached as Exhibit A[2]; LCPS Comprehensive Equity Plan ("Comprehensive Plan"), at LCSB 000457, the relevant pages of which are attached as Exhibit B.[3] The purposes of the assessment included identifying areas for improvement regarding equitable practices in the school division related to diversity, equity, inclusion, and race. Comprehensive Plan, at LCSB 000457.

2. Guided by the recommendations from the Systemic Equity Assessment, the School Board developed "Action Plans to Combat Systemic Racism" beginning around June 2020. Declaration of Lottie Spurlock dated July 15, 2021, attached as Exhibit C, ("2021 Spurlock Dec."), at ¶ 3. One of the sixteen action items provided that "LCPS will collect qualitative data regarding racial incidents to amplify student voices." Action Plans, at LCSB 000412.

3. As part of the Action Plans, the Student Equity Ambassador ("SEA") program was developed to address racial inequities in the school system by selecting students to participate in meetings meant to amplify the voices of students of color. Action Plans, at LCSB 000413; 2021 Spurlock Dec., at ¶ 4.

---

[2] A complete version of the School Board's Action Plans to Combat Racism was included in the Appendix Supporting Plaintiffs' Motions for Preliminary Injunction and to Proceed Anonymously [ECF No. 9–2].
[3] A complete version of the School Board's Comprehensive Equity Plan was included in the Appendix Supporting Plaintiffs' Motions for Preliminary Injunction and to Proceed Anonymously [ECF No. 9–2].

4. The SEA meetings took place four to five times per school year.  2021 Spurlock Dec., at ¶ 5, and attachments at pages 1–4.

5. A form titled "Share, Speak Up, Speak Out: Bias Reporting Form" ("Share, Speak Up, Speak Out form") was created to identify issues and generate discussion points at SEA meetings.  Action Plans, at LCSB 000412; 2021 Spurlock Dec., at ¶ 14.

6. The Share, Speak Up, Speak Out form provided an opportunity for students to anonymously share their experiences regarding issues of racism, injustice, and inequity and expressly stated, just below the title: "Stories of bias shared through this platform will be used in an anonymous manner for the Share, Speak Up, Speak Out sessions with Student Equity Ambassadors."  2021 Spurlock Dec., at ¶ 13; Share, Speak Up, Speak Out: Bias Reporting Form, attached as Exhibit D ("Form"), at LCSB 000535.

7. The Share, Speak Up, Speak Out form further explained that "This process provides information to LCPS leadership (Specifically the Equity Office) that will be used for the Share, Speak Up, Speak Out sessions, as well as inform next steps for professional learning and support for school staff."  Form, at LCSB 000535.  The first four questions on the form sought basic information including name of school, date of incident, location of incident, and type of incident.  Form, at LCSB 000535–000536.

8. The fifth question on the Share, Speak Up, Speak Out form sought the details of the incident and, again, reiterated that, "Sharing details in this space will contribute to topics used to address biases during the Share, Speak Up, Speak Out sessions with the Student Equity Ambassadors from every middle and high school."  Form, at LCSB 000536.  The form made no reference whatsoever to discipline.  See Form generally, at LCSB 000535–000537.

9. The Share, Speak Up, Speak Out form alluded to the possibility of an investigation only after reiterating yet again, in question 6 that, "The primary purpose of this form is for the Office of Equity to capture stories and incidents of bias in an anonymous manner. Would you like this particular incident investigated by the administrators at your school?" Form, at LCSB 000536. The affirmative answer choice included the statement, "If yes, please provide your name below," referring to question 7, which stated, "Providing your name here will allow the Office of Equity to submit your name to your school for investigation." Form, at LCSB 000536.

10. Once a Share, Speak Up, Speak Out Form was completed and submitted, the response went directly to the Equity Office and was not generally shared with other departments within the school division. 2021 Spurlock Dec., at ¶ 13. The purpose of the information collected from a form was to identify issues and generate discussion points for the "Share, Speak Up, Speak Out" meetings held with the SEAs at which students discuss issues related to increasing equity in the school division. These discussions were meant to allow LCPS to better understand the student experience and develop appropriate plans to ensure the safety and wellbeing of all students. 2021 Spurlock Dec., at ¶ 14.

11. The Share, Speak Up, Speak Out form could "inform, not supersede, LCPS policies and protocols for addressing racial incidents." Action Plans, at LCSB 000412.

12. The Equity Office never had authority to investigate any matters reported through Share, Speak Up, Speak Out forms or to issue any discipline as a result of the submission of a form. 2021 Spurlock Dec., at ¶ 14. Any information included on the form was only sent to school administrators if the student expressly requested and provided their name. 2021 Spurlock Dec., at ¶ 16.

13. No disciplinary action was ever taken as a result of anything provided in the Share, Speak Up, Speak Out form; a student's completing the form was not considered filing a formal complaint with school administration; and the forms did not otherwise replace or supersede any established incident reporting policies.  2021 Spurlock Dec., at ¶ 16.

14. The LCPS Equity Office received approximately fifty-two (52) Share, Speak Up, Speak Out forms in spring of 2021, only ten (10) of which indicated that the student submitting the form wanted their school administrator notified of the contents.  Declaration of Lottie Spurlock dated June 14, 2023, attached as Exhibit E ("2023 Spurlock Dec."), at ¶ 7; 2021 Spurlock Dec., at ¶ 16.

15. While the intent of the Share, Speak Up, Speak Out form was to identify issues for discussion at Share, Speak Up, Speak Out meetings, the submitted forms were ultimately not effective in identifying discussion issues because the responses were either duplicative of issues already identified by the Office of Equity, contained information that was off topic, and/or contained insufficient detail to permit meaningful discussion.  2023 Spurlock Dec., at ¶ 8.

16. The Share, Speak Up, Speak Out form was disseminated to schools and principals for use on April 26, 2021.  Principal Update, attached as Exhibit F, at LCSB 000187.  The LCPS Equity Office discontinued all use of the Share, Speak Up, Speak Out forms in the summer of 2021.  2023 Spurlock Dec., at ¶¶ 9, 13.

17. No student submissions of the Share, Speak Up, Speak Out form ever resulted in any formal investigation or disciplinary action of any student, including Plaintiffs.  2023 Spurlock Dec., at ¶ 11.

18. After discontinuing use of the Share, Speak Up, Speak Out form, neither LCPS nor the Equity Office replaced the form with any similar reporting form or any other mechanism. 2023 Spurlock Dec., at ¶ 12.

19. Neither LCPS nor the Equity Office have utilized the Share, Speak Up, Speak Out form since summer of 2021, and there is no intent to reinstate or replace the form with any similar reporting form or any other mechanism. 2023 Spurlock Dec., at ¶ 12.

## STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine issue as to any material fact and the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c); Estate of Kimmell v. Seven Up Bottling Co., 993 F.2d 410, 412 (4th Cir. 1993). The moving party is not required to expressly negate the opponent's claims. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant's initial burden is satisfied when the non-moving party, after having sufficient opportunity for discovery, "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." Id. at 322.

"The party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but 'must come forward with specific facts showing that there is a genuine issue for trial.'" Emmett v. Johnson, 532 F.3d 291, 297 (4th Cir. 2008) (citing Matshushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–88 (1986)). "Only evidence that would be admissible at trial may be considered for summary judgment purposes." Hunter v. Prince George's County, 36 Fed. Appx. 103, 106 (4th Cir. 2002). "Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law." Francis v. Booz, Allen &

Hamilton, Inc., 452 F.3d 299, 308 (4th Cir. 2006).  The nonmoving party cannot "create a genuine issue of material fact through mere speculation or the building of one inference upon another."  Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985).

The Fourth Circuit has recognized that courts have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial."  Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (internal quotation marks omitted).  The simple existence of an "alleged factual dispute between parties [] will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001) (emphasis in original).

## ARGUMENT

For the reasons set forth below, Plaintiffs' claims for injunctive and declaratory relief must be dismissed as moot and, regardless, the School Board is entitled to summary judgment on the merits of both Count IV and Count V and, therefore, the Plaintiffs are not entitled to any of the relief they seek.

### I.   Plaintiffs' claims for declaratory and injunctive relief are moot.

"The doctrine of mootness constitutes a part of the constitutional limits of federal court jurisdiction."  Wicomico Nursing Home v. Padilla, 910 F.3d 739, 749 (4th Cir. 2018) (citation omitted).  "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  Id. (citation omitted).  "When a case is moot, the court's subject matter jurisdiction ceases to exist."  Id. (citation and internal quotation marks omitted).  Federal Rule of Civil Procedure 12(h)(3) demands that if the court determines at any time that it lacks subject-matter jurisdiction, it has a duty to dismiss the action sua sponte.  See,

e.g., Alvarado v. Austin, No. 1:22-cv-876 (AJT/JFA), 2022 U.S. Dist. LEXIS 237772, *28 (E.D. Va. Nov. 23, 2022). As explained in the School Board's Position Concerning What Issues Remain to be Decided in This Case ("Position Brief") [ECF No. 71], Plaintiffs' claims for injunctive and declaratory relief are moot because the bias reporting form was discontinued in summer of 2021 and never replaced.[4] See Statement of Undisputed Material Facts, supra pp. 1-5, ("Facts") at ¶ 18.[5]

In their Notice of Issues Remaining to be Decided, filed on June 21, 2023, Plaintiffs stated that, "LCPS has not moved to dismiss [Counts IV and V] as moot, and Parents would oppose dismissal on that basis" [ECF No. 69, at p. 2]. Although the court can and should dismiss moot claims without regard to whether a formal motion to dismiss has been filed, see Fed. R. Civ. P. 12(h)(3), the School Board hereby requests dismissal of Plaintiffs' claims for declaratory and injunctive relief as moot, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(h)(3) for the reasons set forth in its Position Brief, which is incorporated herein by reference.[6]

## II. Plaintiffs cannot establish a past restriction or infringement of their First Amendment rights.

In Abbott, 900 F.3d at 169, the Fourth Circuit recognized "an unusual First Amendment argument" in which a plaintiff uses "the concept of constitutional chill[] to establish a *past*

---

[4] The School Board also asserted mootness in its Answer [ECF No. 72].
[5] Moreover, as set forth in Defendant's Answer to Counts IV and V of Plaintiffs' First Amended Complaint, [ECF No. 72, ¶¶ 4–5], R.M. and A.M., the children of Menders and Mineo, respectively, have graduated and are no longer enrolled in LCPS, and, therefore, their claims for injunctive and declaratory relief are moot for this additional reason.
[6] Even if the Plaintiffs' claims for injunctive relief were not moot, they would not be entitled to an injunction because Counts IV and V fail on the merits, for the reasons stated below, see infra section II, and because Plaintiffs have not and cannot establish irreparable harm, lack of an adequate remedy at law, that the balance of hardship tips in their favor, or that the public interest would be served by such relief. See, e.g., Quetel Corp. v. Hisham Abbas, 819 Fed. App'x 154, 157 (4th Cir. 2020). The Plaintiffs were unable to make the necessary showing in support of their motion for preliminary injunction, which this court denied on August 31, 2021, [ECF No. 24] and Plaintiffs have developed no additional record evidence since then that would lead to a different result.

restriction or infringement on protected speech that triggers strict scrutiny under the First Amendment."[7] Id. (emphasis original); see also, Reyes, 300 F.3d at 455 n.8 (considering and rejecting a similar claim of past "chill"). However, such a claim is cognizable only when the asserted "chill" would likely "deter a person of ordinary firmness from the exercise of First Amendment rights." Abbott, 900 F.3d at 169; Speech First, Inc. v. Sands, 69 F.4th 184, 192 (4th Cir. May 31, 2023). In other words, the chilling effect on a plaintiff's First Amendment rights must be objectively reasonable. Id. In addition, when a plaintiff seeks a damages award for a period of past chill, he "must establish that he was deterred from some specific, intended act of expression." Abbott, 900 F.3d 169 (citing Reyes, 300 F.3d at 455 n.8).

As demonstrated below, the Plaintiffs' claims that the bias reporting form unconstitutionally chilled their speech fail[8] for two reasons: (1) they cannot establish that the existence of the bias reporting form would likely deter a person of ordinary firmness from exercising their First Amendment rights and (2) they have not and cannot identify and specific, intended act of expression from which they were deterred. Accordingly, the School Board is entitled to summary judgment.

### A. The School Board's bias reporting form would not likely deter a student of ordinary firmness from the exercise of First Amendment rights.

Because no students were ever disciplined or even investigated as a result of the bias reporting form, the Plaintiffs can only point to the mere existence of the form as the cause of their chilled speech. The Fourth Circuit expressly rejected a similar argument in its recent

---

[7] This is in contrast to the more typical claims for "retrospective damages relief under the First Amendment [which] allege direct prohibitions or limitations on speech" and claims for prospective relief like an injunction that "sometimes rest on the prospect of a future injury in the form of self-censorship or unconstitutionally chilled speech that 'fall[s] short of a direct prohibition.'" Abbott, 900 F.3d at 169.
[8] Counts IV and V both fail for the same reasons and are therefore discussed together.

decision in Speech First, Inc. v. Sands. In Sands, a Virginia Tech policy permitted students to submit complaints of bias incidents to a panel of administrators, who were authorized to send letters inviting both the complaining and responding students to participate in a voluntary conversation. There were no consequences for declining to participate in this meeting. The policy also allowed the administrators to refer the complaint to the office of student conduct, which was done infrequently. Id. at 189. The plaintiff asserted that the bias reporting system chilled student speech in violation of the First Amendment, arguing that it "implicitly threaten[ed] students with discipline if they said something 'biased'" but did not identify any student member who had been the subject of such a report.[9] Id. at 193.

In weighing whether the alleged "chill" was objectively reasonable, the court considered the fact that the panel administrators were not authorized to impose discipline or punish students and that the "referral power" of the panel was no different than the "power" of any member of the university to report a student code violation. Id. at 195. Moreover, none of the panel's referrals resulted in sanctions to any student. Id. Thus, the court held that there was no basis to conclude that an objectively reasonable student would self-censor based on the bias response system[10]. Id. at 194.

The Fourth Circuit's holding in Sands that the mere existence of a bias reporting system is not an objectively reasonable basis to chill speech is consistent with its earlier decision in Abbott, which suggests that a chill on student speech is not objectively reasonable in the absence

---

[9] Rather, the plaintiff, a student organization, relied on the affidavits of four anonymous students who claimed they wanted to distribute literature and collect signatures in support of conservative causes. Id. at 190 n.3.

[10] This conclusion was made in the context of determining whether the plaintiffs in Sands had standing. Despite somewhat relaxed standing requirements in First Amendment chill cases, see, e.g., Cooksey v. Futrell, 721 F.3d 226, 235 (4th Cir. 2013), the plaintiffs nevertheless failed to satisfy the injury-in-fact element. Sands, 69 F.4th at 197.

of a specific complaint and an active and ongoing threat of investigation. In Abbott, the defendant university had adopted a discrimination and harassment policy that provided a mechanism for students to submit complaints of potentially discriminatory or harassing behavior. The policy also provided that the university would "ensure that [the complaint] is fairly and expeditiously investigated and if necessary, appropriate sanctions are assessed." Id. at 164.

Several years after the policy's adoption, the plaintiffs—Abbott, a university student and two student organizations he represented—were granted approval to hold an on-campus "free speech event," at which Abbott made statements and engaged in conduct seemingly intended to offend others. Id. at 165. Almost immediately, the university received several written complaints about the event, asserting that tAbbott's conduct violated the discrimination and harassment policy. Id. The day after the event, the university's Title IX coordinator issued a letter to Abbott enclosing copies of the written complaints, making reference to a "Notice of Charge," and directing him to contact the Title IX office "within the next five (5) working days" to arrange a meeting with the Title IX Coordinator. Id. The letter also informed Abbott that if the matter could not be resolved, the Title IX coordinator "'shall move to investigate the complaint' culminating with a recommendation to the Provost and President of the University" and warning that he should not contact the complainants or discuss the complaints with any member of the university community. Id.

Approximately two weeks later, Abbott met with the Title IX Coordinator, who said that, despite his letter referencing a "Notice of Charge," no one had been charged with violating the discrimination and harassment policy; the meeting was standard university practice to gather information in response to a complaint; and that no decision to investigate had been made. Two

weeks after the meeting, the university notified Abbott that it had found no cause to investigate and there would be no further action on the complaints. Id. at 166.

The Fourth Circuit concluded that upon receiving notification that there would be no investigation, a college student of ordinary firmness would not be deterred from engaging in further speech. Id. at 170–71. The court did recognize that a typical college student "reasonably might be alarmed and thus deterred" by the initial letter from the Title IX coordinator but this was based on several extraordinary factors, including that the letter referred to an attached "Notice of Charge," raised the prospect of an investigation and ultimate recommendation to the university Provost and President, directed the student's attendance at a meeting, and prohibited him from discussing the matter with others. Id. at 171. Moreover, the court made clear that any chill was only reasonable for the "brief time period" from when the student was notified of the formal complaints and possible investigation until he was notified the matter was closed. Id. 171.

Thus, in neither Sands nor Abbott, was the mere existence of a mechanism for students to submit complaints considered an objectively reasonable basis for students to chill their speech. It was only the filing of written complaints, coupled with formal notice to the plaintiff, the directive to attend a meeting, and the prospect of an investigation and ultimate recommendations to top university officials, that "might reasonably" have chilled speech, Abbott 900 F.3d at 171, and none of those extraordinary factors are present in this case.

Unlike the remarkable circumstances in Abbott giving rise to a brief period of reasonable chill, here the is no evidence here that any of the Plaintiff students were ever the subject of any report made using the form, much less that they were notified of any such reports about

13

themselves.[11] Nor is there any evidence that any of the Plaintiffs here were threatened with the prospect of an investigation and resulting recommendations. And none of the Plaintiffs were ever required to meet with school officials about any bias report and then prohibited from discussing the matter with anyone else. Accordingly, none of the factors that supported a finding of an objectively reasonable "chill" in Abbott are present in this case.

Here, as in Sands, there was never any threat of investigation or enforcement.[12] The Equity Office, which received the completed bias reporting forms, had no authority to investigate or impose any discipline. Facts, at ¶ 12. Like Sands, the Equity Office could forward the information to the relevant school's administrator but did so infrequently, and no LCPS student was ever investigated or disciplined as a result of the submission of a "Share, Speak Up, Speak Out" form. Facts, at ¶ 17. Under these circumstances, no student of "ordinary firmness" reasonably could have been deterred from exercising their First Amendment rights by the existence of the form. Accordingly, the School Board is entitled to summary judgment on Counts IV and V.

### B. Plaintiffs were not deterred from any specific, intended acts of expression.

Even if the Plaintiffs could establish an objectively reasonable basis to chill their speech, which they cannot do, their claims still fail because they have not identified any specific expression in which they intended to engage but were deterred by the existence of the Share, Speak Up, Speak Out form. As the Fourth Circuit explained in Abbott, "it is not enough to

---

[11] Moreover, unlike the policy at issue in Abbott, the submission of the bias reporting form here was not considered the filing of a formal complaint with school administration. 2021 Spurlock, ¶ 16.

[12] LCPS's bias reporting form is arguably even less of a deterrent to speech than the university's policy in Sands because here the form was never used for the purpose of inviting the complainant and the subject of a complaint to meet or engage in conversation, as it was in Sands. Indeed, there is no evidence in the record to indicate that any student who was the subject of a report was ever even made aware that their conduct had been reported via the form.

establish that a reasonable person *could* have engaged in self-censorship []. Instead, the plaintiffs must show that the defendants actually caused the asserted First Amendment harm—here by alleging that [the policy] deterred some specific intended act of expression protected by the First Amendment." Abbott, 900 F.3d at 171 (citing Reyes, 300 F.3d at 455 n.8) (emphasis added).

The plaintiffs in Abbott identified the subject of their allegedly chilled speech: marijuana legalization and pro-capitalism. Id. at 170. And they claimed that they were not "'comfortable' engaging in activities similar to the Free Speech Event," they "avoided putting on public events," and "hesitated to engage with students." Id. Notwithstanding these facts, however, the court concluded that because the plaintiffs did not "identif[y] any speech event they had planned or wished to sponsor during the brief time period in question … it does not appear that the plaintiffs can establish a past 'chill' sufficient to sustain their damages claim." Id. at 171.[13] Accordingly, the court upheld the district court's grant of summary judgment to the university. Id.

Similarly, in Reyes, the Fourth Circuit rejected a claim for damages based on past chill because the plaintiff failed to establish that he was deterred from engaging in any specific intended act of expression. 300 F.3d at 451 n.8. The plaintiff in Reyes participated in an anti-abortion protest held at a public high school on November 10, 1997, without first obtaining a parade permit from the city, as required by ordinance. Id. at 451. Several weeks after the protest, the plaintiff was charged with trespassing, disorderly conduct, and violation of the parade ordinance. Id. at 451, 455 n.8. In February of the following year, he sued the city

---

[13] The Seventh Circuit has also recognized that, as related to a bias reporting system, students must make a particularized showing that they would be likely to be reported through such a system because of specific statements that they wished to make but were chilled. Speech First, Inc. v. Killeen, 968 F.3d 628, 639–40 (7th Cir. 2020) (citing Abbott, 900 F.3d at 163, 171).

asserting, among other claims, that his speech was chilled because he "planned another protest but feared arrest, criminal and/or civil prosecution and penalties under the parade ordinance." Id. at 451–52. The only specific protest the plaintiff identified was an anti-abortion protest scheduled for March 13, 1998, a few weeks after he filed suit. Id. at 455 n.8.

Before the March 13 protest occurred, however, the plaintiff was found not guilty on the charge that his November protest had violated the parade ordinance. Then, on March 3, the plaintiff was assured that the parade ordinance would not be enforced against him in the future. On March 10, the parade ordinance was formally repealed by the city and the March 13 protest took place "without incident." Thus, the court concluded, the fear of prosecution related to the ordinance could not have chilled his participation in the March 13 protest. Id.

Although the court did not articulate its reasoning as clearly as it did in its subsequent Abbott decision, it appears that the reason the court concluded that the First Amendment claim was "without merit" was that although the subject of plaintiff's intended expression—anti-abortion—was well established, he identified no specific event or act of expression that was chilled between November 10, 1997 and March 10, 1998, when the ordinance was repealed. Id.; see also Abbott, 900 F.3d at 169, 171 (describing the holding in Reyes).

Like the plaintiffs in Abbott and Reyes, the Plaintiffs have not and cannot establish that they were deterred from any specific, intended acts of expression. At most, the Plaintiffs have identified the subjects about which they wanted to speak. See Compl. at ¶ 62 ("The Plaintiffs' children wish to speak out on CRT, race, and gender identity, and other controversial political issues within the LCPS community."). But no evidence has been adduced in discovery to identify any specific statements that the Plaintiffs wanted to make, any events they wanted to attend, or any other specific act of expression that they wanted to but did not make because of

16

the existence of the "Share, Speak Up, Speak Out" form.  Accordingly, like the plaintiffs in <u>Abbott</u> and <u>Reyes</u>, the Plaintiffs here have failed to establish a necessary element of their claim for nominal damages.   And so, just like the university and city defendants in <u>Abbott</u> and <u>Reyes</u>, respectively, the School Board here is entitled to summary judgment.

## CONCLUSION

WHEREFORE, Defendant Loudoun County School Board respectfully requests that this Court enter an Order granting its motion for summary judgment on Plaintiffs' claims and awarding it such further relief as the Court deems appropriate.

RESPECTFULLY SUBMITTED,

LOUDOUN COUNTY SCHOOL BOARD

<u>/s/ R. Matthew Black</u>
Stacy L. Haney (VSB 71054)
R. Matthew Black (VSB 94663)
HANEY PHINYOWATTANACHIP PLLC
9201 Arboretum Pkwy, Suite 160
Richmond, Virginia 23236
Tel: (804) 500-0310
Fax: (804) 500-0309
shaney@haneyphinyo.com
mblack@haneyphinyo.com
*Counsel for Loudoun County School Board*

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of July, 2023, I have electronically filed the foregoing using the Court's CM/ECF system, which will automatically send email notification of such filing to counsel of record as follows:

>Jeffrey D. Jennings
>Daniel R. Suhr
>Reilly Stephens
>Emily Rae
>LIBERTY JUSTICE CENTER
>208 South LaSalle Street, Suite 1690
>Chicago, IL 60603
>Tel: (312) 263-7668
>Fax: (312) 263-7702
>jjennings@libertyjusticecenter.org
>dsuhr@libertyjusticecenter.org
>rstephens@libertyjusticecenter.org
>erae@libertyjusticecenter.org
>*Counsel for Plaintiffs*

>/s/ *R. Matthew Black*
>Stacy L. Haney, Esq. (VSB 71054)
>R. Matthew Black, Esq. (VSB 94663)
>HANEY PHINYOWATTANACHIP PLLC
>9201 Arboretum Pkwy, Suite 160
>Richmond, VA 23236
>Tel: (804) 500-0301
>Fax: (804) 500-0309
>shaney@haneyphinyo.com
>mblack@haneyphinyo.com
>*Counsel for Loudoun County School Board*